**LILAW INC.**
J. James Li, Ph.D. (SBN 202855, lij@lilaw.us)
Daniel R. Peterson (SBN 326798, petersond@lilaw.us)
1905 Hamilton Avenue, Suite 200
San Jose, California 95125
Telephone: (650) 521-5956
Facsimile:  (650) 521-5955

Attorneys for Plaintiff QUINTARA BIOSCIENCES, INC.

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUINTARA BIOSCIENCES, INC., a California corporation, <br><br> Plaintiff, <br><br> v. <br><br> RUIFENG BIZTECH INC., a California corporation, GANGYOU WANG, an individual, ALEX WONG, an individual, ALAN LI, an individual, RUI SHAO, an individual, and RF BIOTECH LLC, a California limited liability company, <br><br> Defendants. | **Case No.** <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |



**LiLaw Inc.**

Plaintiff Quintara Biosciences, Inc. ("Quintara" or "Plaintiff"), by and through its attorneys of record, hereby complains and alleges against Defendants Ruifeng Biztech Inc. ("Ruifeng"), Gangyou Wang ("G. Wang"), Alex Wong ("A. Wong"), Alan Li ("Li"), Rui Shao ("Shao") and RF Biotech LLC ("RF Biotech") (individually "Defendant" and collectively "Defendants") as follows:

## PARTIES AND NATURE OF ACTION

1.      Plaintiff is a corporation organized under the laws of the State of California having its principal places of business in Hayward, California and Cambridge, Massachusetts.

2.      On information and belief, Defendant Ruifeng is a corporation organized under the laws of the State of California with its principal place of business in Hayward, California.

3.      On information and belief, Defendant G. Wang is an individual residing in Palo Alto, California.

4.      On information and belief, Defendant A. Wong is an individual residing in San Francisco, California.

5.      On information and belief, Defendant Li is an individual residing in San Ramon, California.

6.      On information and belief, Defendant Shao is an individual residing in Mountain House, California.

7.      On information and belief, Defendant RF Biotech is a limited liability company organized under the laws of the State of California with its principal place of business in Hayward, California.

8.      This is an Action for fraud, conversion, breach of duty of loyalty, misappropriation of trade secrets, and unfair competition.

## JURISDICTION AND VENUE

9.      This court has personal jurisdiction over Defendants who reside in California.

10.     The venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1) and 1391(b)(2) because all Defendants are residents of this District and a substantial part of the events or omissions giving rise to the claims in this case occurred in this District.



LiLaw Inc.

11.     This court has subject matter jurisdiction over the federal statutory claims for trade secret misappropriation.

12.     This court has supplemental jurisdiction over state law claim.

## GENERAL ALLEGATIONS
### The Oral Loan Agreement

13.     Quintara was established in April 2005 as an unincorporated entity and was converted to a corporation in January 2011, specializing in the business of DNA sequence analysis, serving customers in both academic and commercial settings. One of the founders of Quintara, Richard Shan, has a Ph.D. in Cellular and Molecular Biology. His co-founder, Sue Zhao, has a Ph.D. in Veterinary Sciences and also a Master of Science degree in Computer Sciences, with many years of bioinformatics experience before founding Quintara. The combination of Dr. Shan's molecular biology expertise and Dr. Zhao's bioinformatics expertise was the foundation of Quintara.

14.     Ruifeng was established in 2013, primarily as a vehicle for G. Wang's investment-based application for permanent residence of the United States, commonly referred to as the "green card." At the time, Quintara was seeking a bank loan to solve a cash flow problem which was caused by the regular delays in its customer's payment cycles. Through an intermediary, G. Wang claimed that he could provide the cash flow loan to Quintara free of interest but with the following conditions to help his Green Card application:

    a.  G. Wang's company, Ruifeng, would pay salaries for all 12 Bay Area employees of Quintara and claim them to be Ruifeng's employees. The salary payments that Ruifeng makes for Quintara would be considered interest-free loans to Quintara. Ruifeng may loan Quintara up to $1 million.

    b.  Quintara would hire Ruifeng as its contractor of sample processing and would repay Ruifeng's loan through the contract payment, albeit with delays of several months.

    c.  When G. Wang obtains his Green Card, he may recall the loan immediately and terminate the agreement.

    d.  When Quintara repays all the $1 million loan, Quintara may terminate the agreement.

15.     Quintara agreed to the proposal by G. Wang and asked to sign a loan agreement. G.

LiLaw Inc.



