1
2
3
4
5
6

**LILAW INC.**
J. James Li, Ph.D. (SBN 202855, lij@lilaw.us)
Daniel R. Peterson (SBN 326798, petersond@lilaw.us)
Andrew Pierz (SBN 292970, pierza@lilaw.us)
1905 Hamilton Avenue, Suite 200
San Jose, California 95125
Telephone: (650) 521-5956
Facsimile:  (650) 521-5955

Attorneys for Plaintiff QUINTARA BIOSCIENCES, INC.

7
8
9
10

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17
18
19
20

| | |
|---|---|
| QUINTARA BIOSCIENCES, INC., a California corporation,<br><br>        Plaintiff,<br><br>        v.<br><br>RUIFENG BIZTECH INC., a California corporation, GANGYOU WANG, an individual, ALEX WONG, an individual, ALAN LI, an individual, RUI SHAO, an individual, and RF BIOTECH LLC, a California limited liability company,<br><br>        Defendants. | **Case No.  3:20-cv-04808-WHA**<br><br>**FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

21
22
23
24
25
26
27
28



Plaintiff Quintara Biosciences, Inc. ("Quintara" or "Plaintiff"), by and through its attorneys of record, hereby complains and alleges against Defendants Ruifeng Biztech Inc. ("Ruifeng"), Gangyou Wang ("G. Wang"), Alex Wong ("A. Wong"), Alan Li ("Li"), Rui Shao ("Shao") and RF Biotech LLC ("RF Biotech") (individually "Defendant" and collectively "Defendants") as follows:

## PARTIES AND NATURE OF ACTION

1. Plaintiff is a corporation organized under the laws of the State of California having its principal places of business in Hayward, California and Cambridge, Massachusetts.

2. On information and belief, Defendant Ruifeng is a corporation organized under the laws of the State of California with its principal place of business in Hayward, California.

3. On information and belief, Defendant G. Wang is an individual residing in Palo Alto, California.

4. On information and belief, Defendant A. Wong is an individual residing in San Francisco, California.

5. On information and belief, Defendant Li is an individual residing in San Ramon, California.

6. On information and belief, Defendant Shao is an individual residing in Mountain House, California.

7. On information and belief, Defendant RF Biotech is a limited liability company organized under the laws of the State of California with its principal place of business in Hayward, California.

8. This is an Action for fraud, conversion, breach of duty of loyalty, misappropriation of trade secrets, and unfair competition.

## JURISDICTION AND VENUE

9. This court has personal jurisdiction over Defendants who reside in California.

10. The venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1) and 1391(b)(2) because all Defendants are residents of this District and a substantial part of the events or omissions giving rise to the claims in this case occurred in this District.

LiLaw Inc.

11.     This court has subject matter jurisdiction over the federal statutory claims for trade secret misappropriation.

12.     This court has supplemental jurisdiction over state law claim.

## GENERAL ALLEGATIONS
### The Oral Loan Agreement

13.     Quintara was established in April 2005 as an unincorporated entity and was converted to a corporation in January 2011, specializing in the business of DNA sequence analysis, serving customers in both academic and commercial settings. One of the founders of Quintara, Richard Shan, has a Ph.D. in Cellular and Molecular Biology. His co-founder, Sue Zhao, has a Ph.D. in Veterinary Sciences and also has a Master of Science degree in Computer Sciences, with many years of bioinformatics experience before founding Quintara. The combination of Dr. Shan's molecular biology expertise and Dr. Zhao's bioinformatics expertise was the foundation of Quintara.

14.     On information and belief, Ruifeng was established in 2013, primarily as a vehicle for G. Wang's application for L-1 nonimmigration visa of the United States. As shown on the official website of U.S. Citizenship and Immigration Services ("USCIS"), the L-1 visa application required G. Wang to show that he was in a "managerial or executive" position in a foreign company which had sent him to the U.S. "to establish a new office." *See* https://www.uscis.gov/forms/explore-my-options/l-visas-l-1a-and-l-1b-for-temporary-workers. The "new office" must have "a physical location" *id.* and must have the financial ability to compensate the employee and begin doing business in the United States." https://www.uscis.gov/working-in-the-united-states/temporary-workers/l-1b-intracompany-transferee-specialized-knowledge.[1]

15.     On information and belief, G. Wang also used Ruifeng and his L-1 visa based thereon to apply for the U.S. immigration visa EB-1 (i.e., green card) which requires the evidence that Ruifeng (i.e., the "United States employer") "has been doing business for at least one year" which means "the regular, systematic, and continuous provision of goods and/or services." 8 C.F.R. § 204.5(j)(2).

---

[1] *See* 22 C.F.R. § 41.12 (defining L1 visa as for "Intracompany Transferee (Executive, Managerial, and Specialized Knowledge Personnel Continuing Employment with International Firm or Corporation."); 8 C.F.R. § 214.2(l)(2)(v) &(vi) (the L-1 visa application must present evidence that there is a new office with physical address and business operation).



**LiLaw Inc.**

FIRST AMENDED COMPLAINT

16.     Neither G. Wang nor Ruifeng had done any business related to DNA sequencing or any biological science or technology related businesses before they approached Plaintiff with a proposal to "borrow" Plaintiff's business operation to support G. Wang's L-1 visa and green card application.

17.     In 2013, Quintara was already an established company with 36 employees on the payroll with revenue of more than $3 million per year. G. Wang, through an intermediary, Ms. Wenbo Xu, asked Dr. Shan whether Quintara needed investment. Ms. Xu did not know the business situation of Quintara and she was not in contact with Dr. Shan before and after her introduction of G. Wang to Dr. Shan. Quintara did need capital to expand its business and to solve a cash flow issue caused by the lag of customer payments. G. Wang proposed to Plaintiff a plan to borrow Plaintiff's business operation to support his visa status and green card application by promising to provide a short-term "cash flow" loan to Quintara free of interest for up to $1 million.

18.     Plaintiff and G. Wang eventually reached the following agreement orally:

    a.  As part of the short-term loan, Ruifeng would pay salaries for 9 Bay Area employees[2] of Quintara (the "Payroll Loan") which would enable Ruifeng to claim them to be Ruifeng's employees for G. Wang's L-1 visa and green card application ("L-1/GC application"), while Quintara would repay Ruifeng for the payroll loan within a month or so.

    b.  Ruifeng would pay for some equipment purchases of Quintara (the "Equipment Loan") and to claim such purchase as Ruifeng's equipment in G. Wang's L-1/GC application, while Quintara might delay repayment of the equipment loan by several months depending on its cash flow.

    c.  Quintara would enter a "paper" agreement with Ruifeng for nominally hiring Ruifeng as its contractor for sample processing and would repay Ruifeng's short-term loans through the contractor payment as a formality to allow G. Wang to submit the paperwork to prove Ruifeng had an ongoing business in DNA sequencing, while in fact all the employees, equipment and lab facility were Plaintiff's that were lent to

---

[2] There was an error in the original complaint that states Ruifeng paid for the salaries of 12 employees.



LiLaw Inc.

Ruifeng purely for G. Wang's L1/GC application. Quintara was Ruifeng's only customer.

    d.   When G. Wang finished his L1/GC application, he might recall any unpaid loan immediately and terminate the agreement. Plaintiff might also terminate the agreement after G. Wang received his green card as long as all the loans had been repaid.

19.    Quintara asked G. Wang to sign a written agreement for the loan arrangement. G. Wang said there was no need for any agreement in writing and a handshake was sufficient. Thus, the above agreement is hereafter referred to as the "Oral Loan Arrangement."

20.    Pursuant to the Oral Loan Agreement, Ruifeng was essentially a shell company. Every aspect of Ruifeng's business was "borrowed" from Quintara. In fact, G. Wang seldom came to the office and seldom interacted with the people who actually did the laboratory works.

21.    Although the Oral Loan Agreement for a loan of up to $1 million may sound like a fairy tale in the Western commercial culture, it happens to be the truth in this case because of the special circumstances:

    a.   Both Plaintiff's owners, Drs. Shan and Zhao, grew up in a Chinese culture which relied more on people's words and reputation than on written contracts[3]. In the old days, people seldom used formal contracts for their business dealings. This cultural background of trusting words instead of written contracts was the backdrop for the Oral Loan Arrangement.

    b.   Plaintiff had never had corporate counsel at the time. From the owners' point of view, this Oral Loan Arrangement had very little monetary risk to them. They were borrowing money from G. Wang; not the other way around. The owners believed that as long as they kept detailed accounting records, they had no risks.

    c.   Plaintiff's only concern at the time was whether this Oral Loan Arrangement that allowed Wang to "borrow" its business operation and employees for his L-1/GC application would be illegal. But this concern had nothing to do with whether the arrangement should be oral or written. Further, on this point, G. Wang assured the

---

[3] Things started to change only in recent years due to the increasing commercialization of the Chinese society.



