**LILAW INC.**
J. James Li, Ph.D. (SBN 202855, lij@lilaw.us)
Andrew M. Pierz (SBN 292970, pierza@lilaw.us)
Daniel R. Peterson (SBN 326798, petersond@lilaw.us)
1905 Hamilton Avenue, Suite 200
San Jose, California 95125
Telephone: (650) 521-5956
Facsimile: (650) 521-5955

Attorneys for Plaintiff QUINTARA BIOSCIENCES, INC.

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUINTARA BIOSCIENCES, INC., a California corporation,<br><br>    Plaintiff,<br>    v.<br><br>RUIFENG BIZTECH INC., a California corporation, GANGYOU WANG, an individual, ALEX WONG, an individual, ALAN LI, an individual, RUI SHAO, an individual, and RF BIOTECH LLC, a California limited liability company,<br><br>    Defendants. | **Case No.  3:20-cv-04808-WHA**<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE:**<br><br>**(1) MISAPPROPRIATION OF TRADE SECRETS CLAIM; AND**<br><br>**(2) FRAUD ALLEGATIONS**<br><br>**FROM PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>**Court: Courtroom 12, 19th Floor**<br>**Judge: Hon. William Alsup**<br>**Date: February 11, 2021**<br>**Time: 8:00 a.m.** |

**LiLaw Inc.**



# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 3

III.  ARGUMENT .................................................................................................... 5

   A.   The Motion to Strike the DTSA Claim Should Be Denied ...................................... 5

     1.   The Motion to Strike the DTSA Claim Must Be Viewed as a Motion to Dismiss under Rule 12(b)(6) ................................................................................................ 5

     2.   The Court May Not Dismiss the DTSA Claim If It Meets the Federal Notice Pleading Standard .......................................................................................................... 6

     3.   Plaintiff's Identification of Trade Secrets Passes Muster with both DTSA and § 2019.210 .......................................................................................................... 6

     4.   Defendants' General Attacks on the ATSD Contradict the Established Law and Notice Pleading Principle ............................................................................................... 8

     5.   Defendants' "Mutilation" Defense Should Be Rejected ...................................... 10

     6.   Defendants Confounded Trade Secrets with Patents ........................................... 12

     7.   The ATSD Provides Sufficient Notice to Defendants as to the Contours of the Alleged Trade Secrets ..................................................................................................... 14

     8.   The ATSD Complies with the Court's November 18, 2020 Order ...................................... 17

   B.   The Fraud Allegations are Essential to Other Claims in the First Amended Complaint and are Not Subject to Stricture Under Rule 12(f) ................................................... 18

     1.   Rule 12(f) Motions May Be Used to Strike Matters of "No Possible Bearing upon the Subject Matters of the Litigation" and Only to Avoid Prejudice Such as Undue Burden ... 18

     2.   Most of Allegations at Issue Speak Directly to the Sham Agreement Which Is the Foundation for Quintara's Conversion Claim ................................................... 19

     3.   The Factual Fraud Allegations Are Related to the Unfair Competition and Punitive Damages; Defendants Have Failed to Show Undue Prejudice ...................................... 20

IV.   CONCLUSION .................................................................................................. 22



Case No. 3:20-cv-04808-WHA

OPPOSITION TO MOTION TO STRIKE

# TABLE OF AUTHORITIES

## CASES

*Alta Devices, Inc. v. LG Elecs., Inc.,*

    343 F. Supp. 3d 868 (N.D. Cal. 2018) ........................................................................... 7, 9

*Ashcroft v. Iqbal,*

    556 U.S. 662 (2009) ........................................................................................................ 6

*Bell Atl. Corp. v. Twombly,*

    550 U.S. 544 (2007) ........................................................................................................ 6

*Cataphote Corp. v. Hudson,*

    444 F. 2d 1313 (5th Cir. 1971) ....................................................................................... 12

*Cerra v. Blackstone,*

    172 Cal. App. 3d 604 (1985) .......................................................................................... 19

*Comm. On Children's Television, Inc. v. Gen. Foods Corp.,*

    35 Cal. 3d 197 (1983) .................................................................................................... 21

*DVD Copy Control Ass'n Inc. v. Bunner,*

    116 Cal. App. 4th 241 (2004) ........................................................................................ 12

*Fantasy, Inc. v. Fogerty,*

    984 F. 2d 1524 (9th Cir. 1993) ....................................................................................... 19

*Farhang v. Indian Inst. of Tech., Kharagpur,*

    No. C-08-02658 RMW, 2010 WL 2228936 (N.D. Cal. June 1, 2010) ................................ 18

*Forsyth v. Humana, Inc.,*

    114 F.3d 1467 (9th Cir.1997) ........................................................................................ 21

*Imperial Chem. Indus. Ltd. v. Nat'l Distillers & Chem. Corp.,*

    342 F.2d 737 (2d Cir. 1965) .......................................................................................... 11

*In re Superior Nat'l Ins. Grp.,*



LiLaw Inc.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

No. 1:00–bk–14099–GM, 2014 WL 1873300 (Bankr.C.D.Cal. May 8, 2014) ................... 21

*Integral Dev. Corp. v. Tolat*,

675 F. App'x 700 (9th Cir. 2017) ........................................................................ 14

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*,

920 F.2d 171 (2d Cir. 1990) ................................................................................ 11

*Loop AI Labs Inc. v. Gatti*,

195 F. Supp. 3d 1107 (N.D. Cal. 2016) ............................................................... 9

*MAI Sys. Corp. v. Peak Computer, Inc.*,

991 F. 2d 511 (9th Cir. 1993) .............................................................................. 14

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,

519 F. 3d 1025 (9th Cir. 2008) .............................................................................. 6

*McArdle v. AT&T Mobility LLC*,

2009 U.S. Dist. LEXIS 89231 (N.D. Cal. Sept. 14, 2009) ................................... 19

*Memry Corp. v. Kentucky Oil Tech., N.V.*,

No. C-04-03843 RMW, 2006 WL 3734384 (N.D. Cal. Dec. 18, 2006) ............... 12

*Naton v. Bank of Cal.*,

72 F.R.D. 550 (N.D. Cal. 1976) ........................................................................... 18

*Rockwell Collins, Inc. v. Wallace*,

No. SACV1701369AGJCGX, 2017 WL 5502775, at *2 (C.D. Cal. Nov. 10, 2017)............. 7

*Sidney-Vinstein v. A.H. Robins Co.*,

697 F. 2d 880 (9th Cir. 1983) .............................................................................. 19

*Silvaco Data Sys. v. Intel Corp.*,

184 Cal. App. 4th 210 (2010) ......................................................................... 13, 14

*Starr v. Baca*,

652 F. 3d 1202 (9th Cir. 2011) .............................................................................. 6



LiLaw Inc.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Swierkiewicz v. Sorema N. A.*,

    534 U.S. 506, 512 (2002) ........................................................................... 9

*Taylor ex rel. Thompson v. Zurich Am. Ins. Co.*,

    No. CV 11–08110–PCT–JAT, 2013 WL 1340014 ..................................... 21

*TMX Funding, Inc. v. Impero Tech. Inc.*,

    No. C 10-00202 JF (PVT), 2010 WL 2509979, at *3 ................................ 8

*Townshend v. Rockwell Int'l Corp.*,

    No. C99-0400SBA, 2000 WL 433505 (N.D. Cal. Mar. 28, 2000*)* ....................................... 19

*WeRide Corp. v. Kun Huang*,

    379 F. Supp. 3d 834 (N.D. Cal. 2019) ................................................... 18

*Whittlestone, Inc. v. Handi-Craft Co.*,

    618 F. 3d 970 (9th Cir. 2010) ............................................................ 1, 5

### STATUTES AND RULES

Cal. Bus. & Prof. Code § 17200 ............................................................ 20

Cal. Civ. Code § 3294 ........................................................................ 21

Cal. Code Civ. Proc. § 2019.210 ........................................................ 1, 6, 7

Fed. R. Civ. P. 12(f) .................................................................... 5, 18

Fed. R. Civ. P. 8(a)(2) ...................................................................... 6

### TREATISES

Milgrim on Trade Secrets (2003) § 1.07 ............................................... 12

Wright & Miller, 5C Fed. Prac. & Proc. Civ. (3d ed.), § 1202 ....................... 6, 9

Wright & Miller, 5C FED. PRAC. & PROC. CIV. (3d ed.), § 1204 ....................... 7

Wright & Miller, 5C Fed. Prac. & Proc. Civ. (3d ed.), § 1380 ...................... 5



**LiLaw Inc.**

OPPOSITION TO MOTION TO STRIKE

Plaintiff Quintara Biosciences, Inc., ("Quintara" or "Plaintiff") hereby opposes Defendants Ruifeng Biztech Inc., ("Ruifeng"), Gangyou Wang ("Wang"), Alex Wong ("Wong"), Alan Li ("Li"), Rui Shao ("Shao"), and RF Biotech LLC ("RF Biotech") (collectively "Defendants")'s Motion to Strike: (1) Misappropriation of Trade Secrets Claim; And (2) Fraud Allegations from Plaintiff's First Amended Complaint ("Motion").

## I.   **INTRODUCTION**

By this Rule 12(f) motion, Defendants seek to strike Plaintiff's claim under the Defend Trade Secrets Act ("DTSA"). The Ninth Circuit, however, has made it clear that Rule 12(f) may not be used to strike a claim because such should be the function of Rule 12(b)(6). *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F. 3d 970, 974 (9th Cir. 2010). Thus, to the extent this Court will entertain this part of the Motion, it should be treated as a motion to dismiss under Rule 12(b)(6) pursuant to the notice pleading standard.

Under the notice pleading standard, the First Amended Complaint (the "FAC"), supplemented by the Amended Trade Secret Disclosure ("ATSD"), particularly identifies the trade secrets at issue. Contrary to what Defendants claim, for pleading purposes Plaintiff is not required to spell out the details of the trade secrets. Nor is it required to submit the actual trade secrets or other documents to support its factual allegations regarding the trade secrets. To the contrary, such allegations must be accepted as the truth for the purpose of determining a motion to dismiss. All that is required is to plead sufficient facts to give Defendants the notice as to what information is being claimed to be the trade secrets and whether such information "plausibly" may be trade secrets when the pleadings are viewed in the light most favorable to Plaintiff.

