**LAW OFFICE OF RESHMA KAMATH**
Reshma Kamath, Cal. Bar No. 333800
700 El Camino Real, Suite 120, #1084,
Menlo Park, California 94025, United States
Phone-number: 650 257 0719
E-mail address: reshmakamath2021@gmail.com
**COUNSEL FOR DEFENDANTS**
**RUIFENG BIZTECH INC.; GANGYOU WANG;**
**ALAN LI; AND, RF BIOTECH LLC.**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| QUINTARA BIOSCIENCES, INC., a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>RUIFENG BIZTECH INC., a California corporation, GANGYOU WANG, an individual, ALEX WONG, an individual, ALAN LI, an individual, RUI SHAO, an individual, and RF BIOTECH LLC, a California limited liability company,<br><br>Defendants. | Case No.: 3:20-cv-04808-WHA<br><br>*[Assigned to presiding Judge Honorable William Haskell Alsup]*<br><br>**DECLARATION OF RESHMA KAMATH IN SUPPORT OF THE PREVAILING PARTIES' NOTICE OF MOTION AND MOTION/REQUEST FOR REASONABLE ATTORNEYS' FEES PURSUANT TO DEFEND TRADE SECRETS ACT [DTSA] PURSUANT TO 18 U.S.C. § 1836 *ET SEQ.*; REQUESTS FOR COSTS INCURRED UNDER FED. *RUL. CIV. PROC. RULE 54 ET SEQ.* DURING THE COURSE OF DEFEND TRADE SECRETS ACT LITIGATION**<br><br>**HEARING:**<br><br>**DATE:  SEPTEMBER 14, 2023**<br>**TIME:   08:00 A.M. PDT**<br>**DEP'T:   COURTROOM 12, 19TH FLOOR** |

*TO THE HONORABLE COURT, ALL PARTIES, AND ATTORNEYS OF RECORD, HEREIN:*

## DECLARATION OF RESHMA KAMATH IN SUPPORT OF THE MOTION FOR REASONABLE ATTORNEYS' FEES CASE NO. 3:20-CV-04808-WHA

*I, RESHMA KAMATH, declare as stated below:*

1. I'm the Counsel for the Defendants **RUIFENG BIZTECH INC.; GANGYOU WANG; ALAN LI; and, RF BIOTECH LLC,** (*hereinafter*, "Defendants").

2. I was the lead trial counsel for the above-stated litigants.

3. I'm licensed to practice law only in the State of California, and in good standing.

4. The following facts are within my personal knowledge and, if called as a witness herein, I can and will competently testify hereto.

5. Pursuant to 18 U.S.C. section 1836 *et seq.*, Defendants **RUIFENG BIZTECH INC.; GANGYOU WANG; ALAN LI; and, RF BIOTECH LLC,** via undersigned counsel, **RESHMA KAMATH** request reasonable attorneys' fees and costs in the amount of approximately, **four, and a half million dollars ($4.50 million)**

6. This is the DECLARATION OF RESHMA KAMATH IN SUPPORT OF THE PREVAILING PARTIES' NOTICE MOTION AND MOTION/REQUEST FOR REASONABLE ATTORNEYS' FEES PURSUANT TO DEFEND TRADE SECRETS ACT [DTSA] PURSUANT TO 18 U.S.C. § 1836 *ET SEQ.*; REQUESTS FOR COSTS INCURRED UNDER FED. *RUL. CIV. PROC. RULE* 54 *ET SEQ.*

DURING THE COURSE OF DEFEND TRADE SECRETS ACT LITIGATION.

7. This requested attorneys' fees and costs is reasonable for the three-year litigation for the prevailing parties to defend and litigate until trial with a unanimous jury verdict the improperly-brought trade secrets claim. Quintara, the plaintiff, lost at trial, with its attorneys, James Li, Tamara Rider, Daniel Peterson, and Richard Lambert, who were **unable** to show via a preponderance of evidence the issue of ownership of the alleged trade secret.

8. Defendants via their undersigned counsel, Reshma Kamath, **successfully defended** the bad-faith, and objectively specious DTSA claims brought by the losing party, Quintara and its attorneys, James Li, Tamara Rider, Daniel Peterson, and Richard Lambert.

9. Defendants via their undersigned counsel, Reshma Kamath, **affirmatively defended**, and demonstrated joint-ownership and collaboration with overwhelming evidence of Ruifeng Biztech, Inc.'s payments, W-2s, and executed agreements between parties from the year 2013 to the year 2019. [See TRANSCRIPT OF TRIAL PROCEEDINGS BEFORE THE HONORABLE WILLIAM H. ALSUP UNITED STATES DISTRICT JUDGE AND A JURY ("*hereinafter, "Transcript*") *Volume* 3, pgs. 447-448, line 6; pgs. 449, lines 15-25; See *Volume* 3, pgs. 453, line 3-15.]

**10.** In this case, the LAW OFFICE OF RESHMA KAMATH spent 4,610 hours (amounting to approximately **192.083 days, from November 2021 to present date**) at $450 per hour on this matter from when the law firm was substituted in including the hours spent on pre-trial and trial preparation, trial binder preparation, witness(es) preparation, and the actual trial. This amount summed up to **$2,074,500.**

**11.** A true and correct copy of the Defendants', i.e., prevailing parties' reasonable attorneys' fees litigating this matter while under the Law Office of Reshma Kamath from November 09, 2021, was over **$2,074,500**, ($25,000 paid), attached as "**EXHIBIT A**," and incorporated via reference, herein.

**12.** No other attorney and/or any person has advised me in any aspect of this above-captioned matter. Thus, each line item in the invoice was my work solely. I have further detailed invoicing and logs for clients.

**13.** Because this litigation spanned several years; garnered negative publicity to Defendants' natural persons and corporate persons; tarnished reputations; employed the use of several experts during the course of litigation,; Quintara's lack of telephonic meet-and-confer with undersigned counsel until the pre-trial preparation; Quintara attempting to **delay** the matter even at trial claiming mid-testimony and mid-trial expert production issues *inter alia*, Defendants, i.e., prevailing parties, have

incurred reasonable attorneys' fees with the previous law firm Buchalter charging them over $2.50 million (over $780,000 paid), and costs of experts, Haystack and Sebold ($276,000) adding up to four and a half million ($4.50 million) until November 09, 2021.

14. The losing party, Quintara, with $17.70 million in revenue to date, recklessly and negligently for three (3) years not only in **bad-faith** misled the Court, but also the parties, into deceptively believing that some alleged trade secret existed for which a protective order was required – when none did.

15. A true and correct copy of Quintara's revenue of $17.7 million is attached as "**EXHIBIT B**," and incorporated via reference, herein. [See also how Quintara attorney Ms. Tamara Rider is **concocting "trade secrets"** with Quintara expert, *Berryhill Cross by Ms. Kamath, Transcript Volume* 3, pg. 464, lines 3-25; *See*, how on pgs. 465-467 1-25 each, where Jon Berryhill confirms he had received three productions to investigate; however, Mr. James Li then **misleads** the Court that he did not receive the entire production only for purposes of "**delay**"; see *Berryhill Cross by Ms. Kamath*, pg. 475, lines 13-25; pgs. 477, lines, 1-13.]

16. Not only the deception and trickery of Quintara, but also that of each of its attorneys, was brought in **bad-faith** without investigating the material in its possession, custody, care, and control. This demonstrates that the

litigation was brought only in bad-faith for improper purposes to **delay** [*See Transcript* Volume 3, pg. 425, lines 3-5 where court called Quintara attorneys' conduct a "delay point;" pg. 435, line 1 where court stated "serious problems with this case far outweighed…[intentionally omitted]"], and to **harass** Defendants. *Transcript Volume* 2, pg. 257, lines 4-7; *Volume* 2, pg. 233, line 8-25; *Volume* 2, pg. 257, lines 13-24; *Volume* 2, pg. 259, lines 2-25; *Volume* 2, pg. 267, lines 2-16; *Volume* 2, pg. 285, lines 7-13.