Wang said there was no need for any agreement in writing and handshake was sufficient. Thus, this agreement is hereafter referred to as the "Oral Loan Agreement."

16.     Pursuant to the Oral Loan Agreement, Ruifeng was essentially a shell company. Every aspect of Ruifeng's business was essentially Quintara's business. In fact, G. Wang seldom came to the office. Even as of the date of filing the complaint, Ruifeng's registered agent for service of process is still one of Quintara's co-founders.

17.     Quintara's owners at the time knew G. Wang needed the Oral Loan Agreement for his investment-based Green Card application. However, they did not understand how the Green Card application worked and were not involved in any manner in the Green Card process. Dr. Richard Shan ("Shan"), a co-owner and the Chief Executive Officer ("CEO") of Quintara, asked G. Wang why he needed the seemingly complicated arrangement for his Green Card application, G. Wang told Shan this was designed by his immigration lawyer and completely legal. The same assurance was also given to Shan directly by the immigration lawyer.

18.     Recently, through the process of preparing for this lawsuit, Quintara's owners learned that the Oral Loan Agreement was G. Wang's scheme to defraud the immigration authority. On information and belief, G. Wang's Green Card application requires him to invest $1 million in Ruifeng to create at least 10 new jobs. Instead of investing $ 1 million dollar in Ruifeng, G. Wang merely lent the money to Quintara as a loan. Instead of creating 10 new jobs, G. Wang merely "borrowed" Quintara's preexisting employees as Ruifeng's employees through the complicated loan arrangement.

### The Void Collaboration Agreement

19.     Around the same time of the Oral Loan Agreement, in 2013, G. Wang also asked Quintara to sign a document entitled "Collaboration Agreement".The Collaboration Agreement purportedly formed a joint venture between Quintara and Ruifeng referred to as the "New Corporation," of which Ruifeng would own 51% and Quintara 49%.

20.     Like the Oral Loan Agreement, G. Wang told Shan that this Collaboration Agreement was needed for his immigration application and was drafted by his immigration lawyer. Quintara understood at the time that there was no actual plan to form the joint venture and it was just a paper



LiLaw Inc.

agreement purely for the purpose of submitting to the immigration authority.

21.     The signing parties of the Collaboration Agreement had no mutual consent as to any terms of the Collaboration Agreement because they both understood it to be a form needed for G. Wang's application instead of a real contract. Indeed, no "New Corporation" was ever formed according to the Collaboration Agreement. Instead, the collaboration between Quintara and Ruifeng proceeded according to the Oral Loan Agreement.

**The Void Lease Termination Agreement**

22.     In September 2017, G. Wang said he needed another favor from Quintara for his Green Card application and asked Quintara to switch the lease of 3563 Investment Boulevard, Suite 2, Hayward, California (the "Office") from Quintara to Ruifeng. Quintara started to lease the Office in June 2017 under its own name. Quintara paid the lease deposit and paid for the renovation of the facility before moving in. The Office was used by Quintara's sample processing operation although it was listed as the registered address for Ruifeng according to the Oral Loan Agreement. G. Wang requested in September 2017 that Quintara agree to switch the tenant for the Office from Quintara to Ruifeng under the Oral Loan Agreement because such a switch was necessary to support his Green Card application. Quintara did not want to do that, but G. Wang assured Shan that the switch would be in name only because Quintara would still be paying the rent albeit paying the rent to Ruifeng for the latter to submit to landlord.

23.     At the time, Shan was in Boston and tried to use that as an excuse not to do the fake switch. But G. Wang told Shan that he would handle everything and he did not need Shan to do anything for the switch. Although Quintara at the time felt this "paper" switch might be G. Wang's way of defrauding the government, G. Wang again assured Shan that it was commonly done in immigration application and was advised by his immigration lawyer. Thus, despite his questions, Shan reluctantly agreed to allow the essentially fake tenant switch. He viewed the arrangement as a form of trust under which Ruifeng would hold the leasehold under its name for the benefit of Quintara and Quintara would continue to be the tenant in fact who would pay the rents and use the Office as before the switch.

LiLaw Inc.

24.     Later, G. Wang told Shan that the lease was successfully switched to Ruifeng and asked Quintara to start paying the rent to Ruifeng so that Ruifeng could pass it to the landlord as Ruifeng's rent payment. It was only recently did Shan find out that G. Wang forged his signature in a Lease Termination Agreement signed in October 2017.