FIRST AMENDED COMPLAINT

owners of Plaintiff that the borrowing scheme was legal because it was designed by his immigration lawyer. Plaintiff even directly consulted the immigration lawyer of G. Wang to ascertain the legality of this business borrowing scheme.

d.  From G. Wang's prospective, this oral arrangement was the only way he could achieve his purpose, because he could not put the agreement in writing to jeopardize his L-1/GC application. Thus, it is completely logical for G. Wang to forgo a written contract for the Oral Loan Arrangement.

e.  G. Wang's risk was also much lower than it might appear at first glance. This was not a deal where G. Wang had to write a check to Plaintiff for a $1 million and where Plaintiff had the discretion on how to spend the money. The actual loan in the form of Ruifeng writing a check to Quintara was $395,000. The rest of the "loan" was in the form of Ruifeng writing checks to third parties for payroll and vendor expenses.

f.  G. Wang's risk was further mitigated by the steady stream of repayments in the form of a service contract. In 2014, which was the first year of the total "loan" of $952,015.85, Quintara paid off $305,611.61. In 2015, Quintara paid off $171,132.25, and in 2016 $ 413,426.53. Thus, by the third year of its term, 93.5% of the loan had already been paid off.

g.  G. Wang's risk was also outweighed by his benefit from the Oral Loan Arrangement. If he had to build a real business operation in the United States from scratch to meet the green card requirement or even to maintain his L-1 visa, Ruifeng would have to spend millions of dollars without any guarantee of success and without any guaranteed timeline. The Oral Loan Arrangement allowed Wang to borrow Quintara's business operation for his L-1/GC application without minimal monetary risks.

**The Sham Collaboration Agreement**

22.   Around the same time of the Oral Loan Agreement, in 2013, G. Wang also asked Quintara to sign a what Chinese call a "paper" document, which means a document of mere formality and having no legal effects, for the sole purpose of his L-1/GC application. This Chinese document is



LiLaw Inc.

entitled "collaboration agreement," an English translation of a copy of the agreement supplied by G. Wang is set forth below:

> Collaboration Agreement
>
> Party A: RUIFENG BIZTECH INC [sic]
> Part B: QUINTARA BIOSCIENCES [sic]
>
> The parties have reached an agreement, through friendly discussions, on joint operation of [a] gene sequencing engineering project as follows:
> (1) Party A invests US $1 million which will be used for purchasing new equipment and office rental for the parties' project.
> (2) Party B uses parts of Party B's existing equipment as investment.
> (3) Party A will own 51% of the new company's shares, and controls the new company's bank account.
> (4) Party B will own 49% of the new company's shares, and manages the new company.
> (5) Party A is an oversee investment and will be responsible for Party A's personal expenses and expenses incurred in management and operation that are unrelated to the [new] company.
> (6) In operating and managing the [new company], Party B shall reach 3.5% annual profit and increase its number of employees by 6 annually.
> (7) The collaboration between Party A and B shall last at least 2 years. After two years the collaboration may continue if Party B guarantees 5% or higher annual profit.
> (8) Party B will operate in a way to guarantee business value and growth, and guarantees to return Party A's $1 million investment in full at the end of the parties' collaboration and will make up for the difference from Party's B's personal funds [if the business fund] is insufficient.
> (9) The parties will negotiate to resolve any unresolved matters under the agreement.

23.     G. Wang told Dr. Shan that this "paper agreement" was needed for his immigration application and was drafted by his immigration lawyer. G. Wang assured Quintara at the time that there was no actual plan to form New Company ("NewCo") or investment any money in NewCo and that the "paper agreement" was purely created to support his green card application. In other words, G. Wang presented Quintara with essentially a sham agreement purely for his L-1/GC application.

24.     Despite its sham nature, it reflected some part of the parties' thinking regarding the so-called "investment"—it was not an equity investment but a form of loan which was to be restored in full to Ruifeng at the end of the parties' collaboration, to the extent that Quintara's owners had to use their personal funds to repay the loan. Thus, this arrangement, even if it were not sham, could not



LiLaw Inc.

have been a *de facto* partnership as G. Wang now contends. A partnership requires that the partners share the profit and loss of the business. Yet, this sham agreement guaranteed that Ruifeng would not lose any money through this arrangement because Ruifeng was guaranteed to have its investment returned in full, even to the extent of tapping into Drs. Shan and Zhao's personal assets. Only a fool, which Drs. Shan and Zhao are obviously not, would have agreed to give away 51% equity for this this phantom investment.

25.     Thus, even assuming the sham contract is real, its terms do not compel G. Wang's contention that Ruifeng owned 51% of Quintara or a phantom partnership. Because the agreement guarantees the "return" of the "$1 million investment in full," when the "investment" is returned to Ruifeng in full, the 51% equity would also be returned.

26.     Quintara has kept detailed accounting record showing that all of the $952,015.85 "loan" of Ruifeng had been repaid by 2019. Thus, even if the sham collaboration agreement were real, which it is not, Ruifeng's 51% equity in the phantom NewCo would have been returned to Quintara by 2019 along with the "return" of the "investment." Ruifeng hence had no right to appropriate Quintara's equipment along with the trade secrets therein in 2020.

### The Sham Service Contract

27.     Two days after signing the sham collaboration agreement, on December 30, 2013, another "paper document" entitled "Contract for Services" was signed. Attached as Exhibit A is a copy of the "service contract" that G. Wang has supplied in this case (portion of ECF 17-6).

28.     Like the sham collaboration agreement, G. Wang presented the purported "service contract" as a "paper document" to be submitted to the U.S. government to support his L-1/GC application with no actual effect other than providing a "paper" pathway for Quintara to repay the short-term loans that Ruifeng was to provide under the Oral Loan Arrangement. Thus, the "service contract" is another sham agreement that G. Wang induced Quintara to sign for his L-1/GC application.

29.     For both the sham collaboration agreement and sham service contract, G. Wang never provided a copy of the signed documents to Quintara in 2013. Quintara was only given these

FIRST AMENDED COMPLAINT



LiLaw Inc.

documents by G. Wang when Quintara terminated the Oral Loan Arrangement toward the end of 2019 and G. Wang purported to enforce the agreements after he finally ran out of excuses to prolong the arrangement. In fact, the signature in the sham service contract (Ex. A at p 5) was not Dr. Shan's signature.  Plaintiff hereby reserves its right to challenge the authenticity of the purported "collaboration agreement" and "servicer contract."

30.     Despite its sham nature, the "service contract" made it clear that Ruifeng and Quintara was not forming any partnership under the contract. Ex. A, § 12.

31.     Quintara was never concerned about the possibility that G. Wang may turn the sham contracts into real ones to harm it. Even a quick glance at the relationship between Ruifeng and Quintara would reveal the sham nature of the "paper" agreements. Ruifeng was not doing any business or having any employees in 2013 when the sham agreements were signed, other than probably a plan to run a restaurant business. The only thing Ruifeng seemed to have done, besides piggybacking on Quintara, was to apply for a liquor license. In contrast, in 2013, Quintara was an established business for the sophisticated DNA sequencing with about 36 employees and have lab operations in both the San Francisco bay area and Boston, and also sales and marketing operations in Wisconsin and Colorado. While G. Wang was a businessman in salt trading, Quintara's founders were Ph.D. scientists with advanced professional trainings. Yet, Ruifeng suddenly becomes a contractor for Quintara for processing DNA samples for the sophisticated DNA sequencing process. Thus, the current contention by G. Wang to convert the sham arrangements into a real business relationship is thus a brazen attempt to defraud the Court.

32.     The sham nature of Ruifeng's arrangement with Quintara did not even fool USCIS, for which such sham arrangement was made because G. Wang's L-1 visa was revoked in September 2017 after USCIS conducted some minimal investigation in 2015.

### USCIS Rejected the Sham Arrangement

33.     On information and belief, using the sham arrangement that he made with Quintara in Ruifeng's name, G. Wang, through his immigration lawyer, was able to obtain an L-1 visa on March 18, 2014, less than three months after the signing of the two sham agreements with Quintara. The

**LiLaw Inc.**



visa was valid until March 17, 2015.

34.     In 2015, G. Wang's immigration lawyer applied for extension of his L-1 status, using the old address of Quintara in Richmond, CA, which was approved on March 25, 2015. The entire application was based on the sham arrangement that borrowed Quintara's operation as Ruifeng's, using Quintara's office address. The application was so unconcerned about its truthfulness that it did not update the address when Quintara moved from Richmond to South San Francisco at the end of 2014, which resulted in Ruifeng being listed as being based on Quintara's old office address in Richmond, CA when G. Wang's visa extension was approved in March 25, 2015, which eventually led to the unravelling of G. Wang's sham arrangement.

35.     Subsequent to the approval of G. Wang's visa extension in 2015, USCIS conducted an "administrative site visit" of Ruifeng's purported office at Quintara's old Richmond address and was told Ruifeng had moved out "a while ago."