The cumulative body of law interpreting Cal. Code Civ. Proc. § 2019.210 ("§ 2019.210") does not, and cannot, require more than what is required under the federal pleading standard for the DTSA claim. In fact, California federal courts have either refused to recognize § 2019.210's role in deciding pleading motions under DTSA or found that the pleading requirement under § 2019.210 conforms with the notice pleading standard of the federal court. Thus, to the extent that isolated cases interpreting § 2019.210 to require more than what is required by the notice pleading standard, such cases should have no place in deciding a motion to dismiss in federal courts under the DTSA claim.

LiLaw Inc.

1  Plaintiff has met the notice pleading standard. Plaintiff has identified 11 categories of trade

2  secrets with specificity, including descriptions of the informational items contained in each category,

3  physical embodiment of the information in terms of the types of computer files containing the

4  information, the background of how Plaintiff has developed the information, Plaintiff's reasonable

5  effort to maintain the secrecy of the information, and the business value of the secret information.

6  Coupling with the fact that all the identified information is stored in the 10 computers that

7  Defendants have misappropriated from Plaintiff, Defendants should have no problem to prepare their

8  defense. They can either dig out the information from the stolen computers or obtain it through

9  discovery.

10  Most of Defendants' arguments are aimed to dispute the merits of the identified trade secrets.

11  Such arguments in fact reflects the particularity of the identification which allows Defendants to

12  advance defenses on the merit at the pleading stage. Such arguments are also inappropriate for a

13  motion to dismiss which is supposed to assume the pleaded facts as true. The Motion is replete with

14  attacks on the various trade secrets as public information based on improper evidentiary contentions.

15  Defendants, for example, claim Trade Secret 11 ("TS 11"), i.e., the "protocols, recipes, flow charts,

16  targeted customers, and financial forecasts" for a new "tunable" IL 15 fusion proteins, cannot be a

17  trade secret because a Google search of "IL 15 fusion proteins" returns over 17 million results. This

18  is a specious argument because the secret here is not the phrase "IL 15 fusion proteins, but the

19  protocols, recipes etc. of a "tunable" IL 15 fusion protein that Plaintiff has developed in conjunction

20  with MIT. The fallacy of this argument is shown by an online search of "coca cola recipe" which

21  returns over 56 million results. Such results, however, do not make it a matter of law—for the

22  purpose of determining a motion to dismiss—that coca cola recipe is not a trade secret. The important

23  thing here is that Defendants certainly are appraised of what are being claimed to be the trade secrets

24  under the notice pleading rules. Defendants are now free to conduct discovery and file a motion for

25  summary judgment if they indeed think these identified items of information are not trade secrets.

26  The second part of Defendants motion borders on frivolity. Most of the paragraphs that they

27  seek to strike were directly related to the issue of the "sham agreement" which is the factual

28  foundation for the conversion and other claims. The factual fraud allegations that Defendants seek to



1    strike are relevant to the claims for unfair competition and punitive damages which do not rely on the

2    existence of an actual fraud claim.

3          For these reasons, Plaintiff respectfully requests that the Motion be denied in its entirety.

4    **II.     <u>BACKGROUND</u>**

5          Plaintiff filed their initial complaint on July 17, 2020 asserting various claims including

6    misappropriation of trade secrets in violation of the Defend Trade Secret Acts ("DTSA"). ECF 1.

7          In response to the Court's order on a motion for protective order (ECF 40), Plaintiff filed an

8    Amended Trade Secret Disclosure ("ATSD") on December 2, 2020 in the format defined by the

9    order. ECF 44-1. The ATSD was marked "Trial Counsel's Eyes' Only" and filed under seal pursuant

10   to the court order.[1] ECF 1 at 2. In fact, there are only some small parts of the ATSD that should be

11   sealed. A properly redacted version of the ATSD is attached to this Opposition as Exhibit A.[2]

12         The ATSD describes the trade secrets at issue in this case as "Quintara's confidential

13   technical or business information stored in its office computers which were taken by Defendants,"

14   including "confidential compilations, compositions, designs, and computer programs that do not exist

15   in the public domain." ATSD at 1. These trade secrets are "the core intellectual properties or

16   intangible assets that make what Quintara is today—an established DNA sequencing service

17   provider." *Id.* It took "Quintara years of research, development, and business operation to build these

18   trade secrets brick by brick." *Id.*

19         The ATSD identifies the trade secrets as the following:
        1.  Quintara's customer database in the form of computer spreadsheets
20          and relational database containing fields like names, addresses,
            telephone numbers, emails, and/or contact persons.
21      2.  Quintara's customer profile database containing products and services
            that each customer has purchased from Quintara, including the date,
22          quantity, and price of each purchase, which is set forth in computer
            spreadsheet files and which may further include analysis of additional
23          products and services that Quintara may offer to the customer.
24      3.  Quintara's marketing plans for its existing products and services, set
            forth in the form of text or presentation computer files.
25

26   _____

27   [1] Defendants incorrectly claim that Plaintiff marked the ATSD as "attorneys-eyes only" on its own volition. Mo. at 12.
     Plaintiff was merely obeying the court order ECF-40 that requires Plaintiff to mark the disclosure as "Trial Counsel's
     Eyes' Only."

28   [2] The unredacted version is filed under seal as Exhibit A to Wiseman Declaration and also previously as ECF 44-1.

LiLaw Inc.



4. Quintara's development plans for new products and services, set forth in the form of text or presentation computer files.

5. Quintara's business plans for expansion of the existing business operations and for creation of new business lines in the form of text or presentation computer files.

6. Quintara's database for contact information of external vendors, partners, and consultants in the form of computer spreadsheet files, including fields such as names, addresses, telephone numbers, emails, and/or contact persons.

7. Quintara's computer informatics which are a set of source code for automating Quintara's DNA sequencing flows and related business operations.

8. Quintara's protocols and reagent recipes customized for its DNA sequencing operations using the Sanger sequencing method in the form of computer files.

9. Quintara's recipes and protocols of reagent kits for products under development in the form of computer files.

10. Quintara's product information for DNA Donor Technology, including all aspects of the new product such as protocols, recipes, flow charts, targeted customers, and financial forecasts.

11. Quintara's IL15 Fusion Proteins, including all aspects of the new product such as protocols, recipes, flow charts, targeted customers, and financial forecasts.

ATSD at 13-14.

The ATSD provides detailed explanation for each of the above categories of trade secrets, including background, development history, specific sub-items under each category, the value, and confidential nature of the identified trade secrets. *Id.* at 1-13. For example, for Trade Secret ("TS") 1, i.e., the customer database, the ATSD describes the information items of the database as "detailed compilation of all Quintara customer's names, addresses, telephone numbers, emails, affiliations, research areas, contact persons, and other identifying information." *Id.* at 2. The ATSD points out that, although the customers may be public institutions, this "compilation of customer information is not available anywhere in the public domain." *Id.* The value of the compilation is significant because it aggregates the crucial information for a group of special customers for "DNA related molecular services, including oligo synthesis, gene synthesis or cloning, DNA sequencing, and DNA preparation." *Id.* The value of the compilation is further enhanced because the tabulated information items were collected by "years of efforts" and "manually verified by Quintara employees." *Id.* at 2. The compilation is not just a table or spreadsheet, it is also a "relational database" which allows



LiLaw Inc.

selective retrieval of information using Quintara's in-house software. *Id.*

Despite the above identification of trade secrets, on December 16, 2020, Defendants filed a motion for protective order demanding more particular identification of trade secrets. The Court denied the motion on December 22, 2020 (ECF 22).

On December 22, 2020, Plaintiff filed its First Amended Complaint ("FAC").

On January 5, 2021, Defendants filed a motion to strike the DTSA claim of the FAC and continues to block discover relying on the pleading motion. The motion to strike also seeks to strike certain fact allegations which, notwithstanding Defendants' contention to the contrary, are relevant and material facts for the existing claims.

## III.  ARGUMENT

### A.  The Motion to Strike the DTSA Claim Should Be Denied

#### 1.  The Motion to Strike the DTSA Claim Must Be Viewed as a Motion to Dismiss under Rule 12(b)(6)

A motion to strike is designed for striking "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Procedurally, the court may not "strike" a claim pursuant to a Rule 12(f) motion, because a claim does not fall within the ambit of strike under Rule 12(f). *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F. 3d 970, 974 (9th Cir. 2010). *Whittlestone* reversed an order which dismissed portions of the complaint using a motion to strike under Rule 12(f), holding that allowing such practice "would be creating redundancies within the Federal Rules of Civil Procedure, because a Rule 12(b)(6) motion (or a motion for summary judgment at a later stage in the proceedings) already serves such a purpose." *Id.* In this case, Defendants' motion to strike the DTSA claim seeks to dismiss an entire claim based on the pleadings, which is a function of Rule 12(b)(6) motions. The Motion should be denied as to the DTSA claim under *Whittlestone*.

To the extent that this Court decides to entertain the motion to strike the DTSA claim, the Court should treat the motion as a motion to dismiss under Rule 12(b)(6) for failure to state a claim. *See* Wright & Miller, 5C Fᴇᴅ. Pʀᴀᴄ. & Pʀᴏᴄ. Cɪᴠ. (3d ed.), § 1380 (suggesting that an "inaccurately denominated" motion to strike should be treated as "a motion to dismiss the complaint" for lack of

LiLaw Inc.

prejudice to the "nonmoving party").

### 2. The Court May Not Dismiss the DTSA Claim If It Meets the Federal Notice Pleading Standard

Although Defendants have treated the Motion as if it is a discovery motion under Cal. Code of Civil Procedure, § 2019.210 ("§ 2019.210"), the legal standard here should be the federal notice pleading standard for deciding a Rule 12(b)(6) motion.

The federal notice pleading standard is embodied in Rule 8, which requires in relevant part that "[a] pleading that states a claim for relief must contain … a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Thus, "pleadings under the rules simply may be a general summary of the party's position that is sufficient to advise the other party of the event being sued upon" and "Rule 8 demands no more of the pleadings than this." Wright & Miller, 5C Fed. Prac. & Proc. Civ. (3d ed.), § 1202 (emphasis added).