17. The Court even admonished the attorney for Quintara, James Li, outside the presence of the jury, that James Li must win an "Academy Award." *Volume* 2, pg. 394, lines 14-17. To this, Mr. Li responded, "Yes" in line 18. Even the "immigration sham" argument that James Li and his associate attorneys concocted turned out to be brought in objective and subjective bad-faith. A true and correct copy of the *Transcript Volume* 2, pg. 324, lines 1-13; *Volume* 2, pg. 286, lines 1-25, is attached as "**EXHIBIT C**," and incorporated via reference, herein.

18. For such purposes, the Honorable Court, in its discretion, must award reasonable attorneys' fees in the amount of approximately, four, and a half million dollars (**$4.50 million**) finding Quintara's **bad-faith and improper purpose** in bringing the DTSA claim against the prevailing parties.

19. In this complex litigation, prevailing parties, i.e., Defendants incurred reasonable attorneys' fees at $450 per hour from November 09, 2021, for the undersigned counsel to engage with voluminous information improperly marked by the prior attorneys of Defendants; unilaterally creating trial exhibits and trial witness lists; arranging subpoenas; creating a plethora of trial demonstratives and trial binders; engaging with the trial binder company; reviewing prior deposition transcripts of witnesses; preparing short-statements, trial briefs, final pre-trial draft; reviewing analytically DTSA code, case-law and prior judgments from the 9th Circuit Court; creating on-going case strategy, preparing witnesses; and, drafting opening and closing statements, *inter alia*. See **Exhibit A**.

20. Under *Fed. Rul. Civ. Proc. Rule* 54 et seq., Defendants incurred costs that included retaining the federal court reporter; retaining the certified Mandarin-Chinese-language translator and interpreter. See **Exhibit A**, and **Exhibit S**.

21. Thus, the reasonable attorneys' fees that Defendants have incurred because of Quintara's (and the attorneys') **bad-faith objectively and subjectively via circumstantial evidence** demonstrate a numerical value of approximately, **four, and a half million dollars ($4.50 million).**

22. For the fee-shifting provision, Defendants Ruifeng *et al*., can prove by **circumstantial evidence** that Quintara brought the federal trade secrets

RESHMA KAMATH

misappropriation claim against Defendants in "**bad-faith**" under Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836(b)(3)(D).

23. For the fee-shifting provision, Defendants Ruifeng *et al.* are **not** claiming 'animosity' and 'lack of evidentiary support' to be some kind of alleged bad-faith.

24. For the fee-shifting provision, Defendants Ruifeng *et al.* are claiming a colorable basis, and improper means for harassment and delay. This is particularly and specifically to bolster Quintara's state-court claims. See, *Transcript Volume* 2, pg. 267, lines 2-16; trial where Quintara attorney, James Li brings up the state court claims and addresses how this decision impacts the state court-claims. See *TransPerfect Glob. v. Lionbridge Techs.* (S.D.N.Y., May 31, 2022, 19cv3283 (DLC)).

25. A true and correct copy of the *Transcript Volume* 2, pg. 262, lines 19-25; lines 5-10 is attached as "**EXHIBIT D**," and incorporated via reference, herein.

26. Under the federal Defend Trade Secrets Act [DTSA], a prevailing party may be awarded reasonable attorneys' fees and costs if a claim of misappropriation is made in bad faith. 18 U.S.C. § 1836(b)(3)(D); CAL. CIV. CODE § 3426.4.

27. Courts also have the inherent authority to award attorneys' fees. *Tapgerine, LLC v. 50Mango, Inc.*, No. C 16-06504 WHA, 2017 WL

1956874, at *1 (N.D. Cal. May 11, 2017). Because neither the California Uniform Trade Secrets Act nor the federal Defend Trade Secrets Act defines "bad faith" in the context of trade secret misappropriation, "courts generally adopt a two-pronged standard for the evaluation of such claims." *Farmers Edge Inc. v. Farmobile, LLC*, No. C 16-191, 2018 WL 3747833, at *6 (D. Neb. Aug. 7, 2018) (Judge Joseph F. Bataillon).

28. The party seeking attorneys' fees must show (1) the objective speciousness of the claim, and (2) the subjective bad faith in bringing or maintaining the claim. *CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1111 (9th Cir. 2007) (quoting *Gemini Aluminum Corp. v. California Custom Shapes, Inc.*, 95 Cal. App. 4th 1249, 1262 (2002)).

29. Insofar as controlling law on this subject remains ambiguous, district courts may also exercise discretion in case management to enforce Section 2019.210, and the undersigned judge has in fact done so. See, e.g., *Jobscience, Inc. v. CVPartners, Inc.,* 2014 WL 852477, at *4–5 (N.D. Cal. Feb. 28, 2014).

30. Approaching the issue as one of case management also works well because, technicalities aside, Section 2019.210 ultimately aims to address practical problems that tend to arise in trade secret litigation. See *Advanced Modular Sputtering, Inc. v. Superior Court*, 132 Cal. App. 4th 826, 835 (2005) ("[T]he law is flexible enough for the referee or the trial court to

achieve a just result depending on the facts, law, and equities of the situation.").

31. Among other things, it "promotes well-investigated claims and dissuades the filing of meritless trade secret complaints," "prevents plaintiffs from using the discovery process as a means to obtain the defendant's trade secrets," and "enables defendants to form complete and well-reasoned defenses." *Id.* at 833–34. "Experience has shown that it is easy to allege theft of trade secrets with vagueness, then take discovery into the defendants' files, and then cleverly specify whatever happens to be there as having been trade secrets stolen from plaintiff." *Jobscience I*, 2014 WL 1724763, at *2.

32. The District Court for the Northern District of California recently issued an order awarding partial attorneys' fees for an approximately one-month time-period to a defendant in a trade secret misappropriation case brought pursuant to the federal Defend Trade Secrets Act ("DTSA") and California Uniform Trade Secrets Act ("CUTSA").

33. The decision is most notable for making clear a plaintiff's ethical obligation to immediately dismiss a trade secrets action once it knows that its misappropriation claims are objectively specious. *Swarmify, Inc. v. Cloudflare, Inc.*, *supra*, concerned plaintiff Swarmify's claims of alleged misappropriation of trade secrets related to video streaming technology by

defendant Cloudflare.

34. In *Swarmify, Inc. v. Cloudflare, Inc.*, this Court also found that Swarmify had an ethical duty to immediately dismiss the action, rather than attempt to extract some gain from Cloudflare by settling. Accordingly, the Court determined that Swarmify had acted in bad faith from late May 2018 to early June 2018, and awarded attorneys' fees to Cloudflare in the amount of approximately $9800 for that three-week period.

35. ***In this instant case***, the period of Quintara's bad-faith extended until the unanimous jury verdict for a plethora of years from July 17, 2020, until atleast July 25, 2023 over three (3) years - **not for the three-week** period unlike the *Cloudfare* matter. Hypothetically, if one-month incurred over $9,800 in attorneys' fees in the *Cloudfare* matter, then three years (36 months) must at a minimum incur $498,400 atleast.

36. A true and correct copy of the court docket is attached as "**EXHIBIT E**," and incorporated via reference, herein.

37. In *Weco Supply Company, Inc. v. Sherwin-Williams Company, 2013 U.S. Dist. LEXIS 1572* (January 3, 2013), the court in the Eastern District of California, revisited the issue of what constitutes "bad faith" for purposes of awarding attorneys' fees in trade secret cases.

38. The *TransPerfect Glob.* matter is one of the most recent cases to explore the standard for awarding attorneys' fees to successful trade secret

defendants. *Supra at pg. 16.*

**39.** In addition to citing the DTSA standard, the court in *TransPerfect* also stated it has "the inherent power to award attorneys' fees for bad faith." The court generally explained that in order to meet the "bad faith" standard it must be shown that the claim "was without a colorable basis" and was "motivated by improper purposes such as harassment or delay." *Kerin v. U.S. Postal Serv.*, 218 F.3d 185, 190 (2d Cir. 2000); *Int'l Techs. Mktg., Inc. v. Sys., Ltd.,* 991 F.3d 361, 368 (2d Cir. 2021) (citation omitted).