25.     The Lease Termination Agreement is void, not just because of the forged signature, but also because there was never mutual consent as to actually replace Quintara with Ruifeng as the tenant and there was no actual tenant switch after the Lease Termination Agreement was executed with forged signature. Instead, after the signing of the Lease Termination Agreement by G. Wang using forged signature, Quintara continued to pay the rent and continued to occupy the space the same way as it did before the switch.

### Termination of the Oral Loan Agreement

26.     In early 2019, Quintara learned that G. Wang received his Green Card. At the time, Quintara had repaid all the loan money from Ruifeng and thus asked G. Wang to terminate the Oral Loan Agreement. G. Wang claimed on one hand that the loan had not been completely paid off and on the other hand asked Quintara not to terminate the agreement until end of 2019, saying he still needed the arrangement under Oral Loan Agreement. G. Wang also promised that he would allow the agreement being terminated toward the end of 2019 regardless of his immigration status.

27.     On or about December 26, 2019, Quintara again brought up the termination matter with G. Wang. G. Wang again asked to continue the "collaboration." This time, however, G. Wang started to claim that there was a joint venture company between Quintara and Ruifeng and that Ruifeng owned 51% of the joint venture. G. Wang stated that Ruifeng owns 51% of the assets of Quintara's laboratory located in the Office based on the joint venture ownership. At the time, Quintara had long forgotten the Collaboration Agreement that it signed for G. Wang for his immigration application. In any event, the Collaboration Agreement had never been performed in any way. No "New Company" was ever formed, no Employment Identification was ever applied for the New Company, and the New Company has never had any accounting ledgers or paid any corporate tax. Such joint venture only existed in G. Wang's imagination notwithstanding the Collaboration



LiLaw Inc.

Agreement.

28.     Quintara rebutted G. Wang's claim of 51% ownership by Ruifeng of Quintara's laboratory. Shan wrote an "ultimatum" to G. Wang on December 31, 2019:

> Dear Mr. Wang,
> The collaboration is primarily between Ruifeng and Quintara. Sue, Wentao and I are founders and shareholders for Quintara biosciences. Torno is Quintara's chief financial officer. That is why I need to bring them on board. Quintara used your money years ago for its own development in the form of Ruifeng company. As a return, Quintara outsourced its Sanger sequencing operation in the Bay Area to Ruifeng. One motivation for you to run Sanger sequencing operation is to have certain number of people employed for your immigration petition. Sue and Torno have put in a lot of efforts in helping to manage the finance and transactions between Quintara and Ruifeng. Money is the key point to connect Ruifeng and Quintara. We (Quintara) think we no longer owe money to Ruifeng. All the fund Quintara used has been returned to you in forms of compensation for your assistant, your wife and yourself, and your Sanger sequencing unrelated expenses. If you have dispute on financial term, you need to communicate in writing to Quintara's CFO. Quintara does not have any obligation to further this collaboration as we do not owe any money to you or Ruifeng. Phasing out our collaboration at the end of 2019 has been discussed and agreed by both sides earlier this year (2019).You can run Ruifeng in whatever way as you like. Anyone from Quintara side will not involve in Ruifeng. Quintara needs to focus on its own business. Sanger sequencing operation will be moved back to Quintara in 2020. There will be very little intersection between Ruifeng and Quintara in 2020.

### The Raiding of Quintara's Employees and Conversion of Quintara's Tangible Assets

29.     Upon learning Quintara's determination to terminate the Oral Loan Agreement, G. Wang started a process of misappropriating Quintara's sequencing business assets and raiding its employees so that Ruifeng could essentially take over Quintara's Bay Area business.

30.     G. Wang's plan is rather sinister—he basically turned all things that Quintara had done for Ruifeng for the sole purpose of helping his Green Card application into genuine facts. In February 2020, G. Wang told Quintara's Shan that since Ruifeng is the named tenant of the Office, Ruifeng would start to pay rent itself, instead of taking the rent payment from Quintara as it had been doing since the fake tenant switch in October 2017. Quintara disagreed and sent the payment directly to the landlord. That was when Shan discovered the Lease Termination Agreement with his forged signature. The landlord of course refused to take rent payment from Quintara based on the Lease



**LiLaw Inc.**

Termination Agreement. Quintara then wired the rent to Ruifeng's bank account.