36.     On May 26, 2015, a USCIS agent visited Quintara's then office located at 170 Harbor Way, Suite 100, South San Francisco. The agent talked to A. Wong, who was Quintara San Francisco's General Manager at the time, and asked about Ruifeng and G. Wang.  A. Wong responded by saying that he hardly knew G. Wang and assumed he was an investor in Quintara, without knowing anything about Ruifeng, which was supposed to operate from that very office. A. Wong was supposed to be Ruifeng's Sequencing Operating Manager, according to USCIS's account of the site visit. Yet, A. Wong did not even know that he was supposed to be employed by Ruifeng and had no direct interaction with his supposed employers at all, showing the sham nature of Ruifeng's operations. In reality, A. Wong was one of the employees that G. Wang had borrowed to construct his sham business operation to support his L-1/GC application.

37.     Subsequent to the site visit in May 2015, USCIS conducted some further investigations and eventually revoked G. Wang's L-1 visa. Attached as Exhibit B is a true and correct copy of a letter from USCIS to Ruifeng in 2017 revoking G. Wang's visa.

38.     In revoking G. Wang's visa, USCIS noted that evidence of business operation of Ruifeng based on its sham arrangement with Quintara, as shown in Ruifeng's 2015 tax return and wage reports for employees, but found that these evidence did not "establish that [Ruifeng] has been

LiLaw Inc.

doing business to the extent and scope that [it has] claimed." USCIS noted that Ruifeng never rented a space "large enough to accommodate the number and type of employees" as G. Wang claimed. USCIS also noted that Ruifeng in 2017 did not have any "website or links to [its] contact information" that might show it was "actively advertising" its services to the public." The reason for such an obvious defect in the purported business operations of Ruifeng was simply because the sham arrangement does not require Ruifeng to do any business at all.

39.     USCIS also noted the discrepancy between G. Wang's visa application and Ruifeng's tax return. While on its visa petition, Ruifeng was stated to be in the business of "biotech products processing services, distribution, and investment, etc." which was based on its sham arrangement with Quintara, Ruifeng's 2015 tax return described its business as "International Trade" and its products or service as "Trade and Investment." USCIS also noted that the only business operational licenses that Ruifeng had ever applied for was a "liquor license" for an "eating place."

40.     USCIS further noted G. Wang's immigration counsel's attempt to explain away the cold fact that G. Wang was missing in action at its own office—which was Quintara's office location at 170 Harbor Way in South San Francisco—by claiming that Ruifeng at the time merely "temporarily carried on its business operations by using the lab processing facilities owned by Quintara Discovery." USCIS rejected such explanation, noting that the address for Ruifeng on its 2015 tax return was the "170 Harbor Way" location and a purported "sublease" of the premises at the location was from September 1, 2015 to April 30, 2017. USCIS observed that although Dr. Shan was listed as Ruifeng's "Business Development Manager," the site visit revealed that he was actually Quintara's CEO. USCIS rejected G. Wang's assertion that Ruifeng had an ongoing DNA sequencing business because all it had, from office to employees, were Quintara's busines operation.

41.     Consequently, on January 27, 2017, USCIS issues a notice of Intent to Revoke G. Wang's L-1 visa ("ITR"). On February 24, 2017, G. Wang's immigration counsel filed a response to the ITR. The response included letters purportedly from A. Wong and Dr. Shan, which in fact were drafted by G. Wang's immigration attorney. The response did not work. On September 12, 2017, USCIS officially revoked G. Wang's L-1 visa.



LiLaw Inc.

### **The Sham Lease Switch**

42.     Because of the revocation of G. Wang's L-1 visa, G. Wang said he needed to try again to convince USCIS. This time, he stated that one reason for the revocation was that the lease of the Quintara' office was not in the name of Ruifeng and Ruifeng never rented a large enough space for its claimed operation, even on paper. G. Wang asked for another favor from Quintara to switch the lease of 3563 Investment Boulevard, Suite 2, Hayward, California (the "Office") from Quintara to Ruifeng. Quintara started to lease the Office in June 2017 under its own name. Quintara paid the lease deposit and paid for the renovation of the facility before moving in. The Office was used by Quintara's sample processing operation. Knowing the revocation letter from USCIS, Quintara did not want to do another sham agreement, but felt obligated to G. Wang to help him receive his green card because of the Oral Loan Arrangement. In 2017, Quintara still owed G. Wang $243,866.25 from the 2013 loan, which further compelled Quintara to continue supporting G. Wang's sham arrangement. G. Wang again reassured Quintara about the legality of the sham switch, again quoting his immigration lawyer. He pointed out to Quintara that although USCIS rejected his sham arrangement in 2017, it did not say such arrangement was illegal or unlawful.

43.     At the time, Dr. Shan was in Boston and tried to use that as an excuse not to do the sham lease switch. But G. Wang told Shan that he would handle everything and he did not need Shan to do anything for the switch.

44.     Later, G. Wang told Shan that the lease was successfully switched to Ruifeng and asked Quintara to start paying the rent to Ruifeng so that Ruifeng could pass it to the landlord as Ruifeng's rent payment. It was only recently did Shan find out that G. Wang forged his signature in a Lease Termination Agreement signed in October 2017. Neither the rental company "Black Mountain Property Management" nor G. Wang sent a copy of lease termination document to Shan at the time of switch.

45.     The sham lease switch has no effect on Quintara's use of the Office until February 2020. Quintara continued to pay the rent and continued to occupy the space the same way as it did before the switch.

### **Termination of the Oral Loan Agreement**

Case No. 3:20-cv-04808-WHA

LiLaw Inc.

46.     In 2019, G. Wang told Quintara that his L-1 visa or green card was issued. In 2019 Quintara had repaid all the loan money from Ruifeng and thus asked G. Wang to terminate the Oral Loan Arrangement. G. Wang claimed on one hand that the loan had not been completely paid off and on the other hand asked Quintara not to terminate the agreement until end of 2019, saying he still needed the arrangement under Oral Loan Arrangement. G. Wang also promised that he would allow the arrangement being terminated toward the end of 2019 regardless of his immigration status.

47.     On or about December 26, 2019, Quintara again brought up the termination matter with G. Wang. G. Wang again asked to continue the "collaboration." This time, however, G. Wang started to claim that there was a joint venture company between Quintara and Ruifeng and that Ruifeng owned 51% of the joint venture. This was the first time that G. Wang provided the sham collaboration agreement to Quintara to support his claim. G. Wang stated that Ruifeng owns 51% of the assets of Quintara's laboratory located in the Office based on the joint venture ownership. Quintara rejected the claim.

48.     On information and belief, despite the sham lease switch in 2017, USCIS was still not persuaded by G. Wang regarding Ruifeng's business operation, based on G. Wang's responses to Plaintiff's termination of the sham arrangement, as averred below.

### The Raiding of Quintara's Employees and Conversion of Quintara's Tangible Assets

49.     Upon learning Quintara's determination to terminate the Oral Loan Agreement, G. Wang started a process of misappropriating Quintara's sequencing business assets and raiding its employees so that Ruifeng could essentially take over Quintara's Bay Area business.

50.     G. Wang took this measure in response to Plaintiff's termination of the sham arrangement for his green card application. G. Wang's plan was rather sinister—he basically started to claim the sham arrangement was real.

51.     In February 2020, G. Wang told Quintara's Shan that since Ruifeng was the named tenant of the Office, Ruifeng would start to pay rent itself, instead of taking the rent payment from Quintara as it had been doing since the sham lease switch in October 2017. Quintara disagreed and sent the payment directly to the landlord. That was when Dr. Shan discovered the Lease Termination



LiLaw Inc.

Agreement with his forged signature. The landlord of course refused to take rent payment from Quintara based on the Lease Termination Agreement. Quintara then wired the rent to Ruifeng's bank account.

52.     Meanwhile, G. Wang worked on many Quintara employees to lure them to leave Quintara and join Ruifeng. Some of the employees that G. Wang contacted were employees whom he had borrowed from Quintara for his L-1/GC application, including Defendants A. Wong and Li. By no later than February 15, 2020, G. Wang had successfully recruited Defendants A. Wong, Li, and Shao and the latter three had started working for Ruifeng while they were still Quintara's employees.

53.     A. Wong was the first employee hired by Plaintiff and has been on Quintara's payroll since December 1, 2009 and was until recently Plaintiff's Laboratory Manager who managed the entire operation of Plaintiff's Bay Area operations until he resigned on May 31, 2020.

54.     Li was hired by Plaintiff on April 1, 2013 and was until recently Plaintiff's Account Manager.

55.     Shao was hired by Plaintiff on February 1, 2011 and was until recently Plaintiff's Lead Technician.

56.     A. Wong, Li and Shao signed the NDA (defined later) with Plaintiff as part of its employment shortly after their respective starting date of the employment and in any event long before 2016.

57.     In late 2019 or early 2020, G. Wang planned to purchase his own sequencer or at least he promised A. Wong and Shao he would do so. But by February 2020, G. Wang still had not purchased any sequencer. He had other plans for acquiring a sequencer: He planned to take Quintara's.