Notice under Rule 8 requires the allegation of sufficient facts to make a claim "plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In deciding plausibility, the court may not consider the defendant's disputes over the alleged facts, but must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F. 3d 1025, 1031 (9th Cir. 2008). Further, although "plausibility" is not mere possibility, it is a much lower hurdle than proving "probability." *Bell Atl. Corp.*, 550 U.S. at 556 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."); *see also Starr v. Baca*, 652 F. 3d 1202, 1216-17 (9th Cir. 2011) ("The standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable.").

As discussed below. despite the above well-established pleading rules, Defendants' arguments in this Motion regarding the DTSA claim are mostly about disputing the merits of Plaintiff's pleaded facts and thus entirely inapposite for a motion to dismiss.

### 3. Plaintiff's Identification of Trade Secrets Passes Muster with both DTSA and § 2019.210

LiLaw Inc.

Case No. 3:20-cv-04808-WHA

The trade secret misappropriation claim in this case is pleaded only under DTSA, not California Uniform Trade Secret Act ("CUTSA"). FAC ¶ 92. California federal courts have adopted the CUTSA's pleading standard set forth in Cal. Code Civ. Proc. § 2019.210 ("§ 2019.210") as the pleading standard for DTSA. *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 880–81 (N.D. Cal. 2018).[3] However, to the extent that the past case law of § 2019.210 deviates from the federal notice pleading rules, such law should not be followed in determining a motion to dismiss a DTSA claim. Wright & Miller, 5C FED. PRAC. & PROC. CIV. (3d ed.), § 1204 ("a federal pleading that satisfies the Rule 8(a) standard will not be dismissed simply because it would be vulnerable to a demurrer or a motion to dismiss in a forum state court"); *see also*, *Rockwell Collins, Inc. v. Wallace*, No. SACV1701369AGJCGX, 2017 WL 5502775, at *2 (C.D. Cal. Nov. 10, 2017) (declining to apply § 2019.210 to override Rule 8's notice pleading standard).

It is well established that under DTSA or CUTSA that "a plaintiff need not spell out the details of the trade secret." *Alta Devices, Inc.*, 343 F. Supp. 3d at 881. The plaintiff is only required to "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Id.*

In *Alta Devices*, the plaintiff identified the trade secrets by descriptions in terms more general than the terms used in this case:

> The Confidential Information and trade secrets imparted by Alta to LG[E] includes Alta's Methods of: high throughput thin-film deposition; epitaxial lift-off of the thin-film; and GaAs substrate maintenance and re-use. It includes confidential cost analysis; proofs and tests of manufacturing concepts and techniques; tool roadmaps; manufacturing process flows; and identification of equipment and equipment vendors; and information related to the foregoing.

*Id.* at 881; cf. FAC ¶ 69.  Although an NDA attached to the pleading in *Alta Devices* included a list of confidential information, it is no more particular than Plaintiff's ATSD. *Id.* at 881; cf. Ex. A. While the NDA was a helpful fact in *Alta Devices* for further identifying the trade secrets, the special situation in this case is the fact that all the trade secrets identified were contained within a definitive

---

[3] Some federal courts have ruled that § 2019.210 has no relevance in pleading motions under DTSA. *Rockwell Collins, Inc. v. Wallace*, No. SACV1701369AGJCGX, 2017 WL 5502775, at *2 (C.D. Cal. Nov. 10, 2017)



LiLaw Inc.

physical boundary—Plaintiff's 10 desktop computers that Defendants have converted. FAC ¶ 68.

As noted by *Alta Devices*, such styles of identification have been found to be sufficient under § 2019. *Alta Devices*, 343 F. Supp. 3d at 882 (discussing *TMX Funding, Inc. v. Impero Tech. Inc.*, No. C 10-00202 JF (PVT), 2010 WL 2509979, at *3 (N.D. Cal. June 17, 2010). In *TMX*, the court found the following identification of trade secrets sufficiently particular under CUTSA:

> TMX alleges nine broad categories of trade secret information:
> a. Its software, source codes, data, formulas, and other technical information developed as proprietary and confidential products and services;
> b. Its business methods and marketing plans, such as prospective customer and sales methods for attracting and retaining customers;
> c. Its product information, including, but not limited to, cost, pricing, margin data and other financial information;
> d. Customer lists;
> e. Contact names and information at the various accounts;
> f. Names and contact information of the person(s) with purchasing authority and person(s) with influence over purchasing decisions at the various accounts;
> g. Customer profiles, including but not limited to, a record of all of its previous transactions, feedback, and service history with the various accounts;
> h. Special buying and service needs, buying and service patterns, agreements with customers, and buying preferences of customers, including special terms, discounts, and accessories;
> j. Login and password information to access the computer networks, servers, computer systems, and telephone systems.
> *4 (Complaint ¶ 43.) This description is sufficient to permit Defendants at least to ascertain the boundaries within which the secrets lie.

*TMX Funding, Inc. v. Impero Techs., Inc.*, No. C 10-00202 JF (PVT), 2010 WL 2509979 (N.D. Cal. June 17, 2010).

There can be no doubt that Plaintiff's identification of trade secrets is more specific and particular than the above identification under *TMX*. Cases like *TMX* and *Alta Devices* thus expose the fallacy of Defendants' legal arguments, as discussed below.

### 4. Defendants' General Attacks on the ATSD Contradict the Established Law and Notice Pleading Principle

Defendants claim that Quintara's ATSD was "nothing more than a game of hide the ball" because "Quintara did not attach any of its 'trade secrets' to its disclosure." Mo. at 12. This serious allegation of "bad faith" against Quintara has no basis in law. Under the notice pleading rule, Plaintiff is not supposed, let alone required, to submit evidence which is the function of discovery. *See*

Case No. 3:20-cv-04808-WHA


LiLaw Inc.

1    *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002) ("This simplified notice pleading standard

2    relies on liberal discovery rules and summary judgment motions to define disputed facts and issues

3    and to dispose of unmeritorious claims."). In reversing the lower court's enhanced pleading standard,

4    *Swierkiewicz* rejects the claim of "surprise" in formulating defenses, holding that

5           The provisions for discovery are so flexible and the provisions for pretrial
            procedure and summary judgment so effective, that attempted surprise in

6           federal practice is aborted very easily, synthetic issues detected, and the
            gravamen of the dispute brought frankly into the open for the inspection of the

7           court.

8    *Id.,* quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1202, p. 76 (2d ed. 1990).

9           There are in fact many cases for both § 2019.210 and DTSA that uphold identification of

10   trade secrets when no actual trade secrets were "attached" as so demanded by Defendants in this case.

11   *See, e.g., Alta Devices, Inc.*, 343 F. Supp. 3d at 880–81; *TMX Funding, Inc.*, 2010 WL 2509979, at

12   *3–4. Defendants attempt to turn a pleading requirement into a dispute over merits contradict the

13   notice pleading principle and thus should be rejected.

14          Defendants similarly confused pleading with evidence in other parts of their motion. For

15   example, Defendants took issue with Plaintiff's statement that it took years of effort for it to build its

16   customer database brick by brick, arguing that Plaintiff "provides zero information or facts to support

17   such a conclusion." Mo. at 15. Defendants here again turns a pleading motion into a demand for

18   evidence. To be sure, the statement at issue (i.e., it took many years of efforts to Plaintiff to build the

19   database) is not a conclusory statement by any means, but a specific factual allegation. It is also

20   corroborated by other factual allegations, including (1) Quintara has been in business for over 15

21   years since 2005 (FAC ¶ 13), (2) the database contains extensive information of all Quintara

22   customers, 11,347 customers in all (ATSD at 2), and (3) all critical information items in the database

23   were "manually verified" by Quintara (ATSD at 2). Thus, for deciding a motion to dismiss, the Court

24   is required to take such specific factual aversions the truth. To demand evidence to support the such

25   pleaded facts, as Defendants are doing, is to subvert the notice pleading rules.

26          Defendants also take issue of the use of "'catch-all' descriptions such as 'include'," relying on

27   *Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107 (N.D. Cal. 2016). Mo. at 13. *Loop*, however,

28   involves a very different kind of identification where the "catchall" descriptions refer to a broad



LiLaw Inc.

range of information such as "[a]ll information and documents identified by Plaintiff as containing its trade secrets" or "the information and documents identified in [the complaints]." *Id.* at 1113–14. The ATSD, in contrast, discloses very specific categories of information such as customer database with specific description thereof. Such practice has been widely considered to be appropriate for identifying trade secrets. *See, e.g.,* the above-discussed disclosure in *TMX Funding, Inc.*, 2010 WL 2509979, at *3–4 (using inclusive languages such as "Its product information, including, but not limited to, cost, pricing, margin data and other financial information"). The inclusive languages within a specific category of trade secrets do not in any way hinder the defense. Thus, under the notice pleading rule, to ban the use of inclusive languages in identifying trade secrets is as nonsensical as banning them in a complaint.

### 5.   Defendants' "Mutilation" Defense Should Be Rejected

Defendants resorted to the so-called "mutilation" defense which breaks down an otherwise confidential trade secret to its public parts. For TS 1-6, Defendants erroneously claim that Plaintiff "admits that its information cannot be differentiated from what is publicly disclosed." Mo. at 15. For TS 7-11, Defendants label Plaintiff's acknowledgement that "the source code may contain public component" as an admission for no trade secret. Mo. at 17. These are "mutilation" defenses because they cut out one or more components of the identified trade secret to deny the trade secret nature of the whole simply because the parts may be public.

Take TS 1, i.e., customer database, as an example. TS 1 is the "detailed compilation of all Quintara customer's names, addresses, telephone numbers, emails, affiliations, research areas, contact persons, and other identifying information," and such information items were collected through "years of efforts" of Plaintiff and were "manually verified" by Plaintiff. ATSD at 2. Thus, contrary to Defendants' mischaracterization, acknowledging the fact that these customers are publicly listed institutions is not an admission of no trade secret. There are obviously three major categories of secrecies here that are distinguishable from the public information: (1) the aggregated compilation of a group of entities that have the special need for DNA sequencing services; (2) the additional information items, manually verified, for each customer including phone numbers, emails contact

OPPOSITION TO MOTION TO STRIKE



LiLaw Inc.