**40.** Quintara's claims were objectively specious.

**41.** Defendants Ruifeng *et al* has demonstrated the "something more" standard to merit sanctions against Quintara of reasonable attorneys' fees and costs. This is particularly true given that federal courts seem to be split on whether objective bad faith, subjective bad faith, or a showing of both, are required to establish "bad faith" misappropriation claims. See, e.g., *Aday v. Westfield Ins. Co.*, No. 21-3115, 2022 WL 203327, at *14 (6th Cir. Jan. 24, 2022) (requiring subjective bad faith such that a party defending against a misappropriation claim must prove that "the claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment"); *Insurent Agency Corp. v. Hanover Ins. Co.*, 2020 WL 86813 (S.D.N.Y. Jan. 8, 2020) (claim must be "wholly without merit" to be

entitled to attorneys' fees under the DTSA.)

42. Objectively specious, Quintara's claim was wholly without merit and without colorable basis in fact and law. Whereas, superficially, there seemed to be some kind of concocted federal trade secrets, one review as to the issue of "ownership" pursuant to the parties' agreements, salaries, equipment payments, and taxable W2s revealed the lack of merit in the Quintara DTSA claim.

43. *Firstly*, an objective review of the executed agreements demonstrated in Quintara-Exhibits 2, 2A, 3, 5, and 6 shows that the parties **jointly had ownership** of the DNA sequencing lab work from Richmond in the year 2013, South San Francisco from the year 2015, and Hayward Investment Boulevard work from the year 2017.

44. Bringing the DTSA claim was thus brought by Quintara and each of its attorneys, **objectively in bad-faith**. A true and correct copy of the *Transcript Volume* 2, pg. 341-345, lines 1-25; *Volume* 2, pg. 351, lines 5-20; pg. 352, lines 1-25; *Sue Zhao, Cross, Volume 3*, pg. 716, lines 8-10; 13-15; pg. 714, lines 14-25; pg. 741, lines 3-9 is attached as "**EXHIBIT F**," and incorporated via reference, herein.

45. *Secondly*, an objective review of the California Secretary of State corporate filings - that Quintara produced in Exhibits 67 and 68 - show that 'Qun Shan'/Richard Shan, agent for corporate person, Quintara, had

signed the Articles of Incorporation for Ruifeng Biztech, Inc. in December 2013. The ownership issue was objectively clear from the year 2013 atleast.

46. Yet, in 2021, Quintara brought a lawsuit of federal trade secrets misappropriation. Bringing the DTSA claim in 2021 was thus brought by Quintara and each of its attorneys, **objectively in bad-faith**, because each of the attorneys had knowledge, and/or should have known when they had initiated the lawsuit on July 07, 2020 that there was no unilateral, sole ownership by Quintara. [since the year 2013 there were agreements and payments inter-twining, and then in the year 2019 Sue Zhao and Qun Shan's W2 payments came from Ruifeng Biztech, Inc.].

47. A true and correct copy of the *Transcript Volume* 2, pg. 354, lines 3-25; pg. 356, lines 10-11; *Volume* 3, pg. 513, lines 7-25, is attached as "**EXHIBIT G**," and incorporated via reference, herein.

48. *Thirdly*, and objectively, 'Qun Shan'/Richard Shan, agent for corporate person, Quintara produced corporate hierarchy documents of Ruifeng Biztech, Inc. to show how Qun Shan and Sue Zhao were involved in the formation of Ruifeng. Quintara **knew and/or should have known** since January 2013 of the existence of such documents showing joint-collaboration and ownership until December 2019. Bringing the DTSA claim mid-year 2020 was thus brought by Quintara and each of its

attorneys, **objectively in bad-faith**. See Quintara Trial Exhibits 406 and 408.

49. A true and correct copy of partial *Transcript Sue Zhao, Cross by Ms. Kamath, Volume* 3, is attached as "**EXHIBIT H**," and incorporated via reference, herein.

50. *Fourthly*, and objectively, Quintara and its attorneys, James Li, Tamara Rider, Daniel Peterson, and Richard Lambert, as plaintiff, objectively in bad-faith **failed to investigate** issues of whether the alleged trade secret was 'password-protected,' 'two-factor/multifactor authenticated,' and/or 'encrypted.' *See* Quintara Trial Exhibits 311 and 313. This is the crux of trade secret preservation from the inception to have reasonable measures to protect of any such alleged owned trade secret.

51. A true and correct copy of the trial transcript, *Transcript Jon Berryhill Cross by Ms. Kamath, Volume* 3, pg. 530, line 22-25; pg. 531 lines 11-25; pg. 532 lines 1-25s; pg. 533 lines 1-25, is attached as "**EXHIBIT I**," and incorporated via reference, herein.

52. *Fifthly*, and objectively, Quintara and its attorneys, James Li, Tamara Rider, Daniel Peterson, and Richard Lambert, as plaintiff, failed to investigate and produce to the Court that of the one-million dollar transfer of payment whether loan/investment to Qun Shan/Sue Zhao/Quintara; of the Oligo synthesizer that Qun Shan bought with atleast $100,000 of

Ruifeng/Gangyou Wang's one million dollar investment and took with him to Quintara's Boston lab, *inter alia*. Any and all the materials were produced during discovery, and Quintara produced the exhibits and testimonial evidence from Qun Shan/Sue Zhao at trial – with Quintara and each of its attorneys' failure to investigate in objectively bad-faith that circumstantial evidence exists for no DTSA claim against named Defendants.

53. A true and correct copy of the trial transcript, *Shan Cross by Ms. Kamath*, *Volume 2*, pg. 276, lines 10-14; pg. 320, lines 1-16; pg. 334, line 16-25; pg. 335, lines 1-25, is attached as "**EXHIBIT J**," and incorporated via reference, herein.

54. *Sixthly*, the W-2 salary payments to Sue Zhao/Qun Shan even until the year 2019 demonstrated in Ruifeng-Exhibits 506 (C) and (D) were in Quintara/Sue Zhao/Qun Shan's possession, custody, care, and control [known/should have known] since **atleast 2019** – *prior to them initiating the lawsuit*. To conceal them, is Quintara's objective bad-faith.

55. A true and correct copy of RUIFENG Exhibits 506 (C) and (D) are attached as "**EXHIBIT K**," and incorporated via reference, herein.

56. *Seventhly,* Quintara did not retain an independent expert for damages analysis. It hired Qun Shan's brother, Tomo Kimura, who had never opined prior on trade secret damages, less any kind of damages. *Transcript*

*Volume* 4. For this, Defendants had retained a very expensive expert, Maryellen Sebold.

57. *Eighth*, Quintara misled at trial the Court that Quintara's own expert, Jon Berryhill was not provided with any complete database and material. However, that was a falsified statement, because Berryhill confirms he received three productions. See also how Quintara attorney Ms. Tamara Rider is **concocting "trade secrets"** with Quintara expert, *Beryhill Cross by Ms. Kamath, Transcript Volume* 3, pg. 464, lines 3-25; *See*, how on pgs. 465-467 1-25 each, Jon Berryhill confirms he had received three productions for RF Bioserver; however, in the middle of Berryhill's cross at trial, Mr. James Li then **misleads** the Court that he did not receive the entire production on *Berryhill Cross by Ms. Kamath*, pg. 475, lines 13-25; pgs. 477, only for purposes of "**delay**"; pgs. 447, lines, 1-13.

58. A true and correct copy of *Berryhill Cross by Ms. Kamath, Transcript Volume* 3, pg. 464, lines 3-25; pgs. 465-467 1-25; pg. 475, lines 13-25; pgs. 477, only for purposes of "**delay**"; pgs. 447, lines, 1-13, is attached as "**EXHIBIT L**" and incorporated via reference, herein. For this, Defendants had to retain a very expensive expert, Haystack ID and Rene Novoa. This, *inter alia*, shows the circumstantial evidence required for objective bad-faith of Quintara and Quintara attorneys.

59. Quintara's claims were brought in subjective bad-faith.

**60.** Subjective bad faith "means the action was commenced or continued for an improper purpose, such as harassment, delay, or to thwart competition." *SASCO v. Rosendin Elec., Inc.*, 207 Cal. App. 4th 837, 847 (2012). "The timing of the action may raise an inference of bad faith. Similar inferences may be made where the plaintiff proceeds to trial after the action's fatal shortcomings are revealed by opposing counsel." *FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1278 (2009) (citations omitted). "The absence of evidence alone, even after discovery," however, "does not support a finding of subjective bad faith." *SASCO*, 207 Cal. App. 4th at 847.