31.    Meanwhile, G. Wang worked on many Quintara employees to lure them to leave Quintara and join Ruifeng. Some of the employees that G. Wang contacted were employees whom he had borrowed from Quintara for his Green Card application, including Defendants A. Wong and Li. By no later than February 15, 2020, G. Wang had successfully recruited Defendant A. Wong, Li, and Shao and the latter three had started working for Ruifeng while they were still Quintara's employees.

32.    A. Wong was the first employee hired by Plaintiff in 2007 and was until recently Plaintiff's Laboratory Manager who managed the entire operation of Plaintiff's Bay Area operations.

33.    Li was until recently Plaintiff's Account Manager.

34.    Shao was until recently Plaintiff's Lead Technician.

35.    Apparently, G. Wang initially planned to purchase his own sequencer or at least he promised A. Wong and Shao he would do so. But by February 2020, G. Wang still had not purchased any sequencer. He had other plans for acquiring a sequencer: He planned to take Quintara's.

36.    On March 9, 2020, G. Wang changed the locks of the Office, effectively locking out Quintara other than those who had signed up to work for Ruifeng. Quintara reported to the police, but G. Wang was able to convince the police that Ruifeng was the lawful tenant using the lease termination agreement with forged signature of Shan. Quintara then asked G. Wang to return all of Quintara's  equipment located in the Office. G. Wang refused, claiming Ruifeng was the majority owner of the equipment based on the fake Collaboration Agreement.

37.    All the tangible assets of the Office belonged to Quintara. By locking out Quintara and refusing to return the tangible assets of the Office, G. Wang, along with his co-conspirators A. Wong, Li, and Shao, have converted these assets. The converted assets include, but are not limited to, computers, printers, office and laboratory furniture, scientific instruments such as DNA analyzers, thermocyclers, centrifuges, electrophoresis, as well as laboratory consumables such as pipette tips, enzymes, and DNA sequencing primers (collectively the "Tangible Assets").

38.    Defendants G. Wang, A. Wong, Li, and Shao committed the conversion of the tangible assets of Quintara for their own unjust enrichment and also on behalf and for the benefit of Ruifeng.



LiLaw Inc.

39.     On June 4, 2020, Li registered RF Biotech LLC located at the address of the Office. On information and belief, Defendants have been using RF Biotech as their new operating entity to pitch to many if not all of Quintara's Bay Area customers and also customers in the states of Wisconsin and Colorado. On information and belief, RF Biotech has misappropriated all the equipment of Quintara that Defendants converted through the March 9, 2020 lock out of Quintara.

**The Misappropriation of Trade Secrets**
**Through Conversion and Breach of Confidentiality Agreement**

40.     Over the years, Quintara developed many valuable business and technology trade secrets, many of which have been misappropriated by Defendants through conversion of Quintara's equipment containing the trade secrets.

41.     Defendants have converted a total of 10 desktop computers and one server computer of Quintara. Defendants had ready access to the contents of computers immediately upon the conversion on March 9, 2020, because co-defendants A. Wong, Li, and Shao were granted access to the contents of the computers pursuant to their employment status with Quintara.

42.     Defendants have the following Quintara's trade secrets contained in the computers which they have converted and are currently using:

 a. Quintara's customer database including names, addresses, and contact information of every customer.

 b. Quintara's customer profile database including services or products each customer has purchased from Quintara, the amount of money it has spent with Quintara, analysis of what other products and services of Quintara that each customer may also be interested in based on its purchase behavior.

 c. Quintara's marketing plan for its existing products and services.

 d. Design information of potential new products and services that Quintara is currently developing as well as its plan to commercialize these products and services.

 e. Quintara's database of external vendors, partners, and consultants for products and pricing.



Case No.

f.   Computer informatics (i.e., software) that Quintara developed including (1) informatics for Sanger Sequencing automation, image processing, and data quality control, as well as for automatic data delivery; and (2) informatics for mobile online order tracking.

g.   Customized reagents and protocols for Sanger Sequencing services that Quintara developed in-house, including workflow, lab protocol, and reagent kits suited for different kinds of customer samples.

h.   New product designs of Quintara's special reagent kits for DNA amplification, DNA cleanup, and DNA sequencing. One of the new products, which Quintara is currently testing and very close to launching, has a potential market size over $300 million.

i.   Quintara's new DNA Donor Technology for effective and precise CRISPR-based genome editing.