58.     On March 9, 2020, G. Wang changed the locks of the Office, effectively locking out Quintara other than those who had signed up to work for Ruifeng. Quintara reported to the police, but G. Wang was able to convince the police that Ruifeng was the lawful tenant using the sham lease transfer with forged signature of Shan. Quintara then asked G. Wang to return all of Quintara's equipment located in the Office. G. Wang refused, claiming Ruifeng was the majority owner of the equipment based on the sham collaboration agreement.



LiLaw Inc.

59.     All the tangible assets of the Office belonged to Quintara. By locking out Quintara and refusing to return the tangible assets of the Office, G. Wang, along with his co-conspirators A. Wong, Li, and Shao, have converted these assets. The converted assets include, but are not limited to, computers, printers, office and laboratory furniture, scientific instruments such as DNA analyzers, thermocyclers, centrifuges, electrophoresis, as well as laboratory consumables such as pipette tips, enzymes, and DNA sequencing primers (collectively the "Tangible Assets").

60.     Defendants G. Wang, A. Wong, Li, and Shao committed the conversion of the tangible assets of Quintara for their own unjust enrichment and also on behalf and for the benefit of Ruifeng.

61.     On June 4, 2020, Li registered RF Biotech LLC located at the address of the Office. On information and belief, Defendants have been using RF Biotech as their new operating entity to pitch to many, if not all Quintara's Bay Area customers, and customers in the states of Wisconsin and Colorado.  RF Biotech has misappropriated all the equipment of Quintara that Defendants converted through the March 9, 2020 lock out of Quintara.

62.     Quintara worked extremely hard on recovering its assets held up by G. Wang since the March 9 lockout. On March 15, 2020, Quintara hired the Rimon Law Firm to represent Quintara. Quintara's counsel wrote letters to G. Wang and his lawyer to demand the return of Quintara's properties. Quintara also asked several mutual acquaintances to communicate with G. Wang on recovering Quintara's properties. Unfortunately, none of the mediation efforts had any effect.

63.     One June 6, 2020, Dr. Zhao found direct evidence that A. Wong, Shao, and Li had started to conspire with G. Wang no later than February 15, 2020, from the undeleted text messages left on the company iPhone assigned to A. Wong, which was returned to Quintara after A. Wong resigned on May 31, 2020. Quintara sent the iPhone to Berryhill Computer Forensics, Inc. in Benicia, CA, for forensic recovery on June 12, 2020. The report from forensic inspection led Shan and Zhao to conclude that this was a well plotted case by G. Wang for not only converting Quintara tangible properties, but also stealing Quintara trade secrets and taking over Quintara business. Shan and Zhao engaged LiLaw Inc. to represent Quintara on June 16. 2020.

64.     On information and belief, G. Wang has a backup plan in case his immigration



LiLaw Inc.

application was denied, none of which involved actually developing biotechnology businesses in the United States. In 2018, G. Wang told Shan that he was buying lands and building a casino in the Philippines. G. Wang stated that he would move to Philippines if his immigration petition was denied.

65.     Quintara recently investigated the alleged Chinese parental company of Ruifeng, "Ruixing  Hongye." G. Wang's L-1/GC application based on Ruifeng claimed "Ruixing HongYe" as its foreign parent company, which is required for the application, from 2014 to 2020. Quintara's investigation, however, shows that Ruixing Hongye was registered on October 27, 2011 and was canceled on September 17, 2014. Thus, not only Ruifeng's business operation was a sham arrangement, even its parent company was nonexistent when G. Wang was applying to extend his L-1 visa in 2015 and again in 2017. G. Wang and his immigration attorney fabricated both the business operation and parent company of Ruifeng for his L-1/GC application to USCIS.

66.     G. Wang and Ruifeng also made misrepresentations to the Internal Revenue Services ("IRS") by falsely claiming the phantom business operation and phantom parent company of Ruifeng on their tax returns.

## The Misappropriation of Trade Secrets
## Through Conversion and Breach of Confidentiality Agreement

67.     Over the years, Quintara developed many valuable business and technology trade secrets, many of which have been misappropriated by Defendants through conversion of Quintara's equipment containing the trade secrets.

68.     Defendants have converted a total of 10 desktop computers and one server computer of Quintara. Defendants had ready access to the contents of computers immediately upon the conversion on March 9, 2020, because co-defendants A. Wong, Li, and Shao were granted access to the contents of the computers pursuant to their employment status with Quintara.

69.     Defendants have the following Quintara's trade secrets contained in the computers which they have converted and are currently using:

    a.   Quintara's customer database including names, addresses, and contact information of



every customer.

b.   Quintara's customer profile database including services or products each customer has purchased from Quintara, the amount of money it has spent with Quintara, analysis of what other products and services of Quintara that each customer may also be interested in based on its purchase behavior.

c.   Quintara's marketing plan for its existing products and services.

d.   Design information of potential new products and services that Quintara is currently developing as well as its plan to commercialize these products and services.

e.   Quintara's database of external vendors, partners, and consultants for products and pricing.

f.   Computer informatics (i.e., software) that Quintara developed including (1) informatics for Sanger Sequencing automation, image processing, and data quality control, as well as for automatic data delivery; and (2) informatics for mobile online order tracking.

g.   Customized reagents and protocols for Sanger Sequencing services that Quintara developed in-house, including workflow, lab protocol, and reagent kits suited for different kinds of customer samples.

h.   New product designs of Quintara's special reagent kits for DNA amplification, DNA cleanup, and DNA sequencing. One of the new products, which Quintara is currently testing and very close to launching, has a potential market size over $300 million.

i.   Quintara's new DNA Donor Technology for effective and precise CRISPR-based genome editing.

70.   The above list of information items are Quintara's confidential information and are referred to hereinafter as the "Confidential Information."

71.   Defendants acquired the Confidential Information through improper means including conversion and breach of confidentiality agreement. Defendants A. Wong, Li, and Shao each signed a confidentiality agreement with Quintara which was entitled "Privacy Policy for Quintara Biosciences, Inc." (hereinafter the "NDA").



LiLaw Inc.

72.     The NDA for A. Wong, Li, and Shao states in relevant part that:

By signing this privacy policy form, you hereby agree to abide by the rules set forth below. Any infraction to any or part of these rules may result in termination of employment and even prosecution by law …. This agreement holds even after you have left Quintara Biosciences, Inc. …

I. Technical information learned at Quintara Biosciences, Inc.
a. This includes all protocols used to process samples, any reagents, methods/techniques, equipment. Such information should not be shared/discussed with people outside of Quintara Biosciences, Inc.

II. Customers and their personal information/their samples and data information:
a. Customer's personal information is strictly private. We have information such as phone numbers, email addresses, physical addresses for purposes of contacting them for sample pick up, questions regarding their samples, sending them results of their samples, and billing. Any use of their personal information that is not related to the customer/vendor relationship with Quintara Biosciences, Inc. is forbidden. Needless to say, such information should not be revealed to people, institutions, organizations and so on, that is not affiliated with Quintara Biosciences, Inc.
b. Customer's sample/results information should not be discussed freely with people outside of Quintara Biosciences, Inc. Because there are also competing labs that may be working on similar research area, we should only send results back to the person who submitted the samples. Also, with private companies, Quintara Biosciences, Inc. does have confidentiality agreements in place with very similar conditions.

III. Internal information relating to Quintara Biosciences, Inc., such as , but not limited to, financial standing; financial information regarding customers, vendors or employees; expansion/contraction plans; marketing plans; computer software (especially internally developed ones); employee information, etc.

### Justifiable Reliance

73.     Plaintiff hereby articulate its justifiable reliance on fraud by G. Wang and Ruifeng in response to the Court's order dated October 16, 2020 (the "Order", ECF 28).

74.     As alleged earlier, there are many specifics in this case which made the Oral Loan Arrangement plausible. *See* ¶ 21, *supra*.

75.     One may be incredulous as to whether Plaintiff had any inkling of whether the sham arrangement under the Oral Loan Arrangement was a fraud to USCIS, i.e., lending part of its operation to G. Wang to allow G. Wang to represent it to USCIS as Ruifeng's business operation to



LiLaw Inc.

17

support G. Wang's L-1/GC application. Plaintiff has indeed alleged that he had serious concerns as to whether such arrangement was legal but was assured otherwise not only by G. Wang but by his immigration lawyer who actually devised such scheme. *See* ¶ 21(c), *supra*.