1

2

persons etc. which are not readily and/or accurately available in public; and (3) the relational

database built using these items of information.

3

These entities being public institutions thus does not detract from the trade secret nature of TS

4

1.  Defendants essentially equates the public nature of some <u>individual</u> items in the secret database,

5

such as the names and addresses of the institutions, to the lack of secrecy of the entire database.

6

Courts have long rejected such "mutilation" defense. About sixty years ago, a California court

7

carefully analyzed such defense and held:

8

9

> a trade secret can exist in a ***combination*** of characteristics and components,
> each of which, by itself, is in the public domain, but the unified process,
> design and operation of which, in unique combination, affords a competitive
> advantage and is a protectable secret.

10

*Imperial Chem. Indus. Ltd. v. Nat'l Distillers & Chem. Corp.*, 342 F. 2d 737, 742 (2d Cir. 1965)

11

(citing many cases from several jurisdiction) (emphasis added).

12

In *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171 (2d Cir.

13

14

1990) ("ICM"), the court rejected a "mutilation" defense and focused the analysis on the software

design as a whole. In *ICM*, three former employees and contractors of ICM went to work for the

15

16

defendant and created a software program that "operate in substantially the same manner as

comparable ICM generic programs." *Id.* at 172. In rejecting the defense based on the fact that

17

plaintiff's software was a "combination of utility programs" (*id.* at 171), the court held that "the

18

architecture of ICM's product, or the way in which ICM's various components fit together as building

19

20

blocks in order to form ***the unique whole*** was secret." *Id.* at 174 (internal quotations and citations

omitted; emphasis added).

21

In *Altavion, Inc. v. Konica Minolta Systems Lab. Inc.*, 226 Cal. App. 4th 26 (2014), in

22

23

rejecting a "mutilation" defense regarding a confidential design, the court held that "even if some or

all of the elements of Altavion's design were in the public domain and thus unprotectable, the

24

***combination*** was a protectable trade secret if it was secret and had independent economic value." *Id.*

25

at 47 (emphasis added).

26

Thus, the fact that a secret recipe—such as the famous Coca-Cola recipe—can be broken

27

28

down to publicly known ingredients or chemicals should not take away the secret nature of the recipe.



**LiLaw Inc.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Similarly, a secret customer list containing a group of customers with special commercial interest does not lose its secrecy simply because each customer may have its name and address listed on its website. Thus, Defendants' "mutilation" defense should be rejected.

### 6.   Defendants Confounded Trade Secrets with Patents

Defendants made recurring arguments that fault Plaintiff for not identifying features to distinguish its trade secrets from the "state of the art" or "prior art" based on the knowledge of those "skilled in the field." *See, e.g.,* Mo. at 18, 19. This is a law that is entirely made up by Defendants, by confounding patents with trade secrets.

To be a trade secret, information only needs to be a secret and has value of being a secret. There is no requirement that this secret has to be technically distinguishable from the "state of art" or the "prior art" from the viewpoint of the those "skilled in the art," in the sense of being new, novel or unique. *See Cataphote Corp. v. Hudson*, 444 F. 2d 1313, 1315 (5th Cir. 1971) ("As distinguished from a patent, a trade secret need not be essentially new, novel or unique; therefore, prior art is a less effective defense in a trade secret case than it is in a patent infringement case. The idea need not be complicated; it may be intrinsically simple and nevertheless qualify as a secret, unless it is in common knowledge and, therefore, within the public domain.").

Importantly, this "secrecy" requirement "is generally treated as a relative concept and requires a fact-intensive analysis." *Memry Corp. v. Kentucky Oil Tech., N.V.,* No. C-04-03843 RMW, 2006 WL 3734384, at *4 (N.D. Cal. Dec. 18, 2006), quoting *DVD Copy Control Ass'n Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004) (citing 1 Milgrim on Trade Secrets (2003) § 1.07[2]). In *Memry*, the relevant technology of the plaintiff was published in a patent. *Id.* at *4. The court denied a motion for partial summary judgment based on the contention that the trade secrets have been published in the patent, finding that "[s]ecrecy in this context remains a fact-based inquiry." *Id.*

Defendants in effect are contesting the "secrecy" element by requiring a patent-like high standard. Take TS 7, i.e., computer informatics, as an example. The ATSD identifies it as software for "automating Quintara's sequencing flow and related business operations" with its "overall compositions and functionalities [being] not available publicly." ATSD at 5. TS 7 is further identified



to contain various modules including qbonline, qblib, qbpy, labscan, and SparkDNA. *Id.* at 5-7. With this detailed identification, all Defendants need to do to contest the trade secret nature of TS 7 is to find these software programs on the 10 computers that they stole from Plaintiff and make their arguments accordingly. Yet, Defendants contend such identification is insufficiently particular because Plaintiff has not identified any "specific features or functions" in these software modules "that are unknown to those skilled in the field, or distinct from the state of the art." Mo. at 18.

There are two major problems with Defendants' argument. First, it essentially disputes the factual allegation that the software's "overall compositions and functionalities are not available publicly." Again, this contention is not a conclusory allegation, but specific allegations corroborated by other factual averments including the software programs "were written by Quintara, specifically designed for Quintara's businesses." Thus, the Court is required to accept this factual allegation as the truth in determining the motion to dismiss. It is inappropriate for Defendants to argue otherwise. Second, while it is true that the software modules describe functions that are not earth-shattering technological breakthroughs, the software automates a DNA sequencing lab which is highly valuable to both Plaintiff and potential competitors, and no one other than Quintara has the software because Quintara developed it for its own business operation. Thus, Defendants are confounding patents with trade secrets when they demand the identified trade secrets to be technically distinguishable from the "state of art" or the "prior art."

Another confusion by Defendants related to patent law is the claim that "trade secret law protects the right to maintain the confidentiality of <u>facts, not ideas</u>," relying on *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 220–21 (2010). Mo. at 14. This proposition is a misunderstanding if not outright distortion of *Silvaco*, which holds that the trade secret law protects "information" which may include facts or ideas, while patent law only protects ideas:

> A patent protects an idea, i.e., an invention, against appropriation by others. Trade secret law does not protect ideas as such. Indeed a trade secret may consist of something we would not ordinarily consider an idea (a conceptual datum) at all, but more a fact (an empirical datum), such as a *221 customer's preferences, or the location of a mineral deposit. In either case, <u>the trade secret is not the idea or fact itself, but information tending to communicate (disclose) the idea or fact to another. Trade secret law, in short, protects only the right to control the dissemination of information.</u>

LiLaw Inc.

*Silvaco Data Sys.*, 184 Cal. App. 4th at 220–21. Most of the trade secrets identified in this case are information that includes both ideas and facts, such as computer code. *See Integral Dev. Corp. v. Tolat*, 675 F. App'x 700, 703 (9th Cir. 2017) ("Source code, which conveys ***facts or ideas***, qualifies for trade secret protection."). A computer algorithm may be an idea, the specific code implementing the algorithm is the fact behind the idea. Both the algorithms and the code itself may be protected as trade secrets for source code. Thus, unlike patent law, there is no idea/fact dichotomy in trade secret law. Instead, what matters is whether there is any valuable secret, which is information that may embody facts, ideas, or both.

### 7. The ATSD Provides Sufficient Notice to Defendants as to the Contours of the Alleged Trade Secrets

Contrary to Defendants' contentions, the ATSD has identified the trade secrets, TS 1 through 11, with reasonable particularity, to allow Defendants to properly defend against the identified trade secrets.

For TS 1, the customer database, this issue has been discussed in detail earlier in this brief and will not be repeated here. *See*, Sec. III.A.5, p. 10-11, *supra*. In essence, Defendants' argument on TS 1 goes against a long line of cases that recognize confidential customer list as trade secrets. *See, e.g., MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F. 2d 511, 521 (9th Cir. 1993) (a customer database "assembled over many years that allows [owner] to tailor its service contracts and pricing to the unique needs of its customers" qualifies as a trade secret).

For TS 2, the customer profile database, it is described as "database contains each customer's purchases and payment history over the years, including the products purchased, the dates of the purchases, the prices paid, and any customer feedbacks for the purchases." ATSD at 3. Like TS 1, TS 2 was also built brick by brick over many years and is confidential information not available in the public domain. *Id.* It is difficult to see how this allegation does not provide particular information to allow Defendants to properly defend against the trade secret. All they need to do is prove this database is not confidential or has no value. If they want to see the exact database, they can either look into the stolen computers or conduct discovery.

For TS 3, the marketing plans, it is identified as confidential text files or presentation decks



"outlining Quintara's plans of how to market its existing products and services to customers and potential customers". *Id.* 3:19-21. The plans were "crafted using years of experiences of Quintara in the DNA sequencing field in general and in its product development and sales in particular." *Id.* 3:21-23. Defendants may argue that such marketing plans are not trade secret through a motion for summary judgment, but they cannot claim that they do not know what the alleged trade secret is for TS 3. Defendants can also easily obtain copies of the marking plans, by looking into the stolen computers and by conducting discovery. TS 3 is thus properly identified.

For TS 4, development plans, it is defined to be "plans for developing new products and services" in the form of "text files or presentation decks." *Id.* at 4. For example, the development plans include the "detailed plan" for "Turbo DNA Sequencing Services," which is a new service that Plaintiff has spent over $100,000 to develop the software portion alone. *Id.* 4:10-15. Not only do Defendants know what the development plans are, they have also, allegedly, misappropriated the Turbo DNA Sequencing development plan. *Id.* at 4. Again, by checking the stolen computers or by conducting discovery Defendants would be able to obtain these development plans to defend their case.

For TS 5, business plans, it is "text files or presentation decks for Quintara's planned expansion of its existing business operation and for potential creation of new business lines." *Id.* 4:23-24. In addition to containing "Quintara's plans to develop new service lines such as Turbo Sequencing, single cell sequencing, fast gene synthesis and cloning, and CSS DNA production," (*Id.* 4:27-28) it also includes Quintara's plans for geographic expansion (*Id.* 4:25-26). These business plans are "not publicly available" and "were created based on Quintara's years of business and product development experiences and its owners' foresights as to the future direction of the industry." *Id.* 5:1-3. The Business Plans would be valuable to a competitor, if they were known, as the competitor would become aware of potentially profitable markets and product segments without the effort and costs required of Quintara to generate the Business Plans.