**61.** Similar to *Aday v. Westfield Ins. Co.*, No. 21-3115, 2022 WL 203327, at *14 (6th Cir. Jan. 24, 2022), Quintara and each of its attorneys, James Li, Tamara Rider, Daniel Peterson, and Richard Lambert demonstrated subjective bad faith where Quintara's claims advanced were meritless, because there was no trade-secret misappropriation expert produced; no reasonable particularity in defining whether a single excel spread-sheet from December 2019-February 2020 was the alleged trade secret; and/or some entire SQL database with no particular time-period. *Transcript Volume 2*; pg. 348, lines 4-25; 349, lines 1-25.

**62.** Quintara and each of its attorneys, James Li, Tamara Rider, Daniel Peterson, and Richard Lambert demonstrated subjective bad faith, because

each of them **knew**, and/or **should have known** the above-stated claims against named Defendants were brought in bad-faith. See *Id.;* discovery, *Deposition of Qun Shan* dated April 4th, 2021, pg. 163, line 21.

63. *Firstly*, a clear review of the executed agreements demonstrated in Quintara Trial Exhibits 2, 2A, 3, 5, and 6 shows that the parties **jointly had ownership** of the DNA sequencing lab work from Richmond in 2013, South San Francisco from 2015, and Hayward Investment Boulevard work from 2017. See *Sue Zhao, Cross by Ms. Kamath, Volume 3*, pg. 661, lines 4-25; pgs. 662, lines 10-17; pg. 664, lines 3-16*;* pg. 670, lines 17-25; pg. 671, lines 1-14; pg. 675, lines 1-7; pg. 678, lines 4-23; Quintara Exhibit 143 A.

64. *Secondly*, the California Secretary of State corporate filings [Quintara produced in Exhibits 67 and 68] show that 'Qun Shan'/Richard Shan, agent for corporate person, Quintara, had signed the Articles of Incorporation for Ruifeng Biztech, Inc. in December 2013. Further, 'Qun Shan'/Richard Shan, agent for corporate person, Quintara produced corporate hierarchy documents of Ruifeng Biztech, Inc. to show how Qun Shan and Sue Zhao were involved in the formation of Ruifeng. Quintara ***knew and/or should have known*** since 2013 of the existence of such documents showing joint-collaboration and ownership. Bringing the DTSA claim with such actual, and/or constructive knowledge of non-trade-secret existence, was thus

brought by Quintara and each of its attorney, **subjectively in bad-faith**. *Transcript Volume* 2, pg. 265, lines 6-7; *Volume* 2, pg. 248, lines 12-16; *See* also how, Ms. Rider misleads the Court and opposing party at trial in going back to a rudimentary "entire stack" of Henry Hu materials in Exhibit 68 rather than the pin-pointed material where Qun Shan's name appeared on a filed document.

65. *Thirdly*, Quintara used the notion of "**immigration sham**" to subjectively in bad-faith fool, deceive, and mislead the Court and judicial officers to string this case along *until jury trial*. *Transcript Volume 3*, pg. 413, lines 13-25; pg. 415, lines 4-5 and 6-23; pgs. 417-421; Quintara Exhibit 67; *Volume* 2, pg. 396, lines 23-25; *Volume* 2, pg. 397, lines 17-20. Quintara produced Trial Exhibits 67 and 68 to demonstrate that 'Qun Shan'/Richard Shan, agent for corporate person, Quintara, had **concurrently signed** the immigration documents and letters for Ruifeng Biztech, Inc., and Gangyou Wang, to the immigration authorities. Moreover, Xueling Zhao/Sue Zhao, spouse of Qun Shan/Richard Shan, and Manager of Quintara, appeared on several L1 investor immigration documents for Ruifeng Biztech, Inc., and Gangyou Wang. Any of the four attorneys of Quintara could have reviewed and investigated the exhibits prior to trial, however, they did not. This circumstantial evidence shows subjective bad-faith.

66. A true and correct copy of the trial transcript *Volume* 2, pg. 296, lines 9-

25. is attached as "**EXHIBIT M**," and incorporated via reference, herein.

67. *Fourthly*, Quintara subjectively in bad-faith used the notion of "immigration sham" in ***settling*** the case for damages – when no such damage existed. *Transcript Volume* 2, pg. 307, lines 1-7; 19-25; *Volume* 2, pg. 308, lines 19-25; *Volume* 2, pg. 279, lines 12-25; pg. 280, lines 1-23; *Volume* 3, pg. 557, lines 1-25; *Volume* 3, pg. 563 lines 1-25; *Volume* 3, pg. 562, lines 1-25; *Volume* 3, pg. 558, lines 1-12.

68. *Fifthly*, Quintara subjectively in bad-faith wasted precious judicial resources, and tax-payer dollars in having an eight-person jury trial, where even on trial day 1 and 2, Quintara and its attorneys, James Li, Tamara Rider, Daniel Peterson, and Richard Lambert, each of them, seeing this is a meritless claim, should have dismissed the trade secrets misappropriation case against named defendants. See, *Transcript Volume* 2, pg. 305, lines 10-25; *Volume* 2, pg. 313, lines 10-25; *Volume* 2, pg. 282, lines 4-25.

69. *Sixthly*, Quintara and its attorneys, James Li, Tamara Rider, Daniel Peterson, and Richard Lambert, in subjective bad-faith told the expert witness, Jon Berryhill to **look for what looked like trade secrets**. Qunintara expert, Jon Berryhill stated he was not a trade secret expert. Mr. Berryhill repeatedly stated during his testimony that he was only relying on what the Quintara attorneys gave him, and what Quintara attorneys produced to him. See *Transcript Volume* 3, pgs. 510-511 Quintara expert

Jon Berryhill stating, "WHAT I SAID WAS THINGS WERE REPRESENTED TO ME TO POSSIBLY BE TRADE SECRETS, AS IN THE KIND OF INFORMATION THAT"; specifically, on pg. 511, lines 9-12, "Q. OKAY. SO YOU WERE NOT NECESSARILY ON YOUR OWN THINKING YOU WERE LOOKING FOR TRADE SECRETS, BUT ONLY ASSISTING JAMES LI LOOK FOR INFORMATION THAT HE HAD PROVIDED TO YOU IN A LIST? A. IN A BROAD SENSE, YES.…[intentionally omitted]"; and, pg. 512, lines 2-4, "HE TOLD ME, YES, WE'RE LOOKING FOR TRADE SECRET INFORMATION, AND THAT'S THE OVERALL GOAL, OBVIOUSLY. THAT'S THE PURPOSE OF THE LITIGATION." [Emphasis added.]

70. A true and correct copy of the *Transcript Volume 3*, pgs. 510-512 is attached as "**EXHIBIT N**," and incorporated via reference, herein.

71. *Seventhly*, Quintara and its attorneys, James Li, Tamara Rider, Daniel Peterson, and Richard Lambert, as plaintiff in subjective bad-faith allegedly not bringing the entire production of what the computer forensic experts reviewed. If something were missing, incomplete, and/or not produced, then Quintara and its attorneys, James Li, Tamara Rider, Daniel Peterson, and Richard Lambert, in subjective bad-faith did **not timely bring any motion to compel production**, and/or in subjective bad-faith

**not timely informing** the Court – until defense counsel Reshma Kamath pointed this out to the Court.

72. *Eighth*, Quintara and its attorneys, James Li, Tamara Rider, Daniel Peterson, and Richard Lambert, as plaintiff, in subjective bad-faith did **not investigate** the issues of whether the alleged trade secret was 'password-protected.' *See* Quintara Exhibits 311 and 313. This is the crux of the trade secret preservation from the inception of any such trade secret. *See* **Exhibit I**. They did not even check with the witness prior - Quintara witness Alex Wong clearly testified that he started receiving Ruifeng paychecks from 2015 even when he was initially employed by Quintara.

73. A true and correct copy of the trial transcript of *Transcript of Alex Wong with Cross by Mr. Li*, Volume 3, pg. 542-543, lines 1-25, is attached as "**EXHIBIT O**," and incorporated via reference, herein.