43.   The above list of information items are Quintara's confidential information and are referred to hereinafter as the "Confidential Information."

44.   Defendants acquired the Confidential Information through improper means including conversion and breach of confidentiality agreement. Defendants A. Wong, Li, and Shao each signed a confidentiality agreement with Quintara which was entitled "Privacy Policy for Quintara Biosciences, Inc." (hereinafter the "NDA").

45.   The NDA for A. Wong, Li, and Shao states in relevant part that

By signing this privacy policy form, you hereby agree to abide by the rules set forth below. Any infarction to any or part of these rules may result in termination of employment and even prosecution by law …. This agreement holds even after you have left Quintara Biosciences, Inc. …

I. Technical information learned at Quintara Biosciences, Inc.
a. This includes all protocols used to process samples, any reagents, methods/techniques, equipment. Such information should not be shared/discussed with people outside of Quintara Biosciences, Inc.

II. Customers and their personal information/their samples and data information: a. Customer's personal information is strictly private. We have information such as phone numbers, email addresses, physical addresses for purposes of contacting them for sample pick up, questions regarding their samples, sending them results of their samples, and billing. Any use of their personal information that is not related to the customer/vendor relationship



LiLaw Inc.

with Quintara Biosciences, Inc. is forbidden. Needless to say, such information should not be revealed to people, institutions, organizations and so on, that is not affiliated with Quintara Biosciences, Inc.
b. Customer's sample/results information should not be discussed freely with people outside of Quintara Biosciences, Inc. Because there are also competing labs that may be working on similar research area, we should only send results back to the person who submitted the samples. Also, with private companies, Quintara Biosciences, Inc. does have confidentiality agreements in place with very similar conditions.

III. Internal information relating to Quintara Biosciences, Inc., such as , but not limited to, financial standing; financial information regarding customers, vendors or employees; expansion/contraction plans; marketing plans; computer software (especially internally developed ones); employee information, etc.

# COUNT ONE
## FRAUD
### (Against Defendant G. Wang)

46.     Plaintiff re-alleges the allegations of the foregoing paragraphs as if fully set forth herein.

47.     G. Wang has defrauded Quintara in several aspects. First, G. Wang made intentional misrepresentations to Quintara regarding the reasons for him to enter into the Oral Loan Agreement. G. Wang falsely represented to Quintara that the Oral Loan Agreement was a legitimate way of supporting his Green Card application while in fact it was his fraudulent design to provide fake qualifications to the immigration authority in terms of meeting the standards for at-risk investment and for hiring 10 employees. Under the Oral Loan Agreement, his "investment" of $1 million was not at risk as required by the law, but a loan to Quintara that guarantees return of the principal. Contrary to what he represented to Quintara, G. Wang's way of "borrowing" employees to support his Green Card application was not legitimate way of meeting the legal standard under the immigration law. G. Wang in fact committed fraud on the United States government and deceived Quintara into assisting him with the fraudulent acts by promising the $1 million dollar loan to Quintara.

48.     Second, G. Wang defrauded Quintara into signing the Void Collaboration Agreement by representing as a paper requirement for his Green Card application, while in fact he was planning



LiLaw Inc.

to use it later to make the false claim that he is currently making to justify his conversion of Quintara's equipment and trade secrets.

49.   Third, G. Wang defrauded Quintara into orally agreeing to allow him to change the tenant of the Office from Quintara to Ruifeng to temporarily help with his Green Card application while in fact he was planning to permanently change the lease to prepare for the eventual lockout of Quintara from its own office.

50.   Quintara has justifiable relied on G. Wang's misrepresentations and false promises and has suffered significant damages including loss of tangible properties and intellectual properties as well as its entire office in the Bay Aera to G. Wang and Ruifeng.

51.   In conducting these fraudulent acts, G. Wang has acted with malice, oppression, and fraud, which entitles Quintara to recover punitive damages.

# COUNT TWO
## CONVERSION OF TANGIBLE ASSETS
### (Against All Defendants)

52.   Plaintiff re-alleges the allegations of the foregoing paragraphs as if fully set forth herein.

53.   The Tangible Assets are owned by Quintara. Defendants took possession of the Tangible Assets when they locked out Quintara in March 2020. Quintara has never consented to its being locked out of the Office or Defendants' possessing of the assets. Defendants have since refused to return the assets to Quintara.