76.     Plaintiff's doubt on the legality of the sham arrangement is not to be confused with his reliance on Wang's representations that he was only going to use the sham documents to support his L-1/GC application. Not in their wildest dream did they think G. Wang might turn the sham agreements against them. They never felt that they needed to consult counsel regarding whether they should worry about G. Wang might use the sham agreements as if they were real. Subconsciously, they believed that no one in their right mind could believe the story that G. Wang is now asserting to defraud the Court, for the following reasons:

a.   Until 2017, despite all the sham agreements, G. Wang did very little to even pretend that Ruifeng was indeed doing DNA sequencing, let alone perform the sham agreements. G. Wang got away with such sloppy scheme until 2017 when USCIS saw through the sham arrangement and revoked G. Wang's L-1 visa. Thus, the facts before 2017 should defeat any claim that the sham agreements were real like what G. Wang is claiming now.

b.   After his visa revocation in 2017, G. Wang's immigration lawyer upped his ante by implementing some additional measures such as creating a website and sham transferring Quintara's lease. Other than the fact that these new measures were likely not insufficient to scheme USCIS, they cannot erase the evidentiary value of the facts before 2017 that showed the unmistakable sham nature of the various "paper" agreements.

c.   The sham service contract was never carried out. Ruifeng never submitted any invoices to Quintara for payments. The invoices that G. Wang recently submitted to the Court were his fabrication for this litigation. The fabricated invoices are also obviously fake because they bear no description of the tasks and time entries that required for any service contract invoices. At all times, the sham payroll of Ruifeng only includes one or two sequencing technicians, while the amount of payments that



LiLaw Inc.

Quintara made to Ruifeng to repay the short-term loans, if real, would have required 6 or more technicians.

     d.   The lease transfer in 2017 was also obvious in its sham nature, besides the fact that it was effected through a forged signature, because until February 2020 Quintara, not Ruifeng, continued to pay rent for the leasehold.

77.     Thus, although Plaintiff may be accused of willful ignorance of the fraud that G. Wang was perpetrating against USCIS notwithstanding the assurance by G. Wang's immigration lawyer, Plaintiff justifiably relied on G. Wang's fraudulent representations regarding the sham nature of various agreements because such sham nature was obvious, to the extent that even USCIS rejected the sham arrangement based on some simple investigation.

## COUNT ONE
### FRAUD
### (Against Defendant G. Wang)

78.     Count One is dismissed without leave to amend pursuant to order of ECF 49. Plaintiff expressly reserves the right to appeal the dismissal.

## COUNT TWO
### CONVERSION OF TANGIBLE ASSETS
### (Against All Defendants)

79.     Plaintiff re-alleges the allegations of the foregoing paragraphs as if fully set forth herein.

80.     The Tangible Assets are owned by Quintara. Defendants took possession of the Tangible Assets when they locked out Quintara in March 2020. Quintara has never consented to its being locked out of the Office or Defendants' possessing of the assets. Defendants have since refused to return the assets to Quintara.

81.     Plaintiff has been damaged significantly by Defendants' conversion of the Tangible Assets including but not limited to the fair market value of the assets and the lost profit caused by the



LiLaw Inc.

loss of the use of the assets.

82.     Defendants have acted willfully and fraudulently to convert the Tangible Assets.

## COUNT THREE
### BREACH OF DUTY OF LOYALTY
### (Against Defendants G. Wang, A. Wong, Li, and Shao)

83.     Plaintiff re-alleges the allegations of the foregoing paragraphs as if fully set forth herein.

84.     Defendants A. Wong, Li and Shao were all employees of Quintara and owed the duty of loyalty to Quintara.

85.     While they were still working for Quintara, A. Wong, Li, and Shao breached their duty of loyalty to Quintara. They conspired with G. Wang to take Quintara's Tangible Assets and Confidential Information to form a competing company under Ruifeng, which was later named RF Biotech LLC.  They spent their work hours, when they were supposed to work for Quintara, to work on their conspiracy and resigned only when they were ready to operate under a competing entity.

86.     Plaintiff has been damaged significantly by the breach of duty of loyalty.

87.     Defendants have acted willfully and fraudulently to convert the Tangible Assets.

88.     Defendant G. Wang is jointly and severally liable with Defendants A. Wong, Li, and Shao because of the civil conspiracy among these individual defendants.

## COUNT FOUR
### MISAPPROPRIATION OF TRADE SECRETS
### (Against All Defendants)

89.     Plaintiff re-alleges the allegations of the foregoing paragraphs as if fully set forth herein.

90.     Quintara's Confidential Information is Quintara's trade secret. Quintara is the owner of the Confidential Information. The Confidential Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through



LiLaw Inc.

proper means by, another person who can obtain economic value from the disclosure or use of the information.

91. Quintara has taken reasonable measures to keep the Confidential Information secret by, among other things, limiting access to its trade secret information, guarding electronic access points to the information, and requiring employees to sign confidentiality agreements.

92. Quintara's trade secrets at issue are related to a product or service used in, or intended for use in, interstate or foreign commerce through its offices located in various states. Thus, the trade secrets are covered by the federal trade secret act, 18 U.S.C. § 1836.

93. Defendants acquired Quintara's trade secret information in improper and unlawful manners, including fraud, conversion of the Tangible Assets, breach of duty of loyalty, and breach of confidentiality agreements.

94. As a direct and proximate result of Defendants' conduct as alleged herein, Plaintiff has suffered damages exceeding millions of dollars although the precise amount of the damages is to be proved at trial. Plaintiff is entitled to recover such damages caused by misappropriation of trade secrets under 18 U.S.C. § 1836(b)(3)(B)(i).

95. Defendants' misappropriation of Plaintiff's trade secret information was willful and malicious, further entitling Plaintiff to recover exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and its attorneys' fees and costs under 18 U.S.C. § 1836(b)(3)(D).

96. Under 18 U.S.C. § 1836(c), this Court has the original federal jurisdiction over this claim.

97. On information and belief, if Defendants' conduct is not remedied, and if Defendants are not enjoined, Defendants will continue to misappropriate, disclose, and use for their own benefit and to Plaintiff's detriment Plaintiff's trade secret information.

98. Because Plaintiff's remedy at law is inadequate, Plaintiff seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and other legitimate business interests. Injunctive relief is necessary to eliminate the commercial advantage that otherwise would be derived from Defendants' continued misappropriation of Plaintiff's trade secret information.



# COUNT FIVE
## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AND PROSPECTIVE ECONOMIC ADVANTAGES
### (Against All Defendants)

99.     Plaintiff re-alleges the allegations of foregoing paragraphs, excluding all paragraphs containing allegations of misappropriation of trade secrets, as if fully set forth herein.

100.    There are established contracts between Plaintiff and its customers and vendors.

101.    Defendants knew the existence of the contracts between Plaintiff and its customers and vendors.

102.    Defendants conspired to have emails and other forms of communications sent to Plaintiff's customers and vendors on behalf of RF Biotech with the intent to disrupt the contracts between Plaintiff and its customers and vendors. For example, recently RF Biotech sent emails to each and every customer of Plaintiff claiming that it had taken over all Plaintiff's "accounts" in the Bay Area and asked the customers to submit their DNA sequencing samples to RF Biotech instead of Plaintiff. This has caused tremendous disruptions to Plaintiff's contractual relationship with these customers, including loss of customers, expenditure of time and other resources to placate customers, and reimbursement to customers for failed sequencing works by RF Biotech.

103.    Defendants' action has made the performance of Plaintiff's contract with its customers/vendors more expensive and/or difficult, which has harmed Plaintiff economically.

104.    To the extent that some of the customers and vendors of Plaintiff may not have enforceable written contracts with Plaintiff, Defendants' conducts were intentional interference with prospective economic advantages.

# COUNT SIX
## UNFAIR COMPETITION
### (Against All Defendants)

105.    Plaintiff re-alleges the allegations of foregoing paragraphs, excluding all paragraphs containing allegations of misappropriation of trade secrets, as if fully set forth herein.

106.    Defendants' conducts are fraudulent and unlawful business practices in violation of the unfair competition law of California, Cal. Bus. and Prof. Code §17200 *et seq.*.

LiLaw Inc.

107.    As a result of Defendants' acts, Plaintiff has suffered harm in the form of Defendants' taking of its tangible and intangible properties and is entitled to remedies in the form of restitution and injunction.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against Defendants that the Court shall:

      a.      Impose preliminary and permanent injunction against Defendants;

      b.      Award compensatory damages according to the proof;

      c.      Award punitive and exemplary damages to deter similar wrongdoings;

      d.      Award prejudgment interest at the maximum legal rate as allowed by the law;

      e.      Award reasonable attorney's fees according to the proof;

      f.      Award costs of suit herein incurred; and

      g.      Award such other and further relief as the Court may deem proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  December 22, 2020           **LiLaw Inc.**

                By  /s/J. James Li                    

                    J. James Li, Ph.D.
                    Attorneys for Plaintiff Quintara Biosciences Inc.



LiLaw Inc.

# Exhibit A

# Contract for Services

## 1. Names

This agreement is between Quintara Bioscience Inc, a California corporation (Client), and Ruifeng Biztech Inc, a California corporation (Contractor).

## 2. Services to be Perform

Contractor agrees to perform the following services for Client:

Contractor will set up the machines required for DNA sequencing services.