For TS 6, vendor databases, it is "spreadsheet files containing the contact and business information for the third-party service providers which are essential for Quintara's business operations." *Id.* at 5. Its background is described as being "built through years of cumulative

OPPOSITION TO MOTION TO STRIKE

LiLaw Inc.



1    experiences of Quintara" (*Id.* 5:8-9) and its general field is compilations of business information. Its

2    value from not being generally known is described therein, as the vendor databases contain

3    "Quintara's purchasing plans with specific vendors and the financial agreement between Quintara

4    and such vendors," and any competitor of Quintara would be given an unfair advantage if they

5    acquired this information.

6         For TS 7, computer informatics, it is discussed in detail earlier in this brief. *See* Sec. III.A.6.,

7    p. 12-13, *supra*. It is difficult to see any good faith arguments in Defendants' disputes with this

8    category, because such software source code is well established as trade secrets in a long line of

9    cases. As long as the code is confidential and has some usefulness, there cannot be any reasonable

10   argument that it is not trade secret. *See, e.g., Altavion, Inc.*, 226 Cal. App. 4th at 60 ("source code is

11   undoubtedly a trade secret").

12        For TS 8, the protocols and reagent recipes, it is "an optimal set of protocols and reagent

13   recipes" which improve on the standard protocols known to the industry. *Id.* at 7. As an example, the

14   ATSD compares the ABI standard protocol, which is known to the industry, with one of Quintara's

15   customized Protocols which differs significantly in its procedures and complexity while also offering

16   a higher success rate. *Id.* Defendants' argument that Sanger NA sequencing is well known is again

17   off the mark, as the trade secrets claimed are customized protocols and reagents. All Defendants need

18   to do against TS 8 is to obtain Plaintiff's customized protocols and reagents—from the stolen

19   computers or through discovery—and compare them to the standard Sanger protocols and reagents.

20   There is thus sufficient notice as to TS 8.

21        For TS 9, the new reagent kits, it is "the implementation of new product designs by Quintara."

22   *Id.* at 8. A long list of specific implementations is provided. *Id.* at 8-9. This specific list of

23   implementations gives Defendants a head start as to how to defend against this category. Defendants

24   may also obtain the implementations directly from the stolen computers or by discovery.

25        For TS 10, the DNA Donor Technology, it is "a new product" recently developed by Quintara

26   in collaboration with two universities. *Id.* at 10. Although the idea for the technology has been placed

27   into a patent application and is owned by MIT, Plaintiff owns the implementation of the idea as its

28   trade secrets. *Id.* The trade secret includes a long list of implementations specifically enumerated. *Id.*

LiLaw Inc.



16

at 11-12. These techniques and methods are specifically targeted at a profitable exploitation of CRISPR technology as opposed to purely academic pursuits and gives "a competitive edge in the race to the commercialization of CRISPR" to any potential competitor. *Id.* 10:24-25. It is again very difficult to see how Defendants can contend in good faith TS 10 is not sufficiently identified for pleading purposes.

For TS 11, the IL 15 Fusion Proteins, it is protocols, recipes and other indices of "a series of recombinant proteins with altered IL 15 activities comparing to the native cytokine IL15." *Id.* 12:25-26. Quintara customizes these proteins as "tunable" in activities by "tuning" them to be "the same as or lower than native IL15." *Id.* 12:26-27. Defendants' argument that a Google search of "IL fusion 15 proteins cancer" returns 17,700,000 results is unavailing. A Google search of "coca cola recipe" returns 56,000,000 results[4], which has no bearing on the recipe's status as one of the most protected and valuable trade secrets in modern commerce. The large number of results indicates, if anything, that there is widespread interest in the technology being developed by Quintara showing its value as a result of not being generally known to the public. Thus, Defendants again put forward nearly frivolous arguments here.

### 8.   The ATSD Complies with the Court's November 18, 2020 Order

The Court's November 18, 2020 order (the "Order") applies a standard used by other Northern District courts for reasonable particularity requiring that Plaintiff include: "(1) a summary of the specific trade secret; (2) the background of the trade secret and a description of how each secret has derived independent, actual or potential economic value by virtue of not being generally known to the public; (3) a description of how each secret has been the subject of reasonable efforts to maintain its secrecy; and finally (4) each of the precise claimed trade secrets, numbered, with a list of the specific elements for each, as claims would appear at the end of a patent."

Contrary to Defendants' contention, Plaintiff complied with the Order. The ATSD first summarizes the trade secrets. ATSD at 1. It then sets forth the background and value of each trade secret, including the reasonable efforts made by Plaintiff to maintain the secrecy of the identified

---

[4] *See* https://www.google.fi/search?q=coca+cola+recipe.



1   trade secrets. *Id.* at 1-13. It ends with an enumerated list of the trade secrets. *Id.* at 13-14.

2         Regarding the reasonable effort to maintain secrecy, each trade secret was stored on

3   Plaintiff's internal computer systems and were subject to the same reasonable efforts to maintain its

4   secrecy, hence the consolidated description (*see id.* at 13:6-14) rather than repeating them verbatim

5   for each of the claimed trade secrets. Such efforts include password protection on the computers,

6   unique logins to monitor and control access, and confidentiality agreements as well as physical

7   security measures such as locks and security services. *Id.* At least for the purpose of a pleading

8   motion, these methods constitute reasonable efforts to maintain the trade secrets' secrecy. See

9   *Farhang v. Indian Inst. of Tech., Kharagpur*, No. C-08-02658 RMW, 2010 WL 2228936, at *14

10  (N.D. Cal. June 1, 2010) (reasonable efforts include "confidentiality obligations"); *see also WeRide*

11  *Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 847 (N.D. Cal. 2019) ("reasonable efforts to protect"

12  digital information include the use of unique usernames and passwords). Thus, Defendants'

13  contention of noncompliance with the Order is inapposite.

### B.    The Fraud Allegations are Essential to Other Claims in the First Amended Complaint and are Not Subject to Stricture Under Rule 12(f)

16        Defendants seek to have various factual allegations stricken from the First Amended

17  Complaint because they spoke in part towards Plaintiffs claim for fraud which was dismissed by the

18  Court on, December 10, 2020. (ECF 49). However, these allegations are also key to Quintara's

19  remaining claims and are thus not subject to stricture by a Rule 12(f) motion.

#### 1.    Rule 12(f) Motions May Be Used to Strike Matters of "No Possible Bearing upon the Subject Matters of the Litigation" and Only to Avoid Prejudice Such as Undue Burden

22        Rule 12(f) defines a narrow category of material that a party may move to strike from a

23  pleading: "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

24  Fed. R. Civ. P. 12(f). Rule 12(f) motions are generally disfavored, and they should be denied "unless

25  it is clear that the matter to be stricken can have no possible bearing upon the subject matter of the

26  litigation." *Naton v. Bank of Cal.*, 72 F.R.D. 550, 552 n.4 (N.D. Cal. 1976).

27        The purpose of a legitimate motion to strike is to avoid wasting time and money litigating

LiLaw Inc.

"spurious" or "frivolous" issues. *Fantasy, Inc. v. Fogerty*, 984 F. 2d 1524, 1527 (9th Cir. 1993), rev'd on other grounds, 510 U.S. 517 (1994) (quoting *Sidney-Vinstein v. A.H. Robins Co.*, 697 F. 2d 880, 885 (9th Cir. 1983)). Accordingly, courts are "very reluctant" to resolve "disputed or substantial" legal issues in such motions. *McArdle v. AT&T Mobility LLC*, 2009 U.S. Dist. LEXIS 89231, at *24–25 (N.D. Cal. Sept. 14, 2009) (citation omitted). Disputed or substantial legal issues are "properly . . . determinable only after discovery and a hearing on the merits." *Id*. at *25 (citation omitted).

Because Rule 12(f) motions are disfavored, courts typically require a showing of prejudice to the moving party. *Townshend v. Rockwell Int'l Corp.*, No. C99-0400SBA, 2000 WL 433505, at *4 (N.D. Cal. Mar. 28, 2000*)*. The Ninth Circuit has held that prejudice may arise from, inter alia, allegations that would cause the moving party "undue burden." *Fogerty*, 984 F.2d at 1528.

### 2. Most of Allegations at Issue Speak Directly to the Sham Agreement Which Is the Foundation for Quintara's Conversion Claim

The major part of the materials that Defendants seek to strike, FAC ¶¶ 13-48, are background facts for the sham agreement and thus material for the conversion claim. An essential element of a claim for conversion is that Plaintiff owned, possessed, or had a right to possess, an item of personal property. *See Cerra v. Blackstone*, 172 Cal. App. 3d 604, 609 (1985). Here, Plaintiff alleges that Defendants converted Plaintiff's tangible assets including "computers, printers, office and laboratory furniture, scientific instruments such as DNA analyzers, thermocyclers, centrifuges, electrophoresis, as well as laboratory consumables such as pipette tips, enzymes, and DNA sequencing primers." FAC ¶ 59. This conversion was justified by Defendants on the allegation that "Ruifeng was the majority owner of the equipment <u>based on the sham collaboration agreement</u>." *Id.* ¶ 58 (emphasis added). Thus, all background facts related to the sham collaboration agreement have significant bearing on the conversion claim.[5] As shown below, paragraphs 13-48 are all directly related to the sham agreement and thus cannot be subject to a motion to strike.

Paragraphs 13-21 are the background facts for Plaintiff (¶ 13), Defendants Wang and Ruifeng (¶ 14), and how Wang's immigration application led to the "Oral Loan Arrangement" (¶¶ 14-21). The Oral Loan Arrangement was in turn the basis for Plaintiff's collaboration with Wang and was thus the

---

[5] The conversion claim is also a basis for the misappropriation of trade secrets claim. FAC ¶¶ 67, 68, 93.



LiLaw Inc.

reason behind Plaintiff's participation in the sham cooperation agreement. Without Paragraphs 13-21, the sham cooperation agreement would have lost its factual foundation.

Paragraphs 23-26 are directly about the sham collaboration agreement.

Paragraphs 27-32 are about the sham service contract accompanying the sham collaboration agreement which was signed two days after the collaboration agreement. FAC ¶ 27. The sham collaboration agreement cannot be properly understood or interpreted without referring to the sham service contract and is thus highly relevant to the conversion claim.