74. *Ninth*, Quintara and its attorneys, James Li, Tamara Rider, Daniel Peterson, and Richard Lambert, as plaintiff, had actual/constructive knowledge [known/should have known] of the one-million dollar transfer of payment whether loan/investment to Qun Shan/Sue Zhao/Quintara; had actual/constructive knowledge [known/should have known] of the Oligo synthesizer that Qun Shan bought with atleast $100,000 of Ruifeng/Gangyou Wang's one million dollar investment and took with him to Quintara's Boston lab. Any and all the materials were produced

during discovery, and Quintara produced the exhibits and testimonial evidence from Qun Shan/Sue Zhao at trial – with Quintara and each of its attorneys' failure to investigate in subjective bad-faith that circumstantial evidence exists for no DTSA claim against named Defendants. See *Transcript Volume 2*, pg. 340, lines 13-25; pgs. 564-564, lines 23-25 and line 1-4, respectively; pgs. 568-569, lines 1-25.

75. *Tenth*, the W-2 salary payments to Sue Zhao/Qun Shan even until the year 2019 demonstrated in Ruifeng Exhibits 506 (c) and (d) were in Quintara/Sue Zhao/Qun Shan's possession, custody, care, and control [known/should have known] since atleast 2019 – ***prior to them initiating the lawsuit***. To conceal them, is Quintara's subjective bad-faith. See **Exhibit K**; *Transcript Volume 3*, pg. 657, lines 1-25, e.g., where Quintara attorney, James Li knew about "Ruifeng's money."

76. *Eleventh*, the W-2 salary payments to Sue Zhao/Qun Shan even until the year 2019 demonstrated in Ruifeng-Exhibits 506 (c) and (d) were in Quintara attorneys' possession, custody, care, and control [known/should have known] since atleast discovery – ***prior to them initiating the lawsuit***. To conceal them, is Quintara attorneys' subjective bad-faith.

77. This, *inter alia*, shows the circumstantial evidence required for subjective bad-faith of Quintara, its agents, Qun Shan/Sue Zhao, and its attorneys, James Li, Tamara Rider, Daniel Peterson, and Richard Lambert, for

initiating the trade secrets misappropriation lawsuit on July 07, 2020 against named Defendants.

78. *Next*, Quintara and each of its attorneys, James Li, Tamara Rider, Daniel Peterson, and Richard Lambert demonstrated subjective bad faith, because the motive for filing the suit was for an **improper purpose** such as **harassment**. The attorneys often time misled the court such as not producing Quintara's version of the short statement of the case with defense prior to filing; not producing the trial binders before 5 p.m. PDT on the Friday before trial pursuant to the Court Order and then blaming "Bay Area traffic," not producing a COVID-letter from a doctor for James Li's sudden illness the day before the rescheduled settlement hearing; bringing up the state-court claims to the jury's attention when the judicial officer had specifically informed James Li and others during the final pre-trial conference not to bring up the state-court case; Mr. Peterson making up a complete falsity to the court waving an "employee handbook" that Defense had not included and Mr. Peterson claimed was there; Ms. Rider failing to sign a prior produced document, requesting Defense Counsel, Reshma Kamath, to sign on behalf of Quintara's attorneys, and Reshma Kamath obliging for courtesy; the attorneys not extending the professional courtesy in stipulating to Defense exhibits while those were producing during discovery and Quintara attorneys had those specific exhibits since

the Friday before the commencement of trial; Ms. Rider misleading the court that a motion for sanctions (when there was none) was filed after the 8-person unanimous jury verdict for Defendants/Defense was announced; *inter alia*.

79. A true and correct copy of the e-mails are attached as "**EXHIBIT P**," and incorporated via reference, herein. Even prior to the eve of the final pre-trial conference, June 28, 2023, Quintara and its attorneys **arbitrarily and subjectively dropped the 'vendor database' DTSA claim** that the parties had litigated over for over two years. This, *inter alia*, shows the circumstantial evidence required for subjective bad-faith of the Quintara attorneys.

80. Quintara brought the DTSA claim for 'improper purpose'

81. Gamesmanship, even if well-disguised at the outset, tends to come into clearer focus as litigation progresses. For example, it becomes easier to pinpoint how vaguely-alleged trade secrets may have functioned as moving targets, and how the plaintiff may have taken advantage of the shifting sands of litigation to evade counterarguments. These developments may cast the unreasonableness of the initial disclosure into sharp relief in light of how the alleged trade secrets evolved over time. In such cases, a plaintiff that merely postpones reckoning with Section 2019.210 early on may eventually find that the consequences of their

evasions come home to roost in the form of an adverse ruling on the entire trade secret misappropriation claim. See, e.g., *Waymo*, 2017 WL 5000352, at *7–9.

82. Quintara brought the claim for purposes of harassment and delay in the state-court matter.

83. Since courts have the inherent power to award attorneys' fees for bad faith. *Kerin v. U.S. Postal Serv.*, 218 F.3d 185, 190 (2d Cir. 2000.) To impose fees through a court's inherent power, the movant must satisfy a two-pronged standard. It must show "first, that the challenged claim was without a colorable basis and, second, that the claim was brought in bad faith, i.e., motivated by improper purposes such as harassment or delay." *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.,* 991 F.3d 361, 368 (2d Cir. 2021) (citation omitted). For a claim to lack color, "it must lack any legal or factual basis." *Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267, 283 (2d Cir. 2021) (emphasis added) (citation omitted). A finding that the claim was motivated by improper purposes "may be inferred when an action is so completely without merit as to require the conclusion that it must have been undertaken for some improper purpose." *Int'l Techs. Mktg., Inc.*, 991 at 368 (citation omitted); *See TransPerfect*, *supra*, Opinion and Order at 5-6.

84. ***Wholly without merit***, Quintara and each of its attorneys brought this case

solely to attack Ruifeng, Gangyou Wang, Alan Li, and RF Biotech LLC for reconvening its business after COVID-19 in the Hayward Investment Boulevard Lab with Ruifeng's equipment.

85. *Lacking any colorable basis*, Quintara and each of its attorneys were trying to find trade secrets where none existed. The testimony of Jon Berryhill was explicit with statements about how James Li and other Quintara attorneys demanded him to find trade secrets with lists. Such conclusory statements of trade secrets without any colorable legal and factual basis are wholly without merit against named Defendants. Even prior to the eve of the final pre-trial conference, June 28, 2023, Quintara and its attorneys, **arbitrarily and subjectively dropped the 'vendor database' claim** that for over two years the parties had litigated over.

86. In unanimous jury verdict, Quintara failed to meet its burden to prove ownership by a preponderance of evidence.

87. In the special verdict form, the jury verdict within one single question could decide on the issue of ownership. This question of '**ownership**' of the alleged trade secret did **not** require an entire jury trial when Quintara and Quintara attorneys, individually, and/or collectively, knew, and/or should have known subjectively, as well as objectively, since atleast the year 2019 from the W-2 payments demonstrated in Exhibits 506 (c) and (d), and since the year 2013 from Quintara Exhibits 2, 2 (A), 3, 5, and 6.

Circumstantially, not even its own computer forensic alleged expert, Jon Berryhill claimed that he did not know whether it was a trade secret, and/or not; and, that only the attorneys for Quintara told him to look for certain things in a list.

88. A true and correct copy of the **special verdict form** is attached as "**EXHIBIT Q**," and incorporated via reference, herein.

89. Quintara's DTSA claim lacked any and all evidentiary basis. There was no evidentiary basis for the DTSA claim that Quintara brought. Prior to the eve of the final pre-trial conference, June 28, 2023, Quintara and its attorneys, **arbitrarily dropped the 'vendor database' claim** that for over two years the parties had litigated over.

90. Quintara did not have "atleast some chance of success" in the DTSA claim.

91. Unlike the Fourth Circuit case, *Akira Technologies, Inc. v. Conceptant, Inc.,* affirming the denial of attorney fees where the plaintiff "had at least some chance of success" on its DTSA claim, **in this case**, Quintara, the plaintiff, had **no chance of success**. From Trial day 1, the court outside the presence of the jury admonished the plaintiff Quintara that it will be "**tough**" for the plaintiff to win. This was clear because there was no chance of success in the DTSA claim based on the joint-ownership issue, and the one-million dollar sum that Quintara used of Ruifeng.