54.   Plaintiff has been damaged significantly by Defendants' conversion of the Tangible Assets including but not limited to the fair market value of the assets and the lost profit caused by the loss of the use of the assets.

55.   Defendants have acted willfully and fraudulently to convert the Tangible Assets.

# COUNT THREE
## BREACH OF DUTY OF LOYALTY
### (Against Defendants G. Wang, A. Wong, Li, and Shao)





56.     Plaintiff re-alleges the allegations of the foregoing paragraphs as if fully set forth herein.

57.     Defendants A. Wong, Li and Shao were all employees of Quintara and owed the duty of loyalty to Quintara.

58.     While they were still working for Quintara, A. Wong, Li, and Shao breached their duty of loyalty to Quintara. They conspired with G. Wang to take Quintara's Tangible Assets and Confidential Information to form a competing company under Reifeng, which was later named RF Biotech LLC.  They spent their work hours, when they were supposed to work for Quintara, to work on their conspiracy and resigned only when they were ready to operate under a competing entity.

59.     Plaintiff has been damaged significantly by the breach of duty of loyalty.

60.     Defendants have acted willfully and fraudulently to convert the Tangible Assets.

61.     Defendant G. Wang is jointly and severally liable with Defendants A. Wong, Li, and Shao because of the civil conspiracy among these individual defendants.

## COUNT FOUR
### Misappropriation of Trade Secrets under 18 U.S.C. § 1836
### (Against All Defendants)

62.     Plaintiff re-alleges the allegations of the foregoing paragraphs as if fully set forth herein.

63.     Quintara's Confidential Information is Quintara's trade secret. Quintara is the owner of the Confidential Information. The Confidential Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

64.     Quintara has taken reasonable measures to keep the Confidential Information secret by, among other things, limiting access to its trade secret information, guarding electronic access points to the information, and requiring employees to sign confidentiality agreements.

65.     Quintara's trade secrets at issue are related to a product or service used in, or intended



LiLaw Inc.

for use in, interstate or foreign commerce through its offices located in various states. Thus, the trade secrets are covered by the federal trade secret act, 18 U.S.C. § 1836.

66.     Defendants acquired Quintara's trade secret information in improper and unlawful manners, including fraud, conversion of the Tangible Assets, breach of duty of loyalty, and breach of confidentiality agreements.

67.     As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiff has suffered damages exceeding millions of dollars although the precise amount of the damages is to be proved at trial. Plaintiff is entitled to recover such damages caused by misappropriation of trade secrets under 18 U.S.C. § 1836(b)(3)(B)(i).

68.     Defendants' misappropriation of Plaintiff's trade secret information was willful and malicious, further entitling Plaintiff to recover exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and its attorneys' fees and costs under 18 U.S.C. § 1836(b)(3)(D).

69.     Under 18 U.S.C. § 1836(c), this Court has the original federal jurisdiction over this claim.

70.     On information and belief, if Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit and to Plaintiff's detriment Plaintiff's trade secret information.

71.     Because Plaintiff's remedy at law is inadequate, Plaintiff seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and other legitimate business interests. Injunctive relief is necessary to eliminate the commercial advantage that otherwise would be derived from Defendants' continued misappropriation of Plaintiff's trade secret information.

## COUNT FIVE
### Unfair Competition under Cal. Bus. and Prof. Code §17200 *et seq*
### (Against All Defendants)

72.     Plaintiff re-alleges the allegations of foregoing paragraphs, excluding all paragraphs containing allegations of misappropriation of trade secrets, as if fully set forth herein.



LiLaw Inc.

73.     Defendants' conducts are fraudulent and unlawful business practices in violation of the unfair competition law of California, Cal. Bus. and Prof. Code §17200.

74.     As a result of Defendants' acts, Plaintiff has suffered harm and is entitled to recover damages, the exact amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against Defendants that the Court shall:

    a.     Impose preliminary and permanent injunction against Defendants;

    b.     Award compensatory damages according to the proof;

    c.     Award punitive and exemplary damages to deter similar wrongdoings;

    d.     Award prejudgment interest at the maximum legal rate as allowed by the law;

    e.     Award reasonable attorney's fees according to the proof;

    f.     Award costs of suit herein incurred; and

    g.     Award such other and further relief as the Court may deem proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: July 17, 2020            **LiLaw Inc.**

By  /s/ J. James Li

J. James Li, Ph.D.
Attorneys for Plaintiff Quintara Biosciences Inc.

**LiLaw Inc.**