Client DNA samples will be delivered to Ruifeng daily by 6 pm.  Contractor will process these samples daily according to predefined lab procedures agree upon by Client.

Contractor will deposit sequencing data (image and text file) for each sample onto Client file server as soon as data come out, no later than 6 pm the second date.

Contractor will bill Client at an agree rate $2/sample. This rate will be revisited yearly.

## 3. Time for Performance

DNA samples will be at Ruifeng by 6 pm every day, and sequencing data has to be deposited on to Quintara server by 6 pm the next day.

## 4. Payment

Client will pay Contractor $2 per sample.

## 5. Terms of Payment

Contractor shall send Client an invoice every 30 days. Client shall pay Contractor within

30 days from the date of each invoice.

## 6. Equipment and Supplies

Contractor, at Contractor's expense, will provide all equipment, tools, and supplies necessary to perform the contractual services, except for the following, which will be provided by Client: **Plastic, enzymes, and other chemicals used in the DNA sequencing reactions**.

## 7. Expenses

Contractor will be responsible for all expenses required for the performance of the contractual services.

## 8. Terminating the Agreement

This agreement will become effective when signed by both parties and will terminate on the earlier of the date Contractor completes the services required by this Agreement or the date a party terminates the Agreement as provided below.

With reasonable cause, either party may terminate this Agreement effective immediately by giving written notice of termination for cause. Reasonable cause includes:

- a material violation of this Agreement, or
- Client's failure to pay Contractor's fees as provided in this agreement, where Contractor has demanded payment, in writing, and has not received payment at least 20 days after the date that such demand was sent to Client.

Contractor shall be entitled to full payment for services performed prior to the date this Agreement is terminated.

## 9. Independent Contractor Status

The parties intend Contractor to be an independent contractor in the performance of the services. Contractor and Client agree to the following rights consistent with an independent contractor relationship.

- Contractor will have the right to control and determine the methods and means of performing the contractual services.

2

- Contractor has the right to perform services for others during the term of this Agreement.
- Contractor has the right to hire assistants as subcontractors, or to use employees to provide the services required by this Agreement.
- Client shall not require Contractor or Contractor's employees or subcontractors to devote full time to performing the services required by this Agreement.
- Neither Contractor nor Contractor's employees or subcontractors are eligible to participate in any employee pension, health, vacation pay, sick pay or other fringe benefit plan of Client.

## 10. State and Federal Taxes

Client will not:

    (a) withhold Social Security and Medicare taxes from Contractor's payments or make such tax payments on Contractor's behalf, or

    (b) withhold state or federal income tax from Contractor's payments or make state or federal unemployment contributions on Contractor's behalf.

Contractor will pay all applicable taxes related to the performance of services under this contract. This includes income, Social Security, Medicare and self-employment taxes. Contractor will also pay any unemployment contributions related to the performance of services under this contract.

If Contractor is required to pay any federal, state or local sales, use, property or value added taxes based on the services provided under this Agreement, the taxes shall be separately billed to Client. Client shall be responsible for paying any interest or penalties incurred due to late payment or nonpayment of any taxes by Client.

## 11. Disputes

If a dispute arises, either party may take the matter to court.

## 12. No Partnership

This Agreement does not create a partnership relationship. Neither party has authority to

3

enter into contracts on the other's behalf.

## 13. Entire Agreement

This is an agreement between the parties. It does not replace any other agreement the two sides earlier writings.

## 14. Successors and Assignees

This agreement binds and benefits the heirs, successors and assignees of the parties.

## 15. Notices

All notices must be in writing. A notice may be delivered to a party at the address that follows a party's signature or to a new address that a party designates in writing. A notice may be delivered:

- in person
- by certified mail, or
- by overnight courier.

## 16. Governing Law

This agreement will be governed by and construed in accordance with the laws of the state of California.

## 17. Counterparts

This agreement may be signed by the parties in different counterparts and the signature pages combined will create a document binding on all parties.

## 18. Modification

This agreement may be modified only by a written agreement signed by the parties.

## 19. Waiver

If one party waives any term or provision of this agreement at any time, that waiver will be effective only for the specific instance and specific purpose for which the waiver was given. If either party fails to exercise or delays exercising any of its rights or remedies

4

under this agreement, that party retains the right to enforce that term or provision at a later time.

## 20. Severability

If any court determines that any provision of this agreement is invalid or unenforceable, any invalidity or unenforceability will affect only that provision and will not make any other provision of this agreement invalid or unenforceable and such provision shall be modified, amended or limited only to the extent necessary to render it valid and enforceable.

Date: ___12/30/2013___

Date: ___12/30/2013___

By: **Shanqun**

By: *gangyou Wang*

Qun Shan
President and CEO
Quintara Biosciences Inc.
1563 Solano Avenue, #268
Berkeley, CA 94707

Gangyou Wang
President and CEO
Ruifeng Biztech Inc.
2600 Hilltop Drive, Building B 333
Richmond, CA 94806
Taxpayer ID: 46-4255570

# Exhibit B

U.S. Department of Homeland Security
P.O. Box 10129
Laguna Niguel, CA 92607-1012



**U.S. Citizenship
and Immigration
Services**

**TO:**

Ruifeng Biztech, Inc.
c/o Xueling Zhao, Corporate Secretary
2600 Hilltop Drive, Building B, Suite 333
Richmond, CA 94806

**DATE:** [SEP 1 2 2017

**Petition:** Form I-129

**File:** WAC1511150197

### NOTICE OF REVOCATION OF NONIMMIGRANT PETITION

The approval of your Form I-129, Petition for a Nonimmigrant Worker, filed in behalf of Gangyou Wang, has been revoked for the following reason(s):

**See Attachment**

If you disagree with this decision, you may appeal to the Administrative Appeals Office (AAO) by filing a Notice of Appeal or Motion (Form I-290B) within 30 days (33 days if by mail) of the date of this decision. Alternatively, you may use Form I-290B to submit a motion to reopen or reconsider. For the latest information on filing location, fee, and other requirements, please review the Form I-290B instructions at http://www.uscis.gov/forms, call our National Customer Service Center at 1-800-375-5283, or visit your local USCIS office. If USCIS does not receive a properly filed appeal or motion, this decision will become final.

The Small Business Regulatory Enforcement and Fairness Act established the Office of the National Ombudsman (ONO) at the Small Business Administration. The ONO assists small businesses with issues related to federal regulations. If you are a small business with a comment or complaint about regulatory enforcement, you may contact the ONO at www.sba.gov/ombudsman or phone 202-205-2417 or fax 202-481-5719.

Sincerely,

Kathy A Baran

Kathy A. Baran
Director, California Service Center

Enclosure: Form I-290B
cc: Henry R. Wu, Esq.

Form I-292

www.dhs.gov

WAC-15-111-50197
Page 2

You have filed Form I-129, Petition for a Nonimmigrant Worker on behalf of Gangyou Wang, ("beneficiary") on March 13, 2015, in order to classify the beneficiary as an intracompany transferee with a concurrent request for extension of stay.

Your organization, Ruifeng Biztech, Inc., seeks to employ the beneficiary as a President.

The beneficiary has been employed as a President for your organization in L-1 status from March 18, 2014, to March 17, 2015. Your organization seeks to extend the beneficiary's status for an additional two years.

USCIS approved the instant petition on March 25, 2015. Subsequent to the approval, on January 27, 2017, USCIS issued a notice of Intent to Revoke (ITR) that approval. The reasons for the ITR are explained in that notice. On February 24, 2017, you provided a response to that ITR. The record has now been reviewed and considered in its entirety and a decision to revoke the approval of the instant petition has been rendered. A discussion of that decision can be read below.

8 C.F.R. 214.2(l) (9) Revocation of approval of individual and blanket petitions—

   (i) General. The director may revoke a petition at any time, even after the expiration of the petition.

   (ii) Automatic revocation. The approval of any individual or blanket petition is automatically revoked if the petitioner withdraws the petition or the petitioner fails to request indefinite validity of a blanket petition.

   (iii) Revocation on notice. (A) The director shall send to the petitioner a notice of intent to revoke the petition in relevant part if he/she finds that:

      (1) One or more entities are no longer qualifying organizations;

      (2) The alien is no longer eligible under section 101(a)(15)(L) of the Act;

      (3) A qualifying organization(s) violated requirements of section 101(a)(15)(L) and these regulations;

      (4) The statement of facts contained in the petition was not true and correct; or

      (5) Approval of the petition involved gross error; or

      (6) None of the qualifying organizations in a blanket petition have used the blanket petition procedure for three consecutive years.

## NOT DOING BUSINESS

The first issue to be evaluated in this case is whether your U.S. organization is doing business in accordance with the regulations.

Title 8, Code of Federal Regulations (8 CFR) 214.2(l)(3)(i) mandates that an individual petition for intracompany transferee be accompanied by the following:

ATTACHMENT TO I-292

WAC-15-111-50197
Page 3

    Evidence that the petitioner and the organization which employed or will employ the alien are qualifying organizations as defined in paragraph (l)(1)(ii)(G) of this section.