Paragraphs 33-41 are about U.S. Citizenship and Immigration Services ("USCIS")'s rejection of the sham collaboration agreement and is thus highly relevant to the sham nature of the agreement. The rejection is also the trigger and factual foundation for the sham lease switch which was how the conversion took place. *Id.* ¶¶ 51, 58, 59.

Paragraphs 42-45 are about the sham lease switch, which was the direct result of the USCIS's rejection of the sham collaboration agreement. FAC ¶ 42. This sham lease switch was later used by Defendants to lock out Plaintiff from its own office which was the direct means for the conversion of computers and lab equipment. FAC ¶¶ 51, 58, 59.

Paragraphs 46-48 are about Plaintiff's termination of the Oral Loan Arrangement, which triggered Defendant's Wang's claim that Ruifeng owned 51% of a joint venture based on the sham collaboration agreement. The latter claim of course was the justification of the conversion by Defendants. *Id.* ¶ 58.

Therefore, paragraphs 13-48 are highly relevant to the conversion claim because they are the factual foundation for the sham collaboration agreement.

### 3. The Factual Fraud Allegations Are Related to the Unfair Competition and Punitive Damages; Defendants Have Failed to Show Undue Prejudice

Paragraphs 8, 64, 65, 73-77, 82, 87, and 106 related to the factual fraud allegations. Contrary to Defendants' claim, such allegations are material to the case because they are still relevant to the unfair competition claim and the claim for punitive damages. A claim for unfair competition under Cal. Bus. & Prof. Code § 17200 does not require showing of "actual fraud," but "only to show that members of the public are likely to be deceived." *Comm. On Children's Television, Inc. v. Gen.*

LiLaw Inc.

1    *Foods Corp.*, 35 Cal. 3d 197, 211(1983). The award of punitive damages for state law claims turns on

2    the fact findings of "oppression, fraud, or malice" (Cal. Civ. Code § 3294). Therefore, the factual

3    allegations related to fraud cannot be stricken because they are still material allegations even after the

4    dismissal of the claim for actual fraud.

5         Further, Defendants have offered no evidence or argument that they face any form of

6    prejudice because of the factual fraud claims. There is no showing of "undue burden" as required.

7    *Fogerty*, 984 F.2d at 1528.

8         Defendants seem to take issues with the preservation of the "count one" heading under an

9    explicit statement that the count is dismissed with prejudice. FAC ¶ 78. Plaintiff knows no authority

10   prohibiting this form of pleading, and Defendants have failed to show any. To be sure, Plaintiff is not

11   re-pleading the dismissed fraud claim. In any event, there is no prohibition even on repleading

12   dismissed claims for the purpose of appeal. Such re-pleading was in fact required to preserve the right

13   of appeal until recently. *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012) (overruling

14   *Forsyth v. Humana, Inc.,*114 F.3d 1467, 1474 (9th Cir.1997) which required claims dismissed with

15   prejudice be repled for appeal). Lacey, however, did not prohibit repleading dismissed claim as long

16   as it is clear from the pleading that such pleading was made purely for appeal. *Taylor ex rel.*

17   *Thompson v. Zurich Am. Ins. Co.,* No. CV 11–08110–PCT–JAT, 2013 WL 1340014, at *8 (D. Ariz.

18   April 1, 2013) (*Lacey* did not hold that "an amended complaint *should not* include claims that have

19   been dismissed with prejudice"). The *Taylor* court rejected the defendants' argument that the new

20   complaint should not have included claims which had been dismissed from the case by the court. *Id.*

21   at *8; *see also In re Superior Nat'l Ins. Grp.,* No. 1:00–bk–14099–GM, 2014 WL 1873300, at *4

22   (Bankr.C.D.Cal. May 8, 2014) ("While *Lacey* ... holds that claims dismissed with prejudice need not

23   be repled to be preserved for appeal, it does not prohibit repleading such claims.").

24        It bears emphasis that Plaintiff did not actually replead the fraud claim, but merely preserved

25   the count number for the ease of appeal and deleted all the allegations under the fraud claim with the

26   note that the Count had been dismissed with prejudice. FAC ¶ 78. Thus, there cannot be any doubt

27   that the fraud allegations are not for supporting the actual fraud claim but for supporting the

28   remaining claims, namely the unfair competition and punitive damages. Defendants thus are not

LiLaw Inc.



1   placed in a burdensome position of having to address the actual fraud claim and have not sustained

2   their burden of showing undue prejudice for striking the factual fraud allegations.

3   **IV.     <u>CONCLUSION</u>**

4          Defendants have failed to meet their high burden of showing why portions of Plaintiff's First

5   Amended Complaint should be struck. Therefore, Quintara respectfully requests that the Court deny

6   Defendants' Motion in its entirety.

7

8          Respectfully submitted,

9

10  DATED:  January 19, 2021                **LILAW INC.**

11

12

13                                  By   /s/J. James Li
                                       _____
14                                       J. James Li, Ph.D.
                                         Andrew Pierz
15                                       Attorneys for Plaintiff QUINTARA
                                         BIOSCIENCES, INC.
16

17

18

19

20

21

22

23

24

25

26

27

28



LiLaw Inc.

# Exhibit A

TRIAL COUNSEL'S EYES ONLY PURSUANT TO COURT ORDER ECF 40

**LILAW INC.**
J. James Li, Ph.D. (SBN 202855, lij@lilaw.us)
Daniel R. Peterson (SBN 326798, petersond@lilaw.us)
Andrew Pierz (SBN 292970, pierza@lilaw.us)
1905 Hamilton Avenue, Suite 200
San Jose, California 95125
Telephone: (650) 521-5956
Facsimile:  (650) 521-5955

Attorneys for Plaintiff QUINTARA BIOSCIENCES, INC.


## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| QUINTARA BIOSCIENCES, INC., a California corporation, | Case No.  3:20-cv-04808-WHA |
| Plaintiff,<br>v. | **PLAINTIFF QUINTARA'S AMENDED TRADE SECRET DISCLOSURE** |
| RUIFENG BIZTECH INC., a California corporation, GANGYOU WANG, an individual, ALEX WONG, an individual, ALAN LI, an individual, RUI SHAO, an individual, and RF BIOTECH LLC, a California limited liability company,<br><br>Defendants. | Court: Courtroom 12, 19th Floor<br>Judge: Hon. William Alsup<br><br>Filed Under Seal Pursuant to Court Order (ECF 40) |

**This Disclosure Contains Plaintiff Quintara Biosciences, Inc.'s highly confidential technological and business information that the Court has ordered via ECF 40 to be marked "TRIAL COUNSEL'S EYES ONLY."**

Redacted Version



LiLaw Inc.

TRIAL COUNSEL'S EYES ONLY PURSUANT TO COURT ORDER ECF 40

Pursuant to the Court's order[1] dated November 18, 2020, ECF 40, p. 2, Quintara Biosciences, Inc. ("Quintara") hereby identifies the trade secrets at issue in Quintara's trade secret misappropriation claim against Defendants Ruifeng Biztech Inc., Gangyou Wang, Alex Wong, Alan Li, Rui Shao, and RF Biotech LLC (all collectively "Defendants").

## A. A Summary of the Trade Secrets

All of the trade secrets identified here are Quintara's confidential technical or business information stored in its office computers which were taken by Defendants. The trade secrets include customer database, customer profile database, marketing plans, development plans, business plans, vendor database, computer informatics, laboratory protocols and reagent recipes, and new product designs. Although these trade secrets may contain components that exist in the public domain, they are confidential compilations, compositions, designs, and computer programs that do not exist in the public domain. It has taken Quintara years of research, development, and business operation to build these trade secrets brick by brick. The trade secrets are the core intellectual properties or intangible assets that make what Quintara is today—an established DNA sequencing service provider. Such trade secrets would be highly valuable for any copycats who want to emulate Quintara's business. Quintara has used reasonable measures to maintain the secrecy of the trade secrets, including requiring its employees to sign a confidentiality agreement and using computer security measures to limit access to the trade secrets.

## B. Background and Value of the Trade Secrets

All the trade secrets were developed by Plaintiff through years of investments in its technical and business operations. Quintara's founders were uniquely positioned to lead the company to develop these trade secrets. Both founders have Ph.D. degrees, one in Cellular and Molecular Biology and the other in Veterinary Sciences. Dr. Shan has been working in the DNA sequencing field since early 1990s, especially with the Sanger DNA sequencing methods. Dr. Zhao, in addition to her training and experience in biological sciences, had many years of bioinformatics experience

---

[1] Plaintiff hereby objects to the ruling and expressly reserves the right to appeal the same.

LiLaw Inc.



PLAINTIFF'S PRELIMINARY TRADE SECRET DISCLOSURE

TRIAL COUNSEL'S EYES ONLY PURSUANT TO COURT ORDER ECF 40

before founding Quintara and is the architect of the software programs involved in the trade secret claim in this case. The following is a description of each category of trade secrets identified here.

### 1. The Customer Database

Although most of Quintara's customers are research or commercial institutions that are publicly listed, it took years of efforts for Quintara to build the database brick by brick. The database contains detailed compilation of all Quintara customer's names, addresses, telephone numbers, emails, affiliations, research areas, contact persons, and other identifying information. All critical information items were manually verified by Quintara employees over the years. This compilation of customer information is not available anywhere in the public domain. Such confidential compilations are valuable information to anyone who is interested in building or operating a business to provide any service or product to these customers in competition with Quintara, especially DNA related molecular services, including oligo synthesis, gene synthesis or cloning, DNA sequencing, and DNA preparation.

The information items are stored in a relational database, which allows them to be selectively retrieved using Quintara's in-house software into spreadsheets. A copy of the spreadsheets containing all the customer information are also stored on file servers in the lab, and only employees with login credentials can access the files.

The customer database is also much more than just a compilation of information. It is in fact the foundation of all Quintara's automatic informatics pipelines, including online ordering, automatic data delivery systems, automatic billing, and market planning.  For example, for online ordering, the customers' identities are automatically verified and filled on the online order form using the customer database. Currently there are a total of 11,347 customers' information stored in Quintara database, 3157 of which have logged in and made orders in 2020. These active customers of Quintara are located throughout the country, including California, Massachusetts, Colorado, Maryland, Connecticut, Indiana, Illinois, District of Columbia, Pennsylvania, Michigan, and Texas.