92. Quintara did not define the alleged trade secret with reasonable

particularity. Even in CUTSA cases, such as *Universal Analytics v. MacNeal-Schwendler Corp.*, 707 F. Supp. 1170, 1177 (C.D. Cal. 1989) (Judge Stephen Victor Wilson), courts have stood for the proposition that the plaintiff "should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade." *Imax Corp. v. Cinema Techs., Inc.,* 152 F.3d 1161, 1164–65 (9th Cir. 1998). Universal Analytics, in turn, took that proposition from *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968), the "seminal decision" that became "the genesis of [S]ection 2019.210." *Brescia v. Angelin*, 172 Cal. App. 4th 133, 147 (2009).

**93.** Consistent with this approach, judges in this district — including the undersigned judge — faced with deficient disclosures under Section 2019.210 have routinely entertained defense motions to defeat trade secret misappropriation claims after commencement of discovery, whether styled as a "motion to strike," "motion for summary judgment," or something else. See, e.g., *Openwave Messaging, Inc. v. Open-Xchange, Inc.*, 2018 WL 692022, at *4 (N.D. Cal. Feb. 2, 2018) (Judge William Orrick) (examining adequacy of Section 2019.210 disclosure on motion for summary judgment); *BladeRoom Grp. Ltd. v. Facebook, Inc.,* 2018 WL 514923, at *3–5 (N.D. Cal. Jan. 23, 2018) (Judge Edward Davila) (same);

*Waymo LLC v. Uber Techs., Inc.,* 2017 WL 5000352, at *7–9 (N.D. Cal. Nov. 2, 2017) (Judge William Alsup) (granting overlapping motions to strike and for summary judgment on trade secret misappropriation claim); *Jobscience, Inc. v. CVPartners, Inc.*, 2014 WL 1724763, at *2–4 (N.D. Cal. May 1, 2014) (Judge William Alsup) (granting motion to strike and dismissing trade secret misappropriation claim) (*Jobscience I*); *Art of Living Found. v. Does 1–10*, 2012 WL 1565281, at *23 (N.D. Cal. May 1, 2012) (Judge Lucy Koh) (inviting motion for summary judgment on trade secret misappropriation claim.)

94. **Here**, there was often confusion between Quintara and Quintara attorneys, James Li, Tamara Rider, Daniel Peterson and Richard Lambert, whether they were purporting 'customer profile database', 'vendor database,' 'customer excel spreadsheet from December 2019- February 2020' and/or some other kind of material as the alleged trade secret. 'Vendor database,' as a trade secret, based on their confusion, was dropped on June 28, 2023 after almost three years of litigation.

95. ***Defendants are the "prevailing party" with a judgment on the merits under the 18 U.S.C. section 1836 (b) (3) (D).***

96. On July 13, 2023, at and/or around 3 p.m. PDT, with unanimous jury verdict of all eight jurors, Defendants won, and judgment was entered by this Court subsequently. The unanimous jury verdict, as well as the

judgment, was rendered and entered on the merits. Thus, Defendants were the prevailing party. *Noakes v. City of Los Angeles*, 179 Cal. 38 [ 175 P. 409]; *Hunceker v. Lutz*, 65 Cal.App. 649 [244 P. 1001]; *Martin v. Southern Pacific Co.*, 44 Cal.App. 3, 14 [ 185 P. 1030]; *Fay v. Cox*, 45 Cal.App. 696, 699 [ 188 P. 623].) Thus, the named Defendants were the prevailing party, as defined within 18 U.S.C. § 1836(b)(3)(D). (A jury verdict "'imports findings in favor of the prevailing party on all material issues; and if the evidence supports implied findings on any set of issues which will sustain the verdict, it will be assumed that the jury so found. The court on appeal [may not] speculate on what particular ground the jury may have found in favor of the prevailing party.' [Citations.]" *Everett v. Everett* (1984) 150 Cal.App.3d 1053, 1063-1064; A prevailing party is one who has prevailed on a practical level, by achieving its main litigation objectives. *Rancho Mirage Country Club Homeowners Assn. v. Hazelbaker* (2016) 2 Cal.App.5th 252, 262.) A prevailing party may have realized litigation objectives by judgment, settlement, or in some other way. *Santisas v. Goodin* (1998) 17 Cal.4th 599, 622.) The Supreme Court has said that "a prevailing party" is "one who has been awarded some relief by the court." *Buckhannon*, 532 U.S. at 603, 121 S.Ct. 183; see also *Hewitt v. Helms*, 482 U.S. 755, 760, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987) ("Respect for ordinary language requires that a [party] receive at least

some relief on the merits of his claim before he can be said to prevail.").

97. At a minimum, the DTSA clearly require the attorney-fee claimant to be "the prevailing party." See 18 U.S.C. § 1836(b)(3)(D). Indeed, "[e]rasing 'prevailing party' from the fee statute would be especially troubling because it is a term of art that Congress has used in numerous attorney's fees statutes" to convey a particular meaning. See *Dunster Live, LLC v. Lonestar Logos Mgmt. Co*., 908 F.3d 948 (5th Cir. 2018) (citing *Buckhannon Bd. & Care Home, Inc. v. W.Va. Dep't of Health & Human Res*., 532 U.S. 598, 602-03 (2001)). By using "prevailing party," "Congress 'knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.'" *Id*. at 953 (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952)). The term refers to a "party in whose favor a judgment is rendered," that is, "one who has been awarded some relief by the court." *Buckhannon*, 532 U.S. at 603. See also Party, BLACK'S LAW DICTIONARY (11th ed. 2019); *Royal Palm Props. v. Pink Palm Props.* (11th Cir. 2022) 38 F.4th 1372 defining "prevailing party" as "[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded," as in, "in certain cases, the court will award attorney's fees to the prevailing party").

**98.** When Congress repeats a term of art such as prevailing party in a new statute such as the DTSA, "it knows and adopts the cluster of ideas that were attached to each borrowed work in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. *Morissette, supra* at 263. In addition to the textual rationale for common interpretation of prevailing party across federal fee statutes, the Fifth Circuit also concluded that setting uniform rules for the numerous fee statutes would be more efficient for the district courts tasked with processing myriad such fee motions. The Fifth Circuit stated that, "prevailing party status ordinarily requires being ahead when the final whistle blows in a case, not a halftime." *Dunster Live, LLC supra* at 948.

**99.** If this Court does not find a definition of "prevailing party" under the DTSA, it can find the interpretation of "prevailing party" under the CUTSA.

**100.** Unlike *Dunster Live, LLC,* where the court held fees were properly denied because a dismissal without prejudice did not render defendants "prevailing parties" under the DTSA, and unlike any summary judgment motion, ***in this instant case***, the Defendants were **prevailing parties with a judgment on the merits with unanimous jury verdict**.

**101.** A true and correct copy of the unanimous jury verdict and judgment on the merits is attached as "**EXHIBIT R**," and incorporated via reference,

herein.

102.　　To cross the threshold to prevailing party status, the Supreme Court has emphasized that a party— "at a minimum" — "must be able to point to a resolution of the dispute which changes the legal relationship" between the parties. *Texas St. Teach. Ass'n v. Garland ISD,* 489 U.S. 782 (1989)) (referring to "the material alteration of the legal relationship of the parties" as the "touchstone of the prevailing party inquiry").

103.　　The Supreme Court has applied the term's same legal meaning across various civil rights fee-shifting statutes. And if the same legal term retains its legal meaning across different fee-shifting statutes, there should be no reason to depart from that meaning in the context of costs. See *CRST Van Expedited, Inc. v. E.E.O.C.,* 578 U.S. 419, 422, 136 S.Ct. 1642, 194 L.Ed.2d 707 (2016) ("Congress has included the term 'prevailing party' in various fee-shifting statutes, and it has been the Court's approach to interpret the term in a consistent manner.").