8 CFR 214.2(l)(1)(ii)(G) provides, in part:

    Qualifying organization means a United States or foreign firm, corporation, or other legal entity which:

    (2) Is or will be doing business (engaging in international trade is not required) as an employer in the United States and in at least one other country directly or through a parent, branch, affiliate, or subsidiary for the duration of the alien's stay in the United States as an intracompany transferee; and

8 CFR 214.2(l)(1)(ii)(H) states:

    Doing business means the regular, systematic, and continuous provision of goods and/or services by a qualifying organization and does not include the mere presence of an agent or office of the qualifying organization in the United States and abroad.

As noted in the ITR, a USCIS Immigration Officer (IO) attempted to conduct an administrative site visit at the location where you stated the beneficiary would be working. Upon arriving at the site, a gate security guard informed the IO that your company is affiliated with Quintara, and that your company moved its operations to South San Francisco "a while ago."

In the instant petition, you provided a copy of your 2013 IRS Form 1120 U.S. Corporation Tax Return and wage reports for your employees. In response to the ITR you provided a copy of your 2015 1120 and wage reports for your employees. While these documents indicate that your company has engaged in business activities, they do not necessarily establish that the company has been doing business to the extent and scope that you have claimed.

USCIS conducted a public internet search of your company. No website or other links to your company's contact information could be found. While not determinative by itself, the fact that it does not appear that you are actively advertising your services to the public is a reasonable consideration when analyzing whether, and to what extent your company is doing business.

According to the I-129 petition, your company is engaged in the area of "Biotech products processing services, distribution, and investment, etc." On Schedule K of your 2015 1120 tax return, you have described your business activity as "International Trade" and your product or service as "Trade and Investment."

In an attempt to verify your business operations, USCIS conducted a search of publically available information. According to the California Department of Alcoholic Beverage Control website at https://www.abc.ca.gov/datport/LQSData.asp?ID=83391461 (last viewed on September 8, 2017), the beneficiary on behalf of your company applied for a liquor license (#552915) to serve beer and wine at an "eating place." Although the license was withdrawn, this brings into question whether, and in what capacity your company may or may not be doing business.

ATTACHMENT TO I-292

WAC-15-111-50197
Page 4

Your counsel states in the ITR response that "Petitioner has been offering Quintara biotechnological products testing, processing and customer support services for the past years."

Your counsel further explains in the ITR response that "From January 2015 to September 2015...the petitioner temporarily carried on its business operations by using the lab processing facilities owned by Quintara Discovery until September 2015..." Counsel states that the Quintara address where you "temporarily" carried on your business operations "until September 2015" is 170 Harbor Way, Suite 100, South San Francisco, California. It must be noted, however, even though counsel claims that you only "temporarily" conducted business at this address until "September 2015," the address for your business on your 2015 Federal tax return which was prepared on March 31, 2016, is 170 Harbor Way, Suite 100, South San Francisco, California.

You also provided a copy of a sub-lease with Quintara for the address at 170 Harbor Way. This term of this sub-lease was from September 1, 2015, to April 30, 2017. A copy of your business license which is valid until December 31, 2017, also shows your address to be at 170 Harbor Way. Consequently, the evidence does not support counsel's contention that you only "temporarily" carried on your business operations at the Quintara site.

You have provided a copy of a lease for an office space located at 2600 Hilltop Drive, Building A, Suite C333, Richmond, California. According to an internet search, it appears that this office is in a larger campus called JOINN Innovation Park. Based on the floor plans you provided with the lease agreement, it appears that the space you are leasing in this complex is not large enough to accommodate the number and type of employees you claim to have. The evidence also does not sufficiently establish that you are doing business in the capacity that you claim from this office suite.

As noted above, you have provided a copy of a sub-lease with Quintara. It appears that any work your company may perform is at Quintara. Because Quintara appears to provide similar or the same services you claim to provide, it is unclear what the actual relationship between Quintara and your company really is.

It should also be noted that although you claim Qun Shan is employed by you as Business Development Manager, a review of publically available information indicates that Mr. Shan is the CEO of the aforementioned Quintara Biosciences. Qun Shan is also the registered agent for your corporation. While nothing specifically precludes Mr. Shan from occupying all these roles, it does bring into question the extent of the relationship between your company and Quintara. In the ITR response, counsel states that "By partnering with Quintara Biosciences...the petitioner has been actively into biotechnology driven service business in the US." However, you have not provided any more details or documentary evidence that explains the extent and scope of your "partnering" relationship with Quintara.

You also provided copies of bank statements for two different accounts. One account appears to just be a savings account, and one account appears to be for savings and checking. While these documents indicate that monetary transactions are taking place, they do not provide sufficient information about the nature of the transactions.

To be more specific, in the ITR response, counsel states that "As of the end of January 2017, petitioner had received over $4.4 million cash investment from our Chines[e] parent company, about $2 million of which has been spent on its business operations for the past years."

WAC-15-111-50197
Page 5

As such, it cannot be determined whether the credits which appear in your bank statements are actual business transactions associated with the provision of goods and/or services in the biotech industry, or whether they are "investment" deposits. While investments from the parent company abroad may keep your company viable, they cannot be seen as the backbone of activities which would constitute doing business as contemplated by the regulations. You have not provided any supplemental evidence or explanations to establish the frequency, type, and extent of any business transactions that have occurred on a regular, systematic, and continuous basis. While you did provide copies of several invoices with the initial petition, all of the work that your company has purportedly conducted has been for Quintara.

Lastly, according to the California Secretary of State's website at https://businesssearch.sos.ca.gov/CBS/Detail (last viewed on September 8, 2017), Ruifeng Biztec, Inc. status is listed as "SOS SUSPENDED." According to this website, your company's business status means that "The business entity was suspended or forfeited by the Secretary of State for failure to file the required **Statement of Information**…"

All of this information and discrepancies bring into question whether, and to what extent Ruifeng Biztech, Inc. is operating as an independent business in the biotech industry.

Viewed in its totality, the evidence of record is insufficient to establish that your organization is engaged in the regular, systematic, and continuous provision of goods and/or services in the United States. As a result, it does not appear your U.S. organization is doing business in accordance with the regulations. For this reason alone, the petition must be revoked.

## NOT A MANAGER OR EXECUTIVE IN THE UNITED STATES

The second issue to be discussed is whether you have established that the beneficiary has been employed in a position that is primarily executive or managerial in nature, and is in accordance with the nature and scope that you have attested to. The issue is whether the facts, as you presented them are true and correct.

The Immigration and Nationality Act (INA) 101(a)(15)(L) and its implementing regulation at Title 8, Code of Federal Regulations (8 CFR) 214.2(l)(1)(ii) state:

> . . . an alien who, within 3 years preceding the time of his application for admission into the United States, has been employed continuously for one year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or a subsidiary or affiliate thereof in a capacity that is managerial, executive, or involves specialized knowledge . . .

8 CFR 214.2(l)(3) states that an individual petition filed on Form I-129 shall be accompanied by:

> (i) Evidence that the petitioner and the organization which employed or will employ the alien are qualifying organizations as defined in paragraph (l)(1)(ii)(G) of this section.

> (ii) Evidence that the alien will be employed in an executive, managerial, or specialized knowledge capacity, including a detailed description of the services to be performed.

WAC-15-111-50197
Page 6

(iii) Evidence that the alien has at least one continuous year of full-time employment abroad with a qualifying organization within the three years preceding the filing of the petition.

(iv) Evidence that the alien's prior year of employment abroad was in a position that was managerial, executive, or involved specialized knowledge and that the alien's prior education, training, and employment qualifies him/her to perform the intended services in the United States; however, the work in the United States need not be the same work which the alien performed abroad.

INA 101(a)(44)(B) and 8 CFR 214.2(l)(1)(ii)(C) define the term "executive capacity" as:

. . . an assignment within an organization in which the employee primarily-

(i) directs the management of the organization or a major component or function of the organization;

(ii) establishes the goals and policies of the organization, component, or function;

(iii) exercises wide latitude in discretionary decision-making; and

(iv) receives only general supervision or direction from higher level executives, the board of directors, or stockholders of the organization.

Additionally, whether or not you contend that the beneficiary will be functioning in a managerial capacity, USCIS will also consider the petition based on this issue.  INA 101(a)(44)(A) and 8 CFR 214.2(l)(ii)(B) provide:

The term "managerial capacity" means an assignment within an organization in which the employee primarily-

(i) manages the organization, or a department, subdivision, function, or component of the organization;

(ii) supervises and controls the work of other supervisory, professional, or managerial employees, or manages an essential function within the organization, or a department or subdivision of the organization;

(iii) if another employee or other employees are directly supervised, has the authority to hire and fire or recommend those as well as other personnel actions (such as promotion and leave authorization), or if no other employee is directly supervised, functions at a senior level within the organizational hierarchy or with respect to the function managed; and

(iv) exercises discretion over the day-to-day operations of the activity or function for which the employee has authority.  A first-line supervisor is not considered to be acting in a managerial capacity merely by virtue of the supervisor's supervisory duties unless the employees supervised are professional.