LiLaw Inc.

PLAINTIFF'S AMENDED TRADE SECRET DISCLOSURE

TRIAL COUNSEL'S EYES ONLY PURSUANT TO COURT ORDER ECF 40

### 2.   The Customer Profile Database

Quintara's customer profile database includes a relational database and many computer spreadsheets which were exported from the database and stored on local file servers. The database contains each customer's purchases and payment history over the years, including the products purchased, the dates of the purchases, the prices paid, and any customer feedbacks for the purchases. In some instances, the database also includes an analysis of additional products and services that Quintara may offer to the customer.

Like the customer database, Quintara's customer profile database was also built brick by brick over many years of business transactions. Quintara's analyses as to additional products and services that it may provide to the customers are not available anywhere in the public domain and are of course valuable to a potential competitor of Quintara. Even for the customer order information, although such information may or may not be confidential for each individual customer, the compiled collective data is a detailed business transaction history of many years in a specialized business sector which are not available in the public domain. Thus, the customer profile database is highly valuable to anyone who attempts to copy Quintara's business model. Quintara itself uses the customer profile database in many ways, especially for communication with customers and for internal business planning by the company's accounting team, customer account managers, and sales team.

### 3.   The Marketing Plans

For the marketing plans for existing products and services, they are either text files or presentation decks outlining Quintara's plans of how to market its existing products and services to customers and potential customers. These plans are not publicly available and were crafted using years of experiences of Quintara in the DNA sequencing field in general and in its product development and sales in particular. Thus, a competitor of Quintara will find the marketing plans highly valuable as to how to go about pitching DNA sequencing products and services to potential customers.

PLAINTIFF'S AMENDED TRADE SECRET DISCLOSURE

LiLaw Inc.

**TRIAL COUNSEL'S EYES ONLY** PURSUANT TO COURT ORDER ECF 40

### 4.  The Development Plans

The development plans are Quintara's secret plans for developing new products and services. They are either text files or presentation decks crafted using the company's years of experiences in developing, marketing, and selling sequencing related products and services. They were also created by relying on Quintara's owners' technical and business acumens in terms of predicting the future trends of the industry. They are not available in the public domain. They represent the company's potential future product lines and are thus highly valuable to any potential competitors of Quintara.

The development plans include detailed implementation for Quintara's new product development including laboratory protocols and recipes, informatics, and marketing plans. As an example, the development plans include the detailed plan for a new service that Quintara was going to launch in 2020, "Turbo DNA Sequencing services." The technical foundation for the new service is a Quintara-developed special fast sequencing chemistry which allows the two sequencing reactions to finish within 45 minutes and 90 minutes, respectively. Quintara has spent significant resources developing the Turbo DNA Sequencing services. Just for the informatics, Quintara spent over $100,000 to hire contractors to code it. This service plan was tested in June 2019, and all the components have been through internal testing. The new services were greeted very positively by some of Quintara's existing customers in February 2020. But the launch of the new services has been postponed, initially by Defendants' sabotage and later by the COVID-19 lockdown. A major part of the development plan for the Turbo DNA Sequencing Services was captured in a set of presentation slides which Plaintiff believes have been misappropriated by Defendants along with other informational items for the new services.

### 5.  The Business Plans

The business plans are text files or presentation decks for Quintara's planned expansion of its existing business operation and for potential creation of new business lines. For example, the business plans include Quintara's plans to geographically expand into San Diego, California, as well as the States of New Jersey and Connecticut. The business plans also contain Quintara's plans to develop new service lines such as Turbo Sequencing, single cell sequencing, fast gene synthesis and cloning, and CSS DNA production.




PLAINTIFF'S AMENDED TRADE SECRET DISCLOSURE

TRIAL COUNSEL'S EYES ONLY PURSUANT TO COURT ORDER ECF 40

The business plans are not publicly available.  They were created based on Quintara's years of business and product development experiences and its owners' foresights as to the future direction of the industry. They are highly valuable to any copycat competitors of Quintara.

**6.  Vendor Databases**

The databases for external vendors, partners, and consultants, which are collectively referred to as the "vendors," are spreadsheet files containing the contact and business information for these third-party service providers which are essential for Quintara's business operations. This database was built through years of cumulative experiences of Quintara. Although each individual service provider may have its information online or in other public places, the compilation of these third-party service providers specifically for a DNA sequencing business like Quintara is confidential information. The vendor databases also contain Quintara-specific information that is not available in the public domain, including Quintara's purchasing plans with specific vendors and the financial arrangements between Quintara and such vendors. Thus, the vendor databases are of significant value to any potential competitor of Quintara.

**7.  Computer Informatics**

The computer informatics for automating Quintara's sequencing flow and related business operations were written by Quintara, specifically designed for Quintara's businesses. Although the source code may contain publicly available components, its overall compositions and functionalities are not available publicly and are thus of high value to anyone who wants to emulate Quintara's business. There are several software packages in Quintara's informatics system, including:

- The customer relationship management system, "qbonline," which was designed and programmed inhouse in Quintara based on the Turbogear web framework. The underlining database of qbonline is tailored specifically to Quintara service business. The database, together with its Model and Controller layer, form the core logics of Quintara's online order, data delivery, and billing system. Implementation of the main system started in 2011, with different functionalities being added over the years. The system contains more than 2000 code files, with more than 40,000 lines of codes.

LiLaw Inc.

TRIAL COUNSEL'S EYES ONLY PURSUANT TO COURT ORDER ECF 40

Quintara's customers and employees rely on this system for their daily work, while Quintara's management use this system for analytics in business performance and planning.

- The process management system, "qblib," which is used to manage the workflow and to perform checkpoint on laboratory processes. It includes software to interact with major machines like DNA sequencers and computer servers.  The package interacts with excel spreadsheets and pdf files and uses statistic software packages for graphing and reporting. For example, qblib contains a module named "machineai" which uses artificial intelligence algorithms to check on a model of DNA sequencers that uses 96 capillaries for running samples.  If one of the capillaries is blocked, the module automatically flags all samples run through this broken capillary as failure. The module also runs daily checks for each capillary status, creates status reports, and emails the reports to the right people.

- The data analysis system, "qbpy," is a data analysis package. It contains computer scripts, which are short computer execution programs, for a variety of functionalities, including (a) sequencing data quality control, which reads binary files produced by Sanger sequencer 3730xl and applies Quintara's own data quality scoring matrix;  (b) customized sequencing data analysis flows, specific for different customers, such as EMD, Dupont, Illumina, Merck, Joint BioEnergy and Institute etc.; (c) data analysis flows for bacterial genome identification; (d) antibody discovery flows for antibody annotation, antigen and antibody interaction prediction, which is used to process data for antibody discovery projects performed for drug discovery companies like Glenmark Pharmaceuticals, Ono Pharmaceutics; and (e) software for CRISPR on/off target analysis.

- The iPhone app "Labscan."  This app was developed to work with the Quintara Online for customer order tracking and support Quintara's logistic team for pickups and deliveries.



TRIAL COUNSEL'S EYES ONLY PURSUANT TO COURT ORDER ECF 40

- The QB plasmid editor "SparkDNA," which is a standalone software for plasmid map viewing, editing, and sequencing trace alignment. Dr. Timothy Ham of Quintara spent 16 months from May 2012 to August 2013 on the SparkDNA work, in addition to two coding contractors hired from outside Quintara. The total direct cost (salary and benefit) for Dr. Timothy Ham alone for developing this module was $122,272.

**8. The Customized Protocols and Reagents for Sanger DNA Sequencing**

While Sanger sequencing as a general DNA sequencing technology is not a secret, Quintara's own version of the methodology is. Quintara has been tweaking the protocols and reagents of its own Sanger sequencing operations for years and have developed an optimal set of protocols and reagent recipes which are confidential information of Quintara and which is of great value to a potential competitor who wants to develop its own Sanger DNA sequencing business.

For example, the following charts show the difference between the cycle sequencing PCR protocol published by the DNA sequencer manufacture, ABI, and the cycle sequencing PCR protocol developed by Quintara.  Quintara's protocol is optimized to work with different customer samples, with a higher success rate than ABI's generic protocol.

| ABI Standard Protocol | | |
|---|---|---|
| 96C | 1 m | 1 cycle |
| 96C | 10 s | |
| 50C | 5 s | 25 cycles |
| 60C | 4 m | |
| 4C | hold | |



**9. New Reagent Kits**

The recipes and protocols of reagent kits for new products are the implementation of new product designs by Quintara, who developed the recipes and protocols through years of investments

PLAINTIFF'S AMENDED TRADE SECRET DISCLOSURE



TRIAL COUNSEL'S EYES ONLY PURSUANT TO COURT ORDER ECF 40

in these new products. The recipes and protocols are confidential information not available anywhere in the public domain. A copycat will find the recipes and protocols valuable to help it launch similar products. Specifically, this category of trade secrets include the composition and methods for the reagent kits for the following DNA sequencing related processes:

- DNA sequencing using dye labeled dideoxynucleotide terminators (Sanger method).
- 5x reaction buffer for dye labeled dideoxynucleotide terminator-based DNA sequencing (Sanger method).
- Special reaction buffers for DNA templates containing hairpins or with high GC content for dye labeled dideoxynucleotide terminator-based DNA sequencing (Sanger method).
- Different DNA polymerases in dye labeled dideoxynucleotide terminator-based DNA sequencing (Sanger method).
- 10x gel electrophoresis buffer for ABI genetic analyzers (Sanger sequencers).
- Magnetic beads-based DNA sequencing reaction cleanup kits.
- Magnetic beads-based DNA purification.
- Magnetic beads-based PCR cleanup.
- Enzyme-based PCR cleanup.
- Competent cells for molecular cloning, DNA production, and protein production.
- DNA molecular weight marker, 2kb double stranded fragment.
- DNA molecular weight marker, 3kb double stranded fragment.
- DNA molecular weight marker, 4kb double stranded fragment.
- DNA molecular weight marker, 5kb double stranded fragment.
- DNA molecular weight marker, 6kb double stranded fragment.
- DNA molecular weight marker, 7kb double stranded fragment.
- DNA molecular weight marker, 8kb double stranded fragment.
- DNA molecular weight marker, 10kb double stranded fragment.
- DNA molecular weight marker, 0.33kb single stranded fragment.
- DNA molecular weight marker, 1kb single stranded fragment.
- DNA molecular weight marker, 2kb single stranded fragment.