104.　　Many other courts have recognized as much, applying the same prevailing party standard across different rules and fee shifting statutes. See, e.g., *B.E. Tech., LLC v. Facebook, Inc.*, 940 F.3d 675, 677 (Fed. Cir. 2019) ("We interpret the term ["prevailing party"] consistently between different fee-shifting statutes and between Rule 54(d) [.] (citation omitted)); *Manildra Milling Corp. v. Ogilvie Mills, Inc.*, 76 F.3d 1178,

1180 n.1 (D.C. Cir. 1996)" (applying § 1988 caselaw to a Rule 54(d) analysis because "the meaning of prevailing party is the same in either context"); *Studiengesellschaft Kohle mbH v. Eastman Kodak Co.* , 713 F.2d 128, 132 (5th Cir. 1983) (noting that "the same" prevailing party determination in § 1988 cases "must be made for an award of costs under Rule 54(d)"). The court therefore finds that the meaning of "prevailing party" is the same in either context—fees or costs—and our analysis will proceed accordingly.

**105.** Ruifeng incurred attorneys' fees and costs. The concept of awarding costs to the prevailing party appears in Supreme Court opinions dating as far back as the mid-1800s. See, e.g., *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 460, 461, 18 How. 460, 15 L.Ed. 449 (1855) (noting "the repeated recognition by acts of congress of the right of the prevailing party to costs"); *The Baltimore*, 75 U.S. 377, 388, 8 Wall. 377, 19 L.Ed. 463 (1869) ("Costs have usually been allowed to the prevailing party ...."). Like the DTSA, Fed. *Rul. Civ. Proc.*, Rule 54(d) provides that "the prevailing party" can recover costs other than attorneys' fees, and "[u]sually the litigant in whose favor judgment is rendered is the prevailing party for purposes of [R]ule 54(d)." See FED. R. CIV. P. 54(d)(1); *Myricks v. Fed. Res. Bank of Atlanta*, 480 F.3d 1036, 1043 (11th Cir. 2007). Though a party "need not prevail on all issues to justify a full award of costs," a

prevailing party must obtain a favorable judgment on at least some of its claims. See *Head v. Medford,* 62 F.3d 351, 354-55 (11th Cir. 1995).

106.     Similarly, the court must not tax the fees associated with deposition "exhibit management," reporter attendance fees, and/or transcripts of depositions, videos, in addition to the transcripts that were necessary. The court may not tax costs spent to expedite transcripts solely for counsel's convenience.

107.     A true and correct copy of the costs for court-reporter fees, interpreter fees, and trial binder fees in the amount of **$35,000** are attached as "**EXHIBIT S**," and incorporated via reference, herein.

108.     Any and all extra-ordinary circumstances for DTSA fee-shifting were met. A Louisiana court may offer further guidance where the court stated that after "long and torturous litigation" the parties must end the matter, and awarded reasonable attorneys' fees and costs to end the matter. *Source Prod. & Equip. Co. v. Schehr*, No. 16-17528, 2020 WL 4785048 (E.D. La. Aug. 18, 2020). Under the lodestar methodology, a base amount is first calculated by multiplying the time reasonably spent by each attorney by the reasonable hourly rate of each. *Serrano*, 20 Cal.3d at 48. Included in the time reasonably spent by each attorney is time spent prior to filing the action. *Stokes v. Marsh* (1990) 217 Cal. App. 3d 647. 654-656.

109.     Then, the base amount may be adjusted based on several factors in

*Serrano* for example, the court multiplied the base amount by approximately 1.4 to award Plaintiffs' counsel $800.000 (in 1975 dollars). *Id.* at 49. California law provides that "an attorney fee award should ordinarily include compensation for all the hours reasonably spent." *Ketchum v. Moses*. 24 Cal. 4th 1122. 1133 (2001) (emphasis in original). In this case, the LAW OFFICE OF RESHMA KAMATH spent 4,610 hours (amounting to approximately **192.083 days, from November 2021 to present date**) at $450 per hour on this matter from when the law firm was substituted in including the hours spent on pre-trial and trial preparation, trial binder preparation, witness(es) preparation, and the actual trial. This amount summed up to **$2,074,500.** In addition, Defendants had paid **$17,425.18** in total costs to Buchalter, and Buchalter claims $1,709,010.50 in attorneys' fees due to them. This adds up to over $4.50 million in attorneys' fees. Defendants had paid **$742,877.50** to the prior attorney, Buchalter, (Buchalter's total unpaid invoice is over $1.70M). There is allegedly a pending bill that the prior attorney claims are owed.

110. All of this was "reasonably necessary to the conduct of the litigation," particularly in light of the potentially disastrous ramifications of cutting any corners. *Robertson v. Fleetwood Travel Trailers of Cal. Inc.* (2006) 144 Cal.App.4th 785, 818; see also *Moreno v. City of Sacramento.* 534

F.3d 1106, 1112 (9th Cir. 2008) [overturning fee reduction by the trial court: It would...be the highly atypical civil rights case where plaintiffs' lawyer engages in churning. By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case: after all, he won and might not have had he been more of a slacker.")

111.    Furthermore, all of the work set out in the supporting declarations and exhibits are of the-type of work that would be billed to a client" in a typical hourly-fee matter. *MBNA Am. Bank v. Gorman* (2006) 147 Cal.App.4th Supp. 1. at *12 [affirming award where attorney time consisted "entirely of ordinary litigation activities, i.e., correspondence and telephone conferences with opposing counsel, legal research, drafting legal documents, reviewing opposing counsel's filings, and preparation for and attending hearings.")

112.    With afore-stated costs included, this was **$2,911,377, atleast in reasonable attorneys' fees and costs** that Defendants Ruifeng et al incurred during the course of this expensive litigation.

113.    If this Court includes Buchalter's fees where they have sued the defendants, then the attorneys' fees and costs increases to $4.50 million.

114.    I had advised Buchalter to file their own attorneys' fee motion, and/or include their invoices on their own. I did this, because I cannot attest

and justify to several line items in Buchalter's invoices.

**115.** Buchalter did not help substantively whatsoever from the time they substituted out. The external drive was not delivered timely to me, and I had to communicate even until early 2022 about what had occurred with the online portal, and/or hard-drive. Several deposition transcripts that were taken on behalf of defendants were missing from the hard-drive, and only the litigants then had informed me prior to trial.

**116.** I have included in the sum only those attorneys' fees and costs that I had incurred while my retention.

**117.** This includes LAW OFFICE OF RESHMA KAMATH spending 4,610 hours (amounting to approximately **192.083 days, from November 2021 to present date**) at $450 per hour on this matter from when the law firm was substituted in including the hours spent on pre-trial and trial preparation, trial binder preparation, witness(es) preparation, and the actual trial. This amount summed up to **$2,074,500.**

**118.** The number of $4.50 million even includes the federal court reporter fees, the translator fees, as well as any printing and binder fees for which invoices were provided.

**119.** In the interests of justice to the clients, I have included their number of their prior attorney, Buchalter, where Buchalter's Daniel Wiseman and Tiffany Ng claim they spent over $2.7 million in litigating this matter,

costs separate. There is no way for me to justify this kind of outrageous number, specifically, because Buchalter has sued the defendants for partial non-payment.

120.     Buchalter's Tiffany Ng claims, the fees total is "$1,709,010.50. The costs total is $58,091.61."

121.     This statement is **inaccurate**, because defendants, precisely Gangyou Wang had prior paid Buchalter over $780,000 in attorneys' fees, and $35,000 in costs.

122.     However, Buchalter had not initially included this payment from Gangyou Wang in their invoices.

123.     Only after I had informed Buchalter and Tiffany Ng did they produce to me that Gangyou Wang had the above-stated payments listed in paragraph 116. I even had to inform them to put those numbers in an official invoice for Gangyou Wang.

124.     Buchalter did **NOT** help me and/or the clients substantively whatsoever after substituting out. Nothing.

125.     Buchalter's Dylan Wiseman had threatened, in an uncivil manner, to block me in my initial e-mail communications with him. This is typical of such partners of high-profile law firms to speak in a demeaning fashion such as this.

126.     Even with such derogation, I decided to help the clients, Gangyou

Wang who had paid them and apparently owes them the numbers listed in paragraph 115.