WAC-15-111-50197
Page 7

Further, pursuant to INA 101(a)(44)(C), staffing levels are a relevant factor in determining managerial and/or executive capacity:

> If staffing levels are used as a factor in determining whether an individual is acting in a managerial or executive capacity, the Attorney General shall take into account the reasonable needs of the organization, component, or function in light of the overall purpose and stage of development of the organization, component, or function. An individual shall not be considered to be acting in a managerial or executive capacity (as previously defined) merely on the basis of the number of employees that the individual supervises or has supervised or directs or has directed.

The definitions of executive and managerial capacity have two parts. First, you must show that the beneficiary is performing the high level of responsibilities that are specified in the definitions when employed in the United States. Second, you must establish that the beneficiary is primarily performing these specified responsibilities and will not spend the majority of their time on day-to-day functions. An employee who primarily performs the tasks necessary to produce a product or provide services is not considered to be employed in a managerial or executive capacity. Hence, the fact that you state the beneficiary manages a business does not necessarily establish eligibility for classification as an intracompany transferee in a managerial or executive capacity within the meaning of INA sections 101(a)(44)(A) and (B). The record must establish that the majority of the beneficiary's duties are primarily directing the management of the organization.

When examining the executive or managerial capacity of the beneficiary's U.S. position, USCIS will look to your description of the job duties. 8 CFR 214.2(l)(3)(ii). Your description must describe in detail the duties performed by the beneficiary and indicate whether such duties are in either an executive or managerial capacity. You must specifically state whether the beneficiary is primarily employed in a managerial or executive capacity in the United States.

In response to the ITR you have provided a description of the beneficiary's job duties. In part you state that:

> "He [the beneficiary] directs the business manager, Mr. Quan Shan, in the establishment and improvement of systematized company biotech and business products and equipment investment and testing and processing, and distribution of these products…Mr. Wang has formulated hiring plans with professional assistance from local resources and hired Mr. Quan Shan as company biotech business manager; and directed him in hiring the initial employees for the company's initial setup and biotech lab business operations…In his daily management of the US Subsidiary, Mr. Wang allocates and divides supervisory responsibilities to the business manager regularly through conferences and meetings according to the company general business plan and Chinese company directives…Mr. Wang also regularly reviews, comments and approves or disapproves business activity progress reports, decisions and business documents submitted to him by the business manager, corporate secretary and independent financial, business and legal consultants. Mr. Wang directs the business manager to further tapping market potentials into related business projects and feasibility of establishing other offices in the United States…Meanwhile, Mr. Wang directs the business manager in developing and conducting corporate public relations and promotion strategies, policies and procedures for US company's business operations…"

ATTACHMENT TO I-292

WAC-15-111-50197
Page 8

As a point of clarification, although counsel states that "Quan Shan" is the business manager, none of the records in the file establish that "Quan" Shan is employed by you. It appears that counsel has simply misspelled Qun Shan's name.

Regardless, the consistent theme throughout the description of duties is the direction of the business manager, Mr. Qun Shan. Qun Shan is also listed as the corporate secretary in your articles of incorporation.

In the ITR response, counsel also states:

> "The previously submitted evidence clearly shows that the beneficiary has been directing and supervising the business manager – Mr. Qun Shan who in turn manage other professional employees and run day-to-day business activities at the South San Francisco facilities for the past years."

As noted in the discussion under the first issue above, evidence indicates that Qun Shan is the CEO of Quintara. Mr. Shan is also listed as your corporate secretary, and the registered agent for service of process on your corporate registration in California. Because it appears that any biotech business that your company may perform is at the Quintara site, and that Mr. Shan is the CEO of Quintara, the evidence does not sufficiently support a finding that the beneficiary directs Mr. Shan in the capacity that you have described.

In support of the petition, you provided a list of workers for the U.S. company to illustrate the number and types of employees. You state on the list that you employ the following individuals:

- Gangyou Wang — President/CFO
- Qun Shan — Business Development Manager
- Alex Wong — Sequencing Operation Manager
- Xueling Zhao — Secretary
- Xiaoxia Wang — Administrative Clerk
- Rui Qiu Zhang — Sample Courier
- Chun Wei Fang — Sample Courier
- Ryan Chou — Customer Support Scientist
- Katelyn Siverll — Lab Technician I
- Alan Li — Lab Technician II
- Wentao Zhang — Scientist I
- Qiyun Yang — Scientist I
- Jian Yuan — Scientist II
- James Lee — Scientist II
- Wei Bu — Scientist II
- Jingpei Liu — Lab Assistant

Again, the evidence indicates that Qun Shan is the CEO of Quintara. During the administrative site visit to Quintara, the IO made contact with Alex Wong. Mr. Wong indicated that he was the Account Manager for Quintara, not the Sequencing Operation Manager for you company. During the site visit, an associate of Mr. Wong also confirmed that Mr. Shan is the CEO of Quintara. This associate also indicated that Xueling Zhao is Mr. Shan's wife, and is the CFO for Quintara.

ATTACHMENT TO I-292

WAC-15-111-50197
Page 9

As noted in the discussion under the first issue above, counsel states that your company was using the lab facilities owned by Quintara Discovery. According to Quintara Discovery's website at: http://quintaradiscovery.com/about-us/team/ (last viewed on September 8, 2017), Wentao Zhang is listed as one of the three founders of this company. Nothing in Mr. Zhang's biography on this website indicates that he is employed by your organization in the capacity of Scientist I.

Discrepancies encountered in the evidence call into question the petitioner's ability to document the requirements under the statute and regulations. The discrepancies in the petitioner's submissions have not been explained satisfactorily. Doubt cast on any aspect of the evidence as submitted may lead to a reevaluation of the reliability and sufficiency of the remaining evidence offered in support of the visa petition. Further, it is incumbent on the petitioner to resolve any inconsistencies in the record by independent objective evidence; any attempts to explain or reconcile such inconsistencies, absent competent objective evidence pointing to where the truth lies, will not suffice. Matter of Ho, 19 I.& N. Dec. 582. (Comm. 1988), cited with approval in Spencer Enterprises v. United States of America, 229 F.Supp.2d 1025, 1038 (E.D. Cal. 2001).

Furthermore, if USCIS fails to believe that a fact stated in the petition is true, USCIS may reject that fact. Section 204(b) of the Act; Anetekhai v. I.N.S., 876 F.2d, 1218, 1220 (5th Cir. 1989); Lu-Ann Bakery Shop, Inc. v. Nelson, 705 F.Supp. 7, 10 (D.D.C. 1988); Systronics Corp. v. INS, 153 F. Supp. 2d 7, 15 (D.D.C. 2001).

Based on the multiple discrepancies in the record, it cannot be determined whether your company is doing business; that you are employing the individuals on the list you provided in the capacity that you have stated; and that the beneficiary is directing any of your purported employees in the capacity you have described.

Consequently, it cannot be determined that the beneficiary has any professional, supervisory, or managerial subordinate employees. Furthermore, the evidence does not sufficiently establish that the beneficiary is performing the duties that you have described throughout the record.

The evidence must substantiate that the duties of the beneficiary and the duties of the beneficiary's subordinates correspond to their placement in an organization's structural hierarchy. You have not established that the U.S. business has an organizational structure sufficient to elevate the beneficiary to a supervisory position that is higher than a first-line supervisor of non-professional employees.

Furthermore, as noted in the ITR, the results of the site check did not establish that anyone, let alone professional, supervisory, or managerial employees were actively working at the company's business location. It appears that some of your company's key employees, such as the purported business manager, sequencing operation manager, Scientist I, and secretary are actually employees of Quintara.

Based on the organizational structure provided, in conjunction with the evidence to establish the individuals who were employed by the company; the unexplained discrepancies in the record; and, the lack of financial and other evidence of the company's business activities, it appears the U.S. position has been primarily assisting with the day to day non-supervisory duties of the business. The performance of those tasks precludes the beneficiary from being considered a manager or executive.

You have not shown that there are employees who will relieve the beneficiary from primarily performing the non-qualifying day-to-day duties of the function. Instead, it appears that the beneficiary will be

WAC-15-111-50197
Page 10

primarily involved in the performance of routine operational activities of the entity rather than in the management of a function of your business.

For the foregoing reasons, you have not established that that the beneficiary was employed primarily in a qualifying managerial or executive capacity in the United States at the time of filing or during the validity period of the instant petition. Therefore, the beneficiary is no longer eligible under section 101(a)(15)(L) of the Act.

The burden of proof to establish eligibility for a desired preference rests with the petitioner. Here, that burden has not been met.

As such, the beneficiary is ineligible for classification as an Intra-company Transferee. Therefore, the petition is hereby revoked.