LiLaw Inc.

- DNA molecular weight marker, 3kb single stranded fragment.

- DNA molecular weight marker, 4kb single stranded fragment.

- DNA molecular weight marker, 5kb single stranded fragment.

- DNA molecular weight marker, 6kb single stranded fragment.

- DNA molecular weight marker, 7kb single stranded fragment.

- DNA molecular weight marker, 8kb single stranded fragment.

- DNA molecular weight marker, 10kb single stranded fragment.

- DNA molecular weight marker, 20kb single stranded fragment.

- PCR master mix (Taq polymerase based).

- Realtime PCR master mix (Taq polymerase based).

- PCR master mix (Phusion polymerase based).

- ▮▮▮▮▮▮▮▮▮▮

- Tn5 transposase and its applications on next generation sequencing sample preparation (NGS).

- Reverse transcriptase and its application in NGS sample preparation.

- Phi29 DNA polymerase and its application in sample preparation for Sanger and NGS sequencing.

- Cas12b and its applications in isothermal nucleic acid detection.

- Cas13 and its applications in isothermal nucleic acid detection.

- In vitro transcription and translation system from E. coli.

- Scarless DNA assembly kits (▮▮▮▮▮).

- Genome DNA extraction from yeast.

- Genome DNA extraction from animal tissues.

- Oligo dT cellulose resins.

- NGS library preparation from animal tissues.

- Zero-background cloning vectors.



LiLaw Inc.

PLAINTIFF'S AMENDED TRADE SECRET DISCLOSURE

TRIAL COUNSEL'S EYES ONLY PURSUANT TO COURT ORDER ECF 40

### 10. DNA Donor Technology

The DNA Donor Technology is a new product that Plaintiff is on the verge of launching (which has been delayed by the pandemic and by Defendants' sabotage). It was developed for the Nobel-winning gene editing method called CRISPR. Quintara started to develop the DNA Donor Technology in 2016 based on its founder Dr. Shan's unique understanding of homologous DNA recombination processes. The technology was in fact an extension of one of Dr. Shan's own research papers.

In October 2018, Dr. Shan wrote a summary of the DNA Donor Technology. In this summary, Dr. Shan reviewed the origin of this idea starting from a customer's inquiry on single-stranded DNA (ssDNA) in 2016. Dr. Shan did intensive work on ssDNA and the mechanisms of homologous DNA recombination. Dr. Shan reached out to his graduate adviser at the University of Wisconsin-Madison. Dr. Shan also reached out to Dr. Christopher A. Voigt of MIT who developed a cutting-edge technology of making ssDNA. Eventually, the technology was developed through the collaboration between Dr. Voigt of MIT and Dr. Shan of Quintara.

Dr. Shan sent the summary of the technology to Dr. Mark Neff of Quintara who drafted a mock manuscript based on the summary as a prelude to drafting a provisional patent application. Drs. Neff and Shan spent most of the October of 2018 to draft the provisional patent application for the technology. The provisional application was eventually filed, but has not been published. Quintara has an option for an exclusive license to the MIT's right in the provisional patent application if the application turns into a patent. MIT's patent right, however, does not extend to the trade secrets of the DNA Donor Technology which are the detailed implementations developed by Quintara.

The trade secrets of the DNA Donor technology include the implementation designs, protocols, reagent recipes, testing data, and other related information.  These items of information are all confidential information of Quintara and cannot be found in the public domain. Any competitor who steal the information will gain a competitive edge in the race to the commercialization of CRISPR. Specifically, the trade secrets of the DNA Donor Technology include the designs, reagents, instruments, and protocols for implementing the following specific components of the technology:

- The engineering of HEK293 cells, K562 cells, as well as primary human T cells.



**LiLaw Inc.**

TRIAL COUNSEL'S EYES ONLY PURSUANT TO COURT ORDER ECF 40

- A new method of making circular ssDNA, which is covered by a yet-to-publish patent application filed by Quintara ("Compositions and Methods for Producing Single Stranded DNA", application number 63049584, filing date 10/20/2020).
- Producing Cas9 protein for CRISPR mediated targeted genome modification.
- sgRNA for CRISPR mediated target genome modification.
- Preparing cell lines and primary cells for CRISPR mediated genome modification.
- Isolation and preparation of primary cells such as T cells for CRISPR mediated genome modification.
- Preparation of RNP complexes which include Cas9 protein, sgRNA, and circular ssDNA donor.
- The electroporation conditions of delivery of RNP complexes to cell lines and/or primary cells.
- Making single stranded DNA longer than 10kb and up to 20 kb.
- Circular ssDNA donors for targeted genome modification.
- The phagemid vector for generating circular ssDNA donors.
- Making ultrahigh competent cells for single stranded DNA production.
- Producing ▮▮▮▮ protein, which is an enzyme that could cleave ssDNA at specific location under the guidance of short oligonucleotides.
- Linearization of circular ssDNA into linear ssDNA using restriction endonucleases and oligos complementary to cssDNA.
- Linearization of circular ssDNA into linear ssDNA using ▮▮▮▮ and guide DNA.
- Linearization of circular ssDNA into linear ssDNA using site-specific recombinases like FLP and CRE.
- Isolation and purification of ssDNA.
- Purification of homologous DNA recombinases such as RecA protein.
- Purification of single stranded DNA binding proteins like SSB protein from E. coli.
- Specific mutations of RecA protein and its application in targeted genome modification using circular single stranded DNA.

PLAINTIFF'S AMENDED TRADE SECRET DISCLOSURE



LiLaw Inc.

TRIAL COUNSEL'S EYES ONLY PURSUANT TO COURT ORDER ECF 40

- Specific form of single stranded binding protein (SSB) and its application in targeted genome modification using circular single stranded DNA.
- Specific peptide fragments from RecA protein and its application in targeted genome modification using circular single stranded DNA.
- Fusion proteins consisting of Cas9 and RecA protein or polypeptide derived from RecA protein, and its applications in targeted genome modification using circular single stranded DNA.
- Complex formation between circular ssDNA donor and sgRNA, and its application in targeted genome modification.
- Ligation of two linear ssDNA or multiple linear ssDNA into one ssDNA of large size by T4 ligase and splinter oligos.
- Ligation of two linear ssDNA or multiple linear ssDNA into one ssDNA of large size by RNA ligases.
- Ligation of two linear ssDNA or multiple linear ssDNA into one ssDNA of large size by site-specific recombinases like FLP or CRE.
- Use of large circular ssDNA as antisense DNA to modulate gene expression.
- Use of large circular ssDNA as antisense DNA to block viral infection, and its application in COVID-19 treatment.
- Use of bacteriophage M13 to manufacture functional adeno associated virus (AAV) genomes. The M13 phage based artificial AAV genomes do not have the packaging limitation of 4.5 kb.
- Functionalizing ssDNA as alternative form of mRNA but with enhanced stabilities.
- Gene enrichment, and its application on next generation DNA sequencing (NGS).

### 11. The IL 15 Fusion Proteins

Quintara's Interleukin 15 (IL 15) fusion proteins are a series of recombinant proteins with altered IL 15 activities comparing to the native cytokine IL15. The activities of these recombinant proteins may be "tuned" to be the same as or lower than the native IL15. Thus, Quintara sometimes



LiLaw Inc.

refers to them as IL15 fusion proteins "with tunable activities." These IL15 fusion proteins could potentially become independent agents or part of combination therapy for cancer immunotherapy. They could also be delivered to immune cells like T cells, NK cells and macrophages via CRISPR technology and Quintara's Donor DNA Technology.

As stated above, all the listed trade secrets are stored in Plaintiff's computer systems which Defendants have misappropriated.

Plaintiff has used reasonable efforts to maintain the secrecy of these trade secrets. All of Plaintiff's computers are password protected. Each employee who has the need to access the computers has a unique login and password. Each employee who may access the computers is required to sign a confidential agreement. Over the years, Plaintiff's offices are always properly secured with locks and by the security services provided by the landlords. None of the trade secrets are allowed to be shared with people outside Quintara. Therefore, the trade secrets identified above are of value for not being generally known.

**C.     The List of Trade Secrets**

1.     Quintara's customer database in the form of computer spreadsheets and relational database containing fields like names, addresses, telephone numbers, emails, and/or contact persons.

2.     Quintara's customer profile database containing products and services that each customer has purchased from Quintara, including the date, quantity, and price of each purchase, which is set forth in computer spreadsheet files and which may further include analysis of additional products and services that Quintara may offer to the customer.

3.     Quintara's marketing plans for its existing products and services, set forth in the form of text or presentation computer files.

4.     Quintara's development plans for new products and services, set forth in the form of text or presentation computer files.

5.     Quintara's business plans for expansion of the existing business operations and for creation of new business lines in the form of text or presentation computer files.



**LiLaw Inc.**

TRIAL COUNSEL'S EYES ONLY PURSUANT TO COURT ORDER ECF 40

6.     Quintara's database for contact information of external vendors, partners, and consultants in the form of computer spreadsheet files, including fields such as names, addresses, telephone numbers, emails, and/or contact persons.

7.     Quintara's computer informatics which are a set of source code for automating Quintara's DNA sequencing flows and related business operations.

8.     Quintara's protocols and reagent recipes customized for its DNA sequencing operations using the Sanger sequencing method in the form of computer files.

9.     Quintara's recipes and protocols of reagent kits for products under development in the form of computer files.

10.    Quintara's product information for DNA Donor Technology, including all aspects of the new product such as protocols, recipes, flow charts, targeted customers, and financial forecasts.

11.    Quintara's IL15 Fusion Proteins, including all aspects of the new product such as protocols, recipes, flow charts, targeted customers, and financial forecasts.


DATED:  December 2, 2020                **LILAW INC.**


By        */s/ J. James Li*
         _____
         J. James Li, Ph.D.
         Attorney for Plaintiff QUINTARA
         BIOSCIENCES, INC.