**127.** There are apparently invoices from Haystack ID and RSM pending for the retained experts that Buchalter had retained. It is unclear whether those retained experts were even necessary (not), and whether the invoices they have produced are accurate and truthful as to the gamut of work they claim they did. Since they do not have any engagement letters/retainer letters with me, Buchalter is on the hook for those invoices. Yet, Buchalter has not produced those invoices directly to me, and/or informed me that those invoices were accurate. Thus, I could not include them. However, apparently, there is around $270,000 from Haystack ID, and approximately, $6,000 for RSM US. Since Buchalter has not made any attestations to me about any of the above, I have included them in the calculations, but not in the exhibits.

**128.** Thus, for the client, the total attorneys' fees and costs sums up to $4.50 million.

**129.** This Honorable Court must award costs, because there is objective and subjective bad-faith, precisely, because the immigration sham, and payments from the years December 2013- December 2019 prove joint ownership *prior to* litigation ensuing since July 07, 2020. The Quintara attorneys knew, and/or should have known this. This meets both objective

and subjective bad-faith standard for DTSA to award reasonable attorneys' fees and costs.

130.    The reasonable hourly for such complex commercial litigation in the Bay Area, specifically, in San Francisco federal court is $450-$1000.

131.    I have had four clients to deal with, Gangyou Wang (non-English speaker); Alan Li; Ruifeng Biztech, Inc.; and, RF Biotech, LLC.

132.    The work was quadrupled for each natural, and/or corporate person.

133.    There were voluminous corporate and financial documents to review, study, and examine for Quintara Biosciences, Inc., as well as Ruifeng Biztech, Inc.; and, RF Biotech, LLC. The exact number is over a million pages to review, including depositions and discovery.

134.    I had to communicate via Alan Li and the translator to Gangyou Wang.

135.    I had to communicate via Alan Li to several employees of the entities.

136.    It was difficult to reiterate to non-English speakers, and non-certified translators, such as Alan Li, the legal ramifications, and statements for the parties to understand the focus of this DTSA litigation – not the state-court matter. I had to inform them of the nuanced and niche practice area that the DTSA cases must be litigated.

137.    There were hours of pre-trial preparation with each of the clients.

RESHMA KAMATH

**138.** Amidst this, there was communication with opposing counsel and related drama.

**139.** There were voluminous discovery and deposition binders that FedEx had to print, and I had to provide them in an organized manner.

**140.** I also had to collate and organize a plethora of exhibit folders in the Google Drive to FedEx that were also dilatory. I had to call and e-mail them several times to get the accurate documents printed.

**141.** This is detailed in the **Exhibit A** invoice.

**142.** Clients were aware of each and every communication from the court from the outset from me. I made diligent efforts to notice clients, as I notify any and all clients.

**143.** To clarify, I do reside in Arizona, and I do drive to California for my own reasons. Presently, I'm in California, and will leave shortly.

**144.** I communicate with clients telephonically, and via e-mail. When I'm in the State of California, I communicate with clients via above-stated method, as well as in-person as stated in **Exhibit A**. In this case, I have hundreds of e-mails to the clients notifying them of each and every notification from the Court, as well as any other person who had contacted me for this above-captioned lawsuit.

**145.** I have/am litigating over 70-100 cases since I was licensed in the State of California.

**146.** I have had six (6) trials, inclusive, and this was my first jury trial.

**147.** I had to prepare the opening and closing statements on my own based on my own preparation. As much as I like having this much control over a case, as a sole proprietor, and the only attorney, with no employee and/or secretary, I had to prepare the materials in this case.

**148.** Each document, including the motion for attorneys' fees as well as this declaration were drafted by me. There is no ghost writer.

**149.** It took copious amounts of work that were detailed in the invoice of **Exhibit A**, including legal research, legal strategy, case facts, collating exhibits, reviewing trial transcripts, *inter alia*.

**150.** Thus, I believe the hourly of $450 per hour is justified and reasonable given the San Francisco Bay Area, California; Defend Trade Secrets Act (DTSA) litigation; numerous clients in one litigation; federal laws and rules; the high-profile nature of this case; the precedence it will set in DTSA litigation in not to bring improper bad-faith litigation; the penalty nature of protecting proprietary information as valuable; as well as the customary litigation in this practice area. This is reasonable.

**151.** This Court has prior awarded in the *Swarmify v. Cloudfare* supra, matter atleast $9,800 for a three-week period without any prevailing parties, without any objective/subjective bad-faith, and without any trial. There were points in Waymo/Uber case as well to guide the court.

**152.** This Court should also adhere to case-law in other jurisdictional circuits, because DTSA is a fairly new area of practice.

**153.** Based on this, I request this Honorable Court to award the attorneys' fees and costs, as this Honorable Court deems reasonable, and based on the demonstration of circumstantial evidence of objective and subjective bad-faith by Quintara, and its attorneys.

**154.** Since the trial court does not need to explain its trial court award, the prevailing parties will accept this Honorable Court's award of reasonable attorneys' fees and costs as justified.

**155.** I request the Honorable Court to review the exhibits in detail to guide its decision.

**156.** The Honorable Court was very gracious in the conduct at trial, and I can applaud how the trial was conducted given I have observed some strange conduct by judicial officers at trial.

///

I declare under penalty of perjury under the laws of the State of California and the United States of America that the above is true and correct. Executed on July 27, 2023.

///

**LAW OFFICE OF RESHMA KAMATH**

**DATED:  July 27, 2023**

*/S/ Reshma Kamath*

Reshma Kamath,
Counsel for Defendants RUIFENG BIZTECH
INC.; GANGYOU WANG; ALAN LI; and, RF
BIOTECH LLC

## <u>CERTIFICATE OF SERVICE</u>

F.R.C.P. 5 / C.C.P. § 1013(a)(3), C.C.P. § 1010.6(a)(6) / Cal. R. Ct. R. 2.260.

     I am employed in, the County of San Mateo, California. I am over the age of 18, and not a party to this action. My business/mailing address is: 700 El Camino Real, Suite 120, #1084, Menlo Park, California 94025, United States; and, e-mail address is reshmakamath2021@gmail.com for electronic-service. On July 27, 2023, I sent the following documents via the below method of service. SEE ATTACHED SERVICE LIST.

///

**DECLARATION OF RESHMA KAMATH IN SUPPORT OF THE PREVAILING PARTIES' NOTICE OF MOTION AND MOTION/REQUEST FOR REASONABLE ATTORNEYS' FEES PURSUANT TO DEFEND TRADE SECRETS ACT [DTSA] PURSUANT TO 18 U.S.C. § 1836 *ET SEQ.*; REQUEST FOR COSTS INCURRED UNDER FED. *RUL. CIV. PROC.* 54 *ET SEQ.* DURING THE COURSE OF DEFEND TRADE SECRETS ACT LITIGATION**

///

**EXHIBITS A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S;**

///

**CERTIFICATE OF SERVICE.**

///

     Via **ELECTRONIC SERVICE**: In electronically transmitting courtesy copies of the document(s) listed above to the email address(es) of the person(s) set forth on the attached service list per the electronic service agreement between the parties' counsel. To my knowledge, the transmission was reported as complete and without error. [Notice of Electronic-Service pursuant to California Code of Civil Procedure § 1010.6.]

///

     I declare under penalty of perjury of the laws of the State of California, and the laws of the United States of America that the foregoing is true and correct. Executed on July 27, 2023.

*Sincerely*,

*/S/ Reshma Kamath*

---

DECLARATION OF RESHMA KAMATH IN SUPPORT OF THE MOTION FOR REASONABLE ATTORNEYS' FEES

RESHMA KAMATH

**<u>SERVICE LIST</u>**

Daniel Robert Peterson
Email: petersond@lilaw.us

Richard D Lambert
Email: lambertr@lilaw.us

Tamara Rider
Email: ridert@lilaw.us

J. James Li
LiLaw, Inc.
1905 Hamilton Avenue Suite 200 San Jose, CA 95125
650-521-5956 Fax: 650-521-5955 Email: lij@lilaw.us
ATTORNEY TO BE NOTICED
ATTORNEYS FOR PLAINTIFF QUINTARA BIOSCIENCES, INC.

Ting Jiang, LiLaw, Inc./Quintara's Legal assistant
E.: jiangt@lilaw.